STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone:  (775) 786-7600
E-Mail: steve@harrislawreno.com
Attorney for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

*****

IN RE:

SILVER STATE BROADCASTING, LLC,

     Debtor.

☐  AFFECTS THIS DEBTOR

☐  AFFECTS GOLDEN STATE BROADCASTING, LLC

☐  AFFECTS MAJOR MARKET RADIO LLC

☒  AFFECTS ALL DEBTORS

_____/

Case No. 21-14978-abl
(Chapter 11)

Jointly Administered with:

| 21-14979-abl | Golden State Broadcasting, LLC |
| 21-14980-abl | Major Market Radio LLC |

**DEBTORS' OPPOSITION TO EMERGENCY MOTION TO EXCUSE TURNOVER IN FAVOR OF RECEIVER AND TO DISMISS/ABSTAIN, OR, ALTERNATIVELY, FOR STAY RELIEF AND/OR CONVERSION**

Hearing Date:  December 20, 2021
Hearing Time:  9:30 a.m.
Est. Time:  1 hour
Set by:  Judge Landis per OST

COME NOW, SILVER STATE BROADCASTING, LLC, GOLDEN STATE BROADCASTING, LLC, and MAJOR MARKET RADIO LLC, Jointly Administered Debtors and Debtors-in-Possession herein (collectively "Debtors"), by and through their attorney, STEPHEN R. HARRIS, ESQ., of HARRIS LAW PRACTICE LLC, and file their opposition to the EMERGENCY MOTION TO EXCUSE TURNOVER IN FAVOR OF RECEIVER AND TO DISMISS/ ABSTAIN, OR, ALTERNATIVELY, FOR STAY RELIEF AND/OR CONVERSION [DE 45] ("Motion") filed by federal receiver W. Lawrence Patrick ("Receiver").

## **PRELIMINARY STATEMENT**

The Debtors, managed by their principal Edward R. Stolz ("Mr. Stolz"), come to this Bankruptcy Court in the utmost of good faith. Mr. Stolz has a plan to fully satisfy all creditors by capitalizing on the going concern value of three FM radio stations at the heart of this matter. If necessary, and in the interest of expediency, Mr. Stolz is ready, willing and able to liquidate several privately-held real estate properties for this purpose.

The relief sought by the Receiver is unprecedented because the scope of his appointment was solely for the narrow purpose of paying a judgment which nobody disputes has been paid. The receivership is not a hallowed institution that requires special deference—it is simply a very expensive court-appointed collection agent. The Debtors' Chapter 11 filings obviate any need for the Receiver (like any other prepetition collection agent), because the Bankruptcy Code does not vest any special powers in collection agents to administer a bankruptcy estate or pay creditors. The Receiver is not a trustee or examiner and can never be a disinterested trustee or examiner in these cases.

This is especially true because the Receiver does not even manage or operate the Debtors' radio stations which were put into the receivership. Instead, the Receiver contracted that job out to a third party, VCY America, Inc., under a Local Programming and Marketing Agreement. Thus, the Receiver's request to be excused from the turnover requirements of 11 U.S.C. § 543 smacks of self-interest and defies logic because he does not have authority under the Bankruptcy Code to sell the assets even if he were allowed to retain them. What exactly would the Receiver do with the radio station assets other than continue to accrue expensive fees for himself and his professionals at California-style rates?

On the other hand, the principal of the Debtors, Edward Stolz ("Mr. Stolz"), has built and continuously operated radio stations since 1977. The Debtors do have authority under the Bankruptcy Code to reorganize their business affairs, liquidate assets if necessary, resolve disputed or unliquidated claims against them, and pay creditors through a confirmed plan.

The Receiver's Motion consumes a lot of space dredging up the parties' contentious litigation history in a transparent attempt to diminish Mr. Stolz' character before this Court. But

1   contentious litigation does not have any bearing on Mr. Stolz' ability to operate radio stations he

2   built and/or operated for many years. Moreover, the Bankruptcy Code, with assistance from the

3   United States Trustee, provides sufficient oversight and remedies to keep debtors-in-possession

4   in check during the Chapter 11 process. The Receiver cannot provide any benefit to these estates

5   because of his lack of authority to reorganize the Debtors under the Bankruptcy Code, his inability

6   to liquidate any contingent, disputed claims against the Debtors, his apparent lack of experience

7   in recognizing corporate formalities when marshaling assets for separate entities, and his conflicts

8   of interest.  Importantly, the Receiver was not given control of the LLCs themselves and thus has

9   no authority to act on their behalf, regardless of the Chapter 11 filings. (The receivership is

10  essentially an *in rem* action against the Radio Station Assets.)

11         Finally, it is undisputed that the Debtors are solvent. Thus, 11 U.S.C. § 543 requires the

12  Court to consider the interests of equity holders as well as creditors before excusing the Receiver's

13  turnover requirements. A speedy "fire sale" of the Debtors' radio station assets, presented to the

14  District Court under seal without notice or a hearing, and for a price far below market value, is

15  not in the equity holders' best interests and robs them of the value of their equity in the Debtors.

16  Such a sale is also contrary to all reasonable standards of fairness and due process and offends

17  the most basic principles of transparency and oversight underlying the Bankruptcy Code.

18         Turnover of the Debtors' assets is at the core of this case.  Without the ability to function

19  as debtors-in-possession with their most valuable assets, the Debtors will be prevented from

20  maximizing the value of those assets for the benefit of all creditors and equity holders. The

21  Debtors were compelled to file these Chapter 11 case as a result of the extraordinary relief granted

22  to the Receiver by the District Court which resulted in a threatened loss of the radio stations'

23  equity, possible payment of improper claims asserted against the Debtors, and improper

24  commingling of assets and claims among the Defendants in the Civil Action.

25         The Receiver's arguments put the Debtors in a virtual "Catch-22"—he argues that the

26  Receiver should be maintained, or the cases should be dismissed or converted because the Debtors

27  allegedly cannot reorganize and pay creditors. Yet it is precisely *because* the Receiver is in place

28  that the Debtors cannot administer their assets in order to effectuate a confirmed plan of

reorganization. The Receiver's arguments also fail as a matter of law because he is unable to satisfy the burden required for such extraordinary relief. This Court should not be persuaded by the Receiver's colorful allegations, as they do not support granting the unprecedented relief sought. The Debtors should be given the opportunity to administer their assets as contemplated by the Bankruptcy Code so they can pay their allowed creditors in an orderly and lawful manner. Accordingly, the Receiver's Motion must be denied in its entirety.

## BACKGROUND

1.      In order to save space and meet the filing guidelines under Local Rule 9014(e), the Debtors hereby incorporate by reference the factual background set forth in their Emergency Joint Motion for Order Directing Court Appointed Receiver to Turnover Property Pursuant to 11 U.S.C. §§ 543(a) and (b) [DE 30] ("Turnover Motion"). All capitalized terms are the same as those used in the Turnover Motion.

2.      On July 16, 2021, the Receiver filed a paper in the Civil Action titled "W. Lawrence Patrick's Accounting." *See* District Court DE 453. A copy of the cover page and attached "Receiver's Accounting Report" without additional exhibits, is attached hereto as **Exhibit A**. As evident from Exhibit A, the "accounting" was not an accounting at all. Conspicuously absent was a showing of any income, disbursements, or accounting of how the Debtors' Radio Station assets were administered during the receivership, despite the Receiver having controlled and allegedly operated three FM Radio Stations for an entire year at that point. The "accounting" consists only of the Receiver's purported accrued fees and expenses and alleged claims against "Stolz." The alleged claims against "Stolz" are in fact debts asserted against various of the Civil Action Defendants. Yet the Receiver has simply commingled the claims as if they are purported debts of the same entities or as if the Radio Stations are all owned by the same entity rather than three separate legal entities.

3.      The Receiver touts his credentials as an experienced receiver, trustee, and Juris Doctor (*see* DE 46 ex. 1), and he hired very expensive lawyers to assist him in the receivership. Thus, the Receiver and his professionals should understand the legal need for maintaining corporate formalities when administering assets for multiple, distinct legal entities. Nonetheless,

the Receiver did no such thing and his "accounting" instead proposed to lump all the Debtors' assets together to satisfy purported claims against "Stolz."

4.    On October 19, 2021, Silver State Broadcasting, LLC, Golden State Broadcasting, LLC, and Major Market Radio LLC filed their Chapter 11 voluntary petitions as Case Nos. 21-14978-abl, 21-14979-abl, and 21-14980-abl, respectively. The Debtors also filed motions in their Chapter 11 cases seeking to jointly administer the three cases under the lead case for Silver State Broadcasting, LLC, and this Court granted the joint administration motion pursuant to orders entered on November 19, 2021.

5.    On October 21, 2021, the Bankruptcy Noticing Service ("BNC") served the Receiver via U.S. Mail with each of the Debtor's Notice of Bankruptcy Filing and §341 First Meeting of Creditors.

6.    Despite having actual knowledge of the Debtors' Chapter 11 filings, the Receiver continued to exercise control over the Debtors' FM Radio Station assets, and refused to turn over the Debtors' assets because he would "answer exclusively to an Article III court." *See* **Exhibit B** attached hereto.

7.    Upon information and belief, the Receiver has proceeded to unlawfully administer the Radio Station assets post-petition by continuing the process of trying to sell the Debtors' FCC licenses without first seeking this Court's approval or relief from the 11 U.S.C. § 362(a) automatic stay.

8.    Because of the Receiver's refusal to acknowledge this Court's jurisdiction or to comply with his affirmative duty to turn over the Debtors' assets under 11 U.S.C. § 543, the Debtors had to file their Turnover Motion to compel the Receiver's compliance with the Bankruptcy Code.

9.    It was not until almost a week after the Debtors filed their Turnover Motion that the Receiver finally got around to filing his Motion seeking to be excused from complying with § 543 even though by that time he had known about the Chapter 11 cases for almost five weeks.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LEGAL ARGUMENT**

**A.  The Receiver should not be excused from turnover under 11 U.S.C. § 543(d), because he is unnecessarily expensive and provides no benefit to these estates.**

11 U.S.C. §543 provides in pertinent part:

 (b) A custodian **shall –**

(1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and

(2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody or control of such custodian.

11 U.S.C. § 543(b) (emphasis added).

A receiver appointed in a judicial proceeding other than under Title 11 is considered a custodian pursuant to 11 U.S.C. § 101(11) and therefore comes within the purview of 11 U.S.C. § 543. *In re CCN Realty Corp.*, 19 B.R. 526, 528 (Bankr. S.D. N.Y. 1982). Thus, the Receiver in this case is a custodian subject to the demands of 11 U.S.C. § 543. The Receiver's duty to deliver the Debtors' assets and file an accounting is mandatory, not permissive. *See* 11 U.S.C. §§ 543(a) and (b).

Upon learning of the commencement of a bankruptcy case, any pre-petition receiver is to cease activity and turn assets over to the trustee or debtor-in-possession, and the receiver may take no action unless expressly authorized by the Bankruptcy Court. *In re North Port Dev. Co.*, 36 B.R. 19, 20 (Bankr. E.D. Mo. 1982).  The property of the debtor in a receiver's possession is considered property of the estate under 11 U.S.C. § 541 and is to be turned over by any custodian pursuant to the provisions of 11 U.S.C. § 543.  *In re Redman Oil Company*, 95 B.R. 516, 521 (Bankr. S.D. Ohio 1988).  It is also well understood that a Receiver must turn over property promptly. *In re 245 Associates*, 188 B.R. 743, 753 (Bankr. S.D. N.Y. 1995). A receiver who continues to exercise post-petition control over property of the estate without the bankruptcy court's authority does so unlawfully. *Id.*

In addition to the duty to turn over all estate assets to the Debtors, including all proceeds, products, rents and profits therefrom, the Receiver must also file a real accounting with the Court of any property of the Debtors, and the proceeds, products, offspring, rents, or profits of such property, that at any time came into his possession, custody or control. *See* 11 U.S.C. § 543(b).

The only exceptions to 11 U.S.C. §§ 543(a) and (b) are found in § 543(d) under which a court may excuse a receiver from complying with turnover. The Receiver acknowledges this in his Motion, but incorrectly alleges that the Court need only consider the interests of creditors in deciding whether to excuse the Receiver's compliance with § 543. *See Motion* 15:15–19. Conspicuously absent from the Receiver's analysis is the express requirement under § 543(d)(1) that the Court may excuse compliance with §§ 543(a), (b), or (c) "if the interests of creditors, **and, if the debtor is not insolvent, of equity holders** would be better served by permitting a custodian to continue in possession . . . " 11 U.S.C. § 543(d)(1) (emphasis added).

Indeed, the Receiver not only fails to ever discuss the interests of equity holders, but even goes so far as to say that "the interests of the debtor are not a relevant consideration to the analysis under § 543(d)." *See Motion* at 16:4. That may be true with insolvent debtors, but it is not true for solvent debtors based on the plain language of § 543(d)(1).

What is more, "[b]ecause the Bankruptcy Code contemplates turnover, the party seeking relief has the burden of all issues related to affirmative relief." *In re Northgate Terrace Apartments, Ltd.*, 117 B.R. 328, 332 (Bankr. S.D. Ohio 1990). The basic equities generally favor a debtor-in-possession under §543 as, if nothing more, substantial weight is added to a debtor's burden of attempting to reorganize and promulgate an acceptable plan of reorganization if a debtor cannot have access to all of its assets, starting with an initial breathing spell. *Id.* at 333 (quoting *In re KCC-FUND V, LTD.*, 96 B.R. 237, 239–40 (Bankr. W.D. Mo. 1989)). Unless there is a bad faith filing with no possibility of reorganization, grossly inept management of the assets, or fraudulent behavior, that burden will be hard to sustain. *Id.*

Here, the first consideration is whether the Debtors are solvent or insolvent to determine if the interests of creditors and equity holders must be considered. The Debtors' Schedules of Assets and Liabilities show that the Debtors are solvent with assets far exceeding their liabilities.

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

Indeed, even the Receiver's own substandard "accounting" disclosed total fees and claims against "Stolz" of $2,548,239.40, with the Receiver wanting to sell the radio station assets for $6 million. The entities are thus clearly solvent even where the Receiver was seeking to pay disputed and unliquidated claims that even the District Court rejected on their face. The equity holders' interests are not served by the Receiver because he is seeking to sell the Radio Station Assets at a price far below fair market after submitting the proposed purchase offer to the District Court under seal, without notice or a hearing to allow the Debtors or equity holders with the opportunity to object or present other alternatives. Based on testimony provided by the Debtors' radio station valuation expert in the Civil Action, the Debtors' expert estimated the value of the Radio Station Assets at over $ 30 million. *See* Declaration of Robert W. Mahlman, District Court DE 369-2, ¶ 11, attached hereto as **Exhibit C**.

Moreover, as of July 2021, the Receiver claimed to have incurred almost $600,000 in fees and expenses for himself and his professionals in one year, and he did not pay a single creditor during that process, nor did he manage the Radio Station Assets himself. The Receiver also expects to collect a $210,000 commission under the purchase agreement he negotiated under seal after the Judgment had been paid by the Civil Action Defendants. Thus, the added expense of the Receiver is burdensome and unnecessary and diminishes the equity holders' value in the Radio Station Assets.

In summary, the Receiver cannot meet his burden of proof to excuse his compliance with 11 U.S.C. § 543(a),(b), or (c), because he failed to even analyze the equity holders' interests under § 543(d)(1). On that basis alone, the Receiver's request must be denied as a matter of law.

The interests of creditors may be assessed by analyzing: (1) the likelihood of reorganization; (2) probability that funds for reorganization will be available; and (3) whether there were instances of mismanagement by debtor. *In re Poplar Springs Apartments Ltd.*, 103 B.R. 146, 150 (Bankr. S.D. Ohio 1989).

Here, the best interests of creditors are not served by maintaining the Receiver. A Bankruptcy Court will not invoke §543(d) to allow a state court appointed receiver to retain custody and control of the debtor's estate assets when relief under §543(d) would not confer upon

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

1   receivers, for example, authority "to pay claims to creditors or to conduct litigation on behalf of,

2   or in defense of, the debtor . . . these being the very affairs of the debtor which require attention."

3   *In re Queen City Grain Co.*, 32 B.R. 346 (Bankr. S.D. Ohio 1983).   To permit a receiver to

4   indefinitely remain in possession and to vest him permanently with all duties and powers of a

5   debtor-in-possession goes far beyond the limited relief envisioned by §543 and circumvents the

6   prohibition of 11 U.S.C. §105(b) against the appointment of receivers in lieu of a debtor-in-

7   possession or trustee. *See* 11 U.S.C. § 105(b); *In re Plantation Inn Partners*, 142 B.R. 561, 564

8   (Bankr. S. D. Ga. 1992). The utilization by a bankruptcy court of the services of a court-appointed

9   receiver is to be for a brief limited time only.  *In re Plantation Inn Partners*, 142 B.R. at 564.

10      The Receiver alleges in his Motion that he should be excused from compliance with § 543

11   because the Debtors allegedly: (1) have only "meager" revenue; (2) are incapable of selling their

12   assets or will not use their assets to pay creditors, (3) have been mismanaged by Mr. Stolz; and

13   (4) do not have any scheduled, preferences or require any other special benefit under the

14   Bankruptcy Code to maximize their estates. None of these conclusions is true.

15      **1.  Debtors can reorganize if their Radio Station Assets are returned to them.**

16      In determining the prospects for rehabilitation, the Court must look beyond any facial

17   inadequacies of the information supplied and must make a full evaluation of the present condition

18   of the estate.  *See, e.g., In re Economy Cab & Tool Company, Inc.*, 44 B.R. 721, 724 (Bankr.

19   Minn. 1984*)* (citing *In re Powell Bros. Ice Co.*, 37 B.R. 104 (Bankr. D. Kans. 1984)).   Courts

20   have found a sufficient likelihood of rehabilitation where the debtor's own projections show a

21   "near certainty of short-term operating losses," *In re Garland Corp.*, 6 B.R.  456, 460 (1st Cir.

22   1980), and in an extreme case, even where apparent chances of survival are "precarious," so long

23   as the remaining corporate principals have "business acumen and sufficient resilience" to build

24   the business back up.  *In re Burnside, Lee & Harris Diamond Co.*, 17 B.R. 104 (Bankr. N.D. Fla.

25   1981).  In explaining the term "rehabilitation," *5 Collier on Bankruptcy* Para. 112.03 (15th Ed.

26   1983), at page 1112-15, gives an example of a debtor-in-possession requiring time afforded by

27   the Code to reorganize and to rehabilitate itself through disposing of an unprofitable division.

28   Infusion of new capital, repositioning of the debtor-in-possession in its industry, and reason to

1  expect an increased demand for its goods and services are similar examples of rehabilitation. *Id.*;

2  *see also In re Pied Piper Casuals, Inc.*, 40 B.R. at 727.

3  The Receiver alleges in a conclusory manner that the Debtors cannot reorganize

4  purportedly based on Mr. Stolz's 2018 declaration in the Civil Action (almost four years ago)

5  wherein he indicated that the Defendants at the time did not have a national advertising sales

6  representation company. *See Motion* 16:25–27. But the Receiver does not mention that national

7  sales are only a minor factor in the revenue picture of any typical radio station, with the vast bulk

8  of revenue coming from local ad sales; nor does the Receiver  explain why the Debtors could not

9  now obtain a national advertising sales rep if needed.  Notably, the Receiver does not allege that

10  its chosen manager, VCY, is using a national sales rep firm to generate advertising on the Stations.

11  Next, the Receiver alleges that the Debtors could not possibly propose a liquidating

12  reorganization plan solely because the District Court stated in a conclusory manner in one of its

13  orders that it appointed the Receiver "only after providing Defendants ample opportunity to sell

14  the radio stations through their chosen broker to satisfy the Amended Judgment." *See Motion* 17:

15  4–13. Yet the referenced Amended Judgment was not even entered by the District Court until

16  August 16, 2018 (District Court DE 209), and the District Court appointed the Receiver on July

17  6, 2020 (District Court DE 284)—less than two years after the Amended Judgment. What is more,

18  during that two-year period, the Civil Action Defendants had appealed the Amended Judgment

19  (*see* District Court DE 210), so they were not going to sell their assets to pay a judgment they

20  hoped would be overturned on appeal. Indeed, the Ninth Circuit did not even affirm the Amended

21  Judgment until July 15, 2020 (*see* District Court DE 285)—nine days AFTER the District Court

22  had already appointed the Receiver.

23  Thus, the true facts and history of the Civil Action show that the Debtors were not

24  provided with a good faith opportunity to liquidate any assets themselves before the Receiver was

25  appointed. Moreover, after the Receiver was appointed, the Civil Action Defendants promptly

26  tried to pay the Amended Judgment, and when the Plaintiffs would not accept the money, they

27  sought the District Court's authorization on October 26, 2020, to deposit the money with the

28  court's registry. *See* District Court DE 325.

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

On November 9, 2020, less than four months after the Receiver was appointed and the Amended Judgment was affirmed, Mr. Stolz deposited $1,301,523.16, the full amount of the Amended Judgment, into the District Court's registry. *See* District Court DE 333. Those are not the actions of a party who does not intend to pay its debts, or who will not use its assets to pay creditors as the Receiver alleges. A reasonable party is entitled to avail itself of its legal remedies when faced with a large judgment that it believes was not legally sound. There was nothing improper or evasive about the Civil Action Defendants preserving their valuable assets as long as possible awaiting the outcome of their appeal of the Amended Judgment.

In summary, the Receiver's allegations about the Debtors' purported inability to reorganize or liquidate assets are nothing more than baseless, illogical and conclusory conjecture.

**2.    The Debtors have demonstrated that they will use their assets to pay creditors considering Mr. Stolz promptly paid each Amended Judgment.**

Once again, the Receiver relies on the District Court's comments as alleged evidence that the Debtors will not use their assets to pay creditors. Yet the District Court's record plainly demonstrates the opposite is true. On behalf of debtors, Mr. Stolz promptly paid the Amended Judgment, and later two more amended judgments as the District Court kept piling on more fees and costs by maintaining the Receiver in place after the Amended Judgment had already been paid on November 9, 2020. Moreover, in 2019 Mr. Stolz paid an additional amount over $300,000 to ASCAP to dissolve an injunction and bring Debtors' music licenses current.

Furthermore, Mr. Stolz now pledges in a sworn declaration that he personally holds real estate assets valued well in excess of $1 million, which have already been listed on the market. If, in the interest of expediency, it is necessary to satisfy the remaining creditors by some means other than using the Radio Station assets, then Mr. Stolz is willing to sell those properties, or alternatively to borrow against the equity in those properties to promptly pay the creditors.

The Receiver alleges in his Motion that Mr. Stolz cannot be trusted to manage the Debtors because of his alleged "personal vendettas." *See Motion* at 19:10–11. Yet to any reasonable outside observer, it appears from the record that it is the Receiver and District Court who hold a personal vendetta against Mr. Stolz because he dared to use legal remedies available to the Civil

1    Action Defendants. It seems that some very inequitable decisions were made after the Amended

2    Judgment was entered, and primarily after the Receiver was appointed.

3        The Receiver also alludes to certain sanctions from the California courts assessed against

4    the Debtors because of Mr. Stolz's purported "repeated stonewalling." *See Motion* at 17:25–28.

5    But the Debtors did not have to pay those sanctions because Mr. Stolz paid the judgments himself.

6    Additionally, it is ironic that the Receiver alleges Mr. Stolz's "stonewalling" (in the face of what

7    the Defendants considered inequitable rulings) is grounds for maintaining the Receiver in place

8    when the Receiver: (1) blatantly ignored his turnover mandate under 11 U.S.C. § 543; (2)

9    denigrated this Court's exclusive authority over the Debtors' assets by stating through its lawyer

10   that it would "only answer to an Article III court;" and (3) only finally filed his Motion after the

11   Debtors had to first file their Turnover Motion to compel him to comply with the Bankruptcy

12   Code. Who is stonewalling now?

13       The difference between Mr. Stolz and the Receiver's "stonewalling," is that Mr. Stolz was

14   acting, often under legal advice, to preserve the equity in the Debtors' assets that he built over a

15   lifetime of hard work. On the other hand, the Receiver is stonewalling simply in an attempt to

16   continue to incur, and to collect, his unreasonably high fees and costs in the receivership where

17   he did no meaningful work to pay the Amended Judgment, except for litigating against the

18   Debtors and Mr. Stolz long after the Amended Judgment was paid -- which had been the sole

19   mandate under his appointment.

20       Indeed, instead of fulfilling his fiduciary duties to the receivership estate by preserving

21   the Debtors' assets, the Receiver instead intensified the legal battles. He was also proposing to

22   pay from improperly commingled assets, disputed claims of third parties that were not parties to

23   the Civil Action nor whose claims were included in the order appointing him as receiver or which

24   arose during the ordinary course of administration of the receivership. The Receiver also

25   purportedly accepted a later appointment as receiver over the same Radio Station Assets in the

26   California State Court for the benefit of Bellaire even though the assets were already part of the

27   previous District Court receivership estate. This is bizarre, and most likely not legally enforceable

28   because the Radio Station Assets were already in another receivership estate.

1    The Receiver's administration of the receivership estate is as improper as it would be

2 improper for a trustee of one bankruptcy estate to use those estate assets to pay claims of another

3 bankruptcy estate. Once assets vest in a bankruptcy estate (or any estate), they cannot also

4 concurrently belong to another estate. It is indeed a mystery as to why the District Court allowed

5 such a runaway and unstructured commingling of assets and claims that exceeded the scope of

6 the Civil Action. One can only assume it is because federal receiverships are rare, and other courts

7 are not as well-versed as Bankruptcy Courts in marshalling and properly administering multiple

8 debtors' assets. More reason why the Receiver should be required to promptly return the Debtors'

9 assets.

10    In summary, the Debtors have demonstrated that their principal does pay their debts once

11 those debts are lawfully liquidated, and they intend to pay their debts through a confirmed plan

12 in these Chapter 11 cases. By the Receiver's own standards, the Receiver cannot maintain

13 possession of the Debtors' assets because he has stonewalled, ignored his duties under the

14 Bankruptcy Code, and arrogantly disregarded this Court's authority. Thus, if the Receiver is

15 allowed to maintain the assets even temporarily for a transition period, he cannot be trusted to

16 return the assets at a later date when ordered by this Court to do so. He may first demand an order

17 from an Article III court in California.

18    **3.  Mr. Stolz has not mismanaged the Debtors and in fact built a valuable radio**

19        **station enterprise.**

20    The Motion alleges that the litigation history leading to the judgments, and then to the

21 appointment of the Receiver, somehow constitute "mismanagement." But courts have rejected

22 the notion that litigation or the appointment of a receiver is considered mismanagement for

23 purposes of § 543. *See In re Poplar Springs*, 103 B.R. at 149 (reasoning that the debtors' pre-

24 petition defaults alone do not bar return of the assets to the debtors and it is only where

25 mismanagement continues that turnover is inappropriate); *In re Northgate*, 117 B.R. at 332

26 (explaining that the existence of prepetition defaults to a lender is not sufficient to allow a receiver

27 to ignore the mandate of § 543(a)).

28    Interestingly, the factors that courts consider as proper management are things which the

Receiver failed to do, but which the Debtors will do in these Chapter 11 cases. Courts like to see segregated accounts to prevent asset commingling, proper reporting, and organized books and records. *See In re Polar Springs*, 103 B.R. at 151; *In re Northgate*, 117 B.R. at 332.

As can be seen from the Receiver's "accounting" attached hereto as Exhibit A, the Receiver has not properly reported any of the income or disbursements for the receivership estate, he has commingled all the Debtors' assets, and he lumped together the purported third-party claims against all Debtors and Stolz which were not even part of the receivership estate.

Courts have also considered whether the cost of a receiver is more than the administrative costs of a debtor-in-possession to administer the same assets, and whether the Debtors intend to manage the assets themselves or take them from the receiver who was managing the assets only to replace the receiver with a third-party management company. *See In re Bryant Manor, LLC*, 422 B.R. 278, 289–90, 292 (Bankr. D. Kan. 2010).

Here, these factors all support turnover of the Radio Station Assets by the Receiver because he is not managing the assets himself and instead relies on VCY, a third party. Based on the Receiver's expenses to date of almost $600,000, it is also plain to see that he surely cannot "manage" the Radio Station Assets at a lower cost than the Debtors, or even at a reasonable cost.

Finally, the Receiver alleges that Mr. Stolz mismanaged the Radio Station Assets because VCY, the third party management company, allegedly elected to purchase some equipment for the stations because the Radio Station Assets are purportedly in "shambles." *See Motion* 19:5–9. Yet VCY is hardly a disinterested party since it is the buyer under the Receiver's proposed sale of the Radio Station Assets. It is quite commonplace for a proposed buyer of property to want to add or modify things for their own reasons—it hardly means the radio stations were in "shambles." After all, the Receiver proposes to sell the Radio Station Assets for $6 million even though he submitted the offer under seal to the District Court only three months after his appointment; a time period that indicates the assets were not marketed very thoroughly. Although the Debtors contend that the proposed sale at $6 million is far less than the Radio Station Assets' fair market value if they were marketed in a commercially reasonable manner, even the $6 million "pandemic price" is still evidence that the Debtors are solvent and therefore could not have been

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

1  mismanaged by Mr. Stolz to the detriment of any creditors.

2  In summary, it is not Mr. Stolz who has mismanaged the Debtors under the factors

3  analyzed by courts. Instead, it is the Receiver who has mismanaged the Radio Station Assets,

4  failed to maximize the value of the Radio Station Assets, and failed to minimize the receivership

5  expenses. The Receiver cannot be excused from his turnover mandate under 11 U.S.C. § 543.

6  **4. The Debtors do require the benefit of proposing a plan of reorganization under**

7  **the Bankruptcy Code.**

8  The Receiver alleges that the Debtors do not require the benefit of the Bankruptcy Code

9  to maximize the value of their assets, an allegation which flies in the face of the Debtors'

10  consistent urging that the Receiver is seeking to sell all the Radio Station Assets at far below their

11  fair market value without just reason to do so.

12  Moreover, the District Court appointed the Receiver only for the narrow scope of paying

13  the Amended Judgment, and not a myriad of other purported creditors who are not even parties

14  to the Civil Action. The District Court rightfully denied certain claims in the receivership estate

15  which were not liquidated. The Receiver does not have authority to liquidate those purported

16  claims against the Debtors because he was <u>not</u> appointed as a receiver over the LLCs—only the

17  Radio Station Assets. The Receiver is not the Debtors' agent.

18  On the other hand, the Debtors can liquidate claims against them in these Chapter 11 cases

19  through the claims allowance process, preserve the value of their assets in the meantime, and then

20  pay all ultimate allowed claims in an orderly manner through a confirmed Plan where all creditors

21  are treated fairly.

22  In summary, it is clear the Receiver is unable to pay all alleged creditors because he cannot

23  liquidate the claims in the first place. Nonetheless, the Receiver is attempting to unnecessarily

24  sell all of the Debtors' valuable Radio Station Assets for far below their market value even though

25  all the allowed claims could conceivably be paid from the sale of just one radio station, especially

26  since the Receiver has disregarded the Debtors' status as separate legal entities. The Receiver acts

27  without regard for maximizing the value of assets or minimizing expenses and claims against the

28  Radio Station Assets.

1    **B.  There is no cause to dismiss or convert these Chapter 11 cases.**

2        **1.  The Debtors' Chapter 11 cases were not filed in bad faith and there is no**

3            **diminution of the estate at the Debtors' hands.**

4        The bankruptcy court has broad discretion in determining what constitutes "cause" under

5    Section 1112(b*). In re Sullivan*, 522 B.R. 604 (B.A.P. 9th Cir. 2014) (citing *In re Chu*, 253 B.R.

6    92, 95 (S.D. Cal. 2000)). The movant bears the burden of establishing by a preponderance of the

7    evidence that cause exists. *Id.* (citing *StellarOne Bank v. Lakewatch LLC (In re Park)*, 436 B.R.

8    811, 815 (Bankr. W.D. Va. 2010)). A bankruptcy court abuses its discretion if it bases its ruling

9    upon an erroneous view of the law or a clearly erroneous assessment of the evidence. *In re Beatty*,

10   162 B.R. 853, 855 (B.A.P. 9th Cir. 1994).

11       Under 11 U.S.C. §1112(b), the Court is faced with a balance of equities.  Congress has

12   determined that it is better to reorganize a debtor when possible, particularly when it is in the best

13   interest of creditors.  *In re The Huntington Ltd.*, 654 F.2d 578, 589 (9th Cir. 1981); *In re Sheehan*,

14   14 B.R. 36, 37 (Bankr. S.D. 1986); *In re International Horizons, Inc.*, 15 B.R. 798, 800 (Bankr.

15   N.D. Ga. 1981).   In considering any motion under Section 1112(b), the Court must begin by

16   recognizing that the stated purpose of Chapter 11 is to further the rehabilitation of businesses (or

17   individuals) in economic distress.  "A court should not precipitously sound the death knell for a

18   debtor by prematurely determining that the debtor's prospects for economic revival are poor.*" In*

19   *re Shockley Forest Industries, Inc.*, 5 B.R. 160, 162 (Bankr. N.D. Ga. 1980).  The Court, therefore,

20   should resolve all doubts in favor of the debtor.  *See In re Pied Piper Casuals, Inc.*, 40 B.R. 723,

21   727 (Bankr. S.D.N.Y. 1984); *In re Heatron, Inc.*, 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980).  On

22   the other hand, the Court must also consider the interests of the creditors.  *See* 5 Collier on

23   Bankruptcy ¶ 1112.03 (15th Ed. 1985).

24       The Receiver alleges these Chapter 11 cases should be dismissed because the Debtors

25   allegedly filed the cases in bad faith to "interfere" with the receivership. But the Receiver was

26   simply a very expensive court-appointed collection agent for the Civil Action Plaintiffs. The

27   Bankruptcy Code contemplates that bankruptcy cases are often used to terminate receiverships

28   which is precisely why § 543 exists.

1     The Receiver also talks about previous contempt proceedings in the Civil Action, but none

2   of those contempt proceedings are currently pending against the Debtors. There is no pending

3   litigation in the Civil Action other than the Debtors' attempt to terminate the Receiver's

4   appointment. Indeed, the Receiver admits that the only thing remaining in the Civil Action to

5   terminate the receivership was for the Debtor to pay alleged claims, including the Receiver's fees

6   and expenses. But the Debtors could not comply because it was a never-ending moving target and

7   nobody could provide the Civil Action Defendants with a precise dollar figure they could pay to

8   finally be finished with the receivership. As a result, the Bankruptcy Court is the proper forum

9   for the Debtors to finally end the Receiver/collection agent's unnecessary and ever-increasing

10   expenses and pay their debts in an orderly manner rather than in the haphazard proceedings taking

11   place in California.

12     Filing bankruptcy to avoid payment of claims is not bad faith. In fact, in *In re Sullivan*,

13   522 B.R. 604, 615 (B.A.P. 9th Cir. 2014), the court specifically found that the bankruptcy court

14   erred when it found that the debtor's case had been filed in bad faith solely because the debtor

15   had filed its bankruptcy petition to stop a judgment creditor's collection efforts pending an appeal.

16   The Ninth Circuit BAP stated that "[d]ebtor's petition, filed within 89 days of perfection of

17   [a]ppellee's judgment lien, not only appropriately provided [d]ebtor a breathing spell, it laid the

18   groundwork for another key goal underlying the bankruptcy process; leveling the playing field

19   for other creditors of the estate." *In re Sullivan*, 522 B.R. at 615.  The *Sullivan* court also held that

20   the debtor's clear intention to save equity in his New York home, and his desire for an orderly

21   liquidation of assets if he could not propose a confirmable plan, were both legitimate reasons to

22   file bankruptcy.  *Id.* at 616; *see In re Lake Mich. Beach Pottawattamie Resort LLC*, 547 B.R.

23   899906-07 (Bank. N.D. Ill. 2016) (finding no cause to dismiss where debtor had only one

24   unliquidated unsecured claim based on pending litigation).

25     Here, the Debtors filed their Chapter 11 cases to preserve the equity in their Radio Station

26   Assets for the benefit of their estate and creditors, including equity holders, and to level the

27   playing field for all creditors and equity holders—all good faith reasons for Chapter 11.

28     The Receiver also alleges the Debtors have caused a continuing loss to the estates even

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

though the Receiver has been in charge of the Debtors' primary assets for the last seventeen months. For purposes of finding "cause," diminution or losses have to have occurred post-petition. Yet the Debtors do not even have control over the Radio Station Assets. Thus, any loss in the Debtors' business operations must be attributable to the Receiver's management, although of course nobody knows how the assets have been managed because the Receiver has not filed a proper accounting.

Moreover, contrary to the Receiver's allegations, the Amended Judgment, as subsequently amended, did not diminish any of the Debtors' assets because Mr. Stolz paid those personally. All of that occurred pre-petition anyway and is not factored into the analysis. The Receiver's other allegation about the Debtors' alleged failure to sell the Radio Station Assets was also previously addressed and is not relevant to an analysis of post-petition conduct.

The Receiver cannot achieve the same results and return for creditors in the Civil Action as the Debtors can within bankruptcy because the Receiver is much too expensive, he cannot liquidate certain disputed unliquidated claims against the Debtors, he has commingled the assets and claims, and he is not maximizing the value for equity holders.

Lastly, the Receiver alleges the Debtors made misrepresentations by "failing to disclose the secured status of Bellaire in the Golden State case." *See Motion* at 23:1–3. But Golden State did not list Bellaire as secured, because it disputes that Bellaire has a properly perfected security interest in Golden State's assets.  That is a legal position—not a misrepresentation.

The Receiver has not met his burden of proof to show cause exists to dismiss or convert these cases, especially considering all doubts must be resolved in the Debtors' favor.

**2.  Abstention under 11 U.S.C. § 305 is not warranted.**

11 U.S.C. § 305(a)(1) requires the Court consider the interests of all creditors and the Debtors. *See In re Uno Broadcasting Corp.*, 167 B.R. 189, 198 (Bankr. D. Ariz. 1994). Section 305 abstention is usually seen in involuntary cases because almost by definition, debtors in voluntary Chapter 11 cases have reorganization goals that are inconsistent with a particular creditor. *Id.* Notably, relief under § 305 "is appropriate only in 'an egregious situation.'" *Id.* at 200.

For all the reasons mentioned previously, it is not in the creditors or Debtors' best interests for the Court to abstain under § 305. The Receiver cannot adequately marshal the Debtors' assets, nor liquidate and pay all claims against the Debtors, nor is Receiver maximizing the value of the Debtors' assets, either through liquidation or as going concerns. The Receiver has already exceeded the scope of the order appointing him, and he failed to do the one thing he was appointed to do—namely, pay the Amended Judgment.

**C. The Court should not terminate the automatic stay, because the Receiver cannot properly administer the Debtors' Radio Station Assets or pay all creditors' claims.**

After throwing everything against the wall to see what will stick, the Receiver also argues that the Court should terminate the automatic stay to allow him to proceed with a sale of the Radio Station Assets. But as the Debtors have explained repeatedly, the Receiver does not have authority to liquidate all claims against the Debtors and he is unnecessarily seeking to sell all the Radio Station Assets for less than fair market value even though the sale of only one station would be enough to satisfy any remaining claims arising from the Civil Action, even if Bellaire's disputed secured claim was also considered. Also contrary to the Receiver's allegations, the *Curtis* factors weigh strongly against relief from stay.

**Factor 1:** All claims and disputes between the Debtors and Receiver will not be resolved in the Civil Action. Interestingly, the Receiver lists the pending disputes as "resolution of the pending VCY sale to satisfy the outstanding claims of creditors." *See Motion* 27:16–17. But payment of creditors' claims is soundly within the purview of the Bankruptcy Court, and the Receiver cannot pay all creditors' claims. Thus, this factor weighs against lifting the stay.

**Factor 2:** The Receiver purports to divine the future by alleging that a trustee will ultimately have to be appointed because of the Debtors' future misconduct. This factor is supposed to be about whether or not lifting the stay would interfere with the bankruptcy case, and indeed, it would because the Debtors require the ability to administer their Radio Station Assets to propose a feasible plan for the benefit of all allowed creditors and equity holders—not just a select few creditors preferred by the Receiver. The Civil Action does not advance the interests of these bankruptcy cases and this factor strongly weighs against relief from stay.

**Factors 4, 10 and 11:** These factors also clearly weigh against relief from stay, as evidenced by the haphazard manner in which the District Court allowed the Receiver to commingle assets and claims, disregard the Debtors' corporate formalities, run up costs unnecessarily, and conduct the Receiver's business under seal with no transparency. Federal receiverships are rare, and it is evident that the District Court does not have anywhere near the experience of the Bankruptcy Court to oversee the administration of assets for multiple debtors. The California State Court likewise erred in allegedly appointing the Receiver over the same assets that were already subject to another receivership estate of other debtors.

**Factor 7:** The receivership will prejudice certain creditors and the equity holders because the Receiver does not have the ability to liquidate some creditors' claims against the Debtors. The Receiver only cares about the creditors it considers to be "significant," and he completely disregards the interests of the equity holders. Thus, this factor also weighs against granting relief from stay.

**Factor 3:** The Receiver was certainly supposed to act as a neutral fiduciary, but he failed to maximize the Radio Station Assets, minimize costs, segregate assets and claims, or protect corporate formalities. Instead, the Receiver acted, and is still acting, in a self-serving manner to prolong the receivership far too long and he is seeking to sell the Radio Station Assets so he can collect a large commission.  The Receiver also cannot pay all the Debtors' creditors. This factor also weighs against relief from stay.

**Factor 12:** The balance of hurt also weighs against granting relief from stay because a sale of the Radio Station Assets proposed by the Receiver will irreparably damage the Debtors through the unnecessary fire sale of their most valuable assets. The Debtors' equity holder will never be able to recover the losses. Moreover, the Receiver fails to disclose to this Court that the pending offer to sell the Radio Station Assets must still be approved by the FCC, which has not occurred in an entire year. Then after the FCC consents, the Receiver must obtain, within three business days, final court approval of the sale from the District Court. *See Purchase Agreement* § 1.10. Considering that the Debtors have been trying to terminate the Receiver's appointment for over a year, all the parties knew that the Civil Action could terminate at any moment, thus

1  also terminating any possible sale of the Radio Station Assets. Indeed, the FCC has not consented

2  to the proposed sale because it was aware that the sole legitimate purpose of the receivership

3  terminated when the Amended Judgment was paid in full.

4  **Factors 5, 6, 8, and 9:** The Receiver alleges these factors are not implicated, but Factor 9

5  may be implicated because the Debtors believe that Bellaire's purported judicial lien is not

6  properly perfected because the Radio Station Assets are primarily intangible licenses owned by

7  Nevada limited liability companies Thus, Factor 9 also weighs against lifting the stay because the

8  Receiver cannot adjudicate the nature and extent of Bellaire's purported lien.

9  ## CONCLUSION

10  Based on the foregoing, it is plain to see that the Receiver has not met his substantial

11  burden of proof for any of the relief he seeks in the Motion. Indeed, his motives are transparently

12  self-serving in putting this much effort in prolonging the Civil Action. The Receiver is really the

13  only party that will benefit in a prolonged receivership through continued accrual of his fees and

14  expenses, payment of his fees and expenses, and payment of an additional sizable commission if

15  the proposed sale is finally approved and consummated. These actions are all to the detriment of

16  some of the Debtors' creditors, the Debtors, and the equity holders. For these reasons, the Debtors

17  respectfully request this Court enter its order denying the Receiver's Motion in its entirety.

18  DATED this 13th day of December 2021.

19

20  HARRIS LAW PRACTICE LLC

21

22  STEPHEN R. HARRIS, ESQ.
   Attorney for Debtors

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

1   FRED D. HEATHER - State Bar No. 110650
    fheather@glaserweil.com
2   RORY S. MILLER - State Bar No. 238780
    rmiller@glaserweil.com
3   GLASER WEIL FINK HOWARD
      AVCHEN & SHAPIRO LLP
4   10250 Constellation Boulevard, 19th Floor
    Los Angeles, California 90067
5   Telephone:  (310) 553-3000
    Facsimile:  (310) 556-2920
6
7   Attorneys for
    Court-Appointed Receiver
    W. Lawrence Patrick

8

9           UNITED STATES DISTRICT COURT

10          CENTRAL DISTRICT OF CALIFORNIA

11               EASTERN DIVISION

12   WB MUSIC CORP. et al.,          CASE NO.: 5:16-cv-00600-JGB (SPx)

13          Plaintiffs,        Hon. Jesus G. Bernal

14   v.                      **RECEIVER W. LAWRENCE**

15   ROYCE INTERNATIONAL       **PATRICK'S ACCOUNTING**
    BROADCASTING CORP., et al.,

16          Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

1    Pursuant to the Court's June 2, 2021 order (dkt. no. 432), the Court-Appointed

2 Receiver W. Lawrence Patrick hereby submits the attached accounting and supporting

3 exhibits.

4    The Receiver's accounting, set forth in Exhibit 1, is divided into several

5 sections, each identifying the relevant exhibits where backup for the accounting may

6 be found.  These are:

7    (1) Receiver's Fees and Expenses (Exhibits 2-11), with a subtotal of

8 $852,190.10;

9    (2) Unpaid Judgments Against Stolz (Exhibits 12-14), with a subtotal of

10 $400,240.68; and

11    (3) Creditor/Vendor Claims[1] Against Stolz (Exhibits 15-19), with a subtotal of

12 $1,295,808.62.

13    In total, these three categories represent total debts of the receivership estate of

14 $2,548,239.40, and the Receiver respectfully requests that the Court order these debts

15 satisfied prior to releasing any of defendants' assets from receivership, and, further,

16 that the Court set a date certain by which the entirety of these debts are either paid

17 independently by defendants or the sale of the receivership assets to VCY America be

18 concluded so that these debts may be paid out of the proceeds, with the balance

19 returned to defendants.

20 ///

21 ///

22 ///

23 ///

24

25

26 [1] These totals reflect amounts that the Receiver has been made aware of, been provided backup for, and, in his opinion as Receiver, are properly debts of the receivership estate.  Additional creditors may come forward, and the Receiver has instructed, and will continue to instruct, any such creditors to directly make their claims to the Court.  Additionally, the Receiver understands that VCY America intends to make claims against the receivership estate.

27

28

Glaser Weil

DATED:  July 16, 2021

GLASER WEIL FINK HOWARD
      AVCHEN & SHAPIRO LLP

By
      FRED D. HEATHER
      RORY S. MILLER
      Attorneys for
      Court-Appointed Receiver
      W. Lawrence Patrick

# Exhibit 1

# Receiver's Accounting Report of W. Lawrence Patrick

# Receiver's Accounting Report of W. Lawrence Patrick in the KFRH(FM), North Las Vegas, NV; KREV(FM), Alameda, CA; and KRKC(FM), Mecca, CA Receivership Litigation

<u>Receiver's Fees and Expenses</u>:

| | |
|---|---|
| Receiver's Bond premium—8/3/2020 and renewal on 6/30/21 **[Exhibit 2]** | $ 200.00 |
| 13 months of Receiver fees at $7,500.00 per month from July, 2020 through July, 2021 | $ 97,500.00 |
| Brokerage fee due Patrick Communications [Five percent (5%) on the first $3.0 million and two percent (2% on the balance of the sale price. This is a standard broadcast brokerage commission.] | $ 210,000.00 |
| Reimbursements for travel to the stations or hearings: **[Exhibit 3]** | |
| July 15-19, 2020 | $ 2,145.23 |
| August 15-18, 2020 | $ 1,885.87 |
| Sept. 29-Oct. 2, 2020 | $ 4,197.82 |
| Payment of FCC filing fee for STA for KRKC-FM **[Exhibit 4]** | $ 200.00 |
| Payment of FCC Regulatory Fees for the Royce stations—9/28/20 **[Exhibit 5]** | $ 21,100.00 |

Payment of BLM User fee proration for
  KFRH(FM), on Black Mountain, Arden Peak
  **[Exhibit 6]**                                      $      3,543.14

KFRH(FM) license renewal regulatory fee                $        200.00
  **[Exhibit 7]**

Legal Fees due to Glaser Weil Fink Howard
  Avchen & Shapiro, LLP  (Receivership counsel)        $    333,680.54
  **[Exhibit 8]**

Legal fees due Scarrino & Shubert (FCC counsel)        $    117,537.50
  **[Exhibit 9]**

Compensation due James Palomares for consulting
  work for the stations  **[Exhibit 10]**              $     40,000.00

Compensation due Albert Ramirez for consulting
  work for the stations  **[ Exhibit 11]**             $     20,000.00


Sub-total of Receivership fees                         $    852,190.10

2

Judgments Against Stolz:

| | |
|---|---|
| Judgment to Bellaire Tower Homeowners Association, Daniel Kelly, Esq. **[Exhibit 12]** | $  338,978.09 |
| Judgment to Hans Peterson Fleischner, Esq. **[Exhibit 13]** | $   27,120.00 |
| Judgment owed to John J. Rueda, Esq. **[Exhibit 14]** | $   34,142.59 |
| Sub-total of Judgment Claims | $   400,240.68 |

**3**

Case 21-14978-abl    Doc 80    Entered 12/13/21 16:59:11    Page 30 of 42
Case 5:16-cv-00600-JGB-SP    Document 453-1    Filed 07/16/21    Page 5 of 75    Page ID
#:8743

<u>Creditor/Vendor Claims Against Stolz:</u>

Rent for the Crown Castle transmitter site on
   Mt. Petosi, Las Vegas, Nevada
   **[Exhibit 15]**                                    $  822,270.32

Building rent for studio/office space in Palm Desert,
   California owed to Shah Management
   **[Exhibit 16]**                                    $  178,430.12

Rent for the transmitter site for KREV(FM), Alameda,
   California owed to Chuck Hass
   **[Exhibit 17]**                                    $  205,619.02

Past due balance owed to Broadcast Music, Inc.
   from 2017 forward including arbitration award
   balances as well as license fees for that period
   when Mr. Stolz did not execute a BMI license
   for his stations.[1]  **[Exhibit 18]**              $   85,489.16

Balance owed to SoundExchange for payment of
   streaming mandatory fees
   2018-2021 **[Exhibit 19]**                       $    4,000.00

Sub-total of Creditor Claims                       $    1,295,808.62

---

[1] BMI is another performance rights organization like ASCAP, the original Plaintiff in this proceeding.

Case 21-14978-abl    Doc 80    Entered 12/13/21 16:59:11    Page 31 of 42
Case 5:16-cv-00600-JGB-SP    Document 453-1    Filed 07/16/21    Page 6 of 75    Page ID
#:8744

**Total of all fees, reimbursements, judgments and
Claims against the Stolz radio stations**          <u>$  2,548,239.40</u>

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

## Steve Harris

| | |
|---|---|
| **From:** | Rory Miller <rmiller@glaserweil.com> |
| **Sent:** | Wednesday, November 3, 2021 7:55 PM |
| **To:** | Steve Harris |
| **Cc:** | Fred Heather; Edward Stolz |
| **Subject:** | Re: Silver State Broadcasting, LLC/ Golden State Broadcasting, LLC/ Major Market Radio LLC - Chapter 11 Cases 21-14978, 21-14979, 21-14980 |
| **Attachments:** | doc00434120211103184853.pdf |

Steve:

We will do no such thing. Apart from answering exclusively to an Article III court, at no point in your letter do you grapple with the fact that Edward Stolz is singularly unfit to have anything to do with the properties, whether within or without the bankruptcy process. In fact, I could think of no clearer example of facts where "the interests of creditors . . would be better served by permitting a custodian to continue in possession, custody or control of such property" as provided in 11 U.S.C. 543(d)(1), and note that the receivership has been in place now for more than a full year, subjecting the receivership estate to the mandatory excuse provisions of 11 U.S.C. 543(d)(2).

RSM

> On Nov 3, 2021, at 6:56 PM, Steve Harris <steve@harrislawreno.com> wrote:
>
> Dear Counsel,
>
> Enclosed please find correspondence for your immediate review.
>
> Thank you,
> Steve Harris
>
> **Stephen R. Harris, Esq.**
> **Harris Law Practice LLC**
> 6151 Lakeside Drive, Suite 2100
> Reno, Nevada 89511
> 775-786-7600
> steve@harrislawreno.com

Although some Glaser Weil attorneys and staff still are working remotely in order to reduce the risks associated with COVID-19, we all will continue doing our utmost to provide prompt, professional service to and on behalf of our clients.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

# HARRIS LAW PRACTICE LLC
## ATTORNEY AND COUNSELOR AT LAW
### STEPHEN R. HARRIS, ESQ.
6151 LAKESIDE DRIVE, SUITE 2100
RENO, NEVADA 89511
(775) 786-7600
steve@harrislawreno.com

November 3, 2021

*Via Email*
Fred H. Heather, Esq. fheather@glaserweil.com
Rory S. Miller, Esq. rmiller@glaserweil.com
Glaser Weil Fink Howard Avchen & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067

Re:   Silver State Broadcasting, LLC Chapter 11 Case No. 21-14978
      Golden State Broadcasting, LLC Chapter 11 Case No. 21-14979
      Major Market Radio LLC Chapter 11 Case No. 21-14980

Dear Sirs:

This law firm represents the above-referenced Debtors in Chapter 11 bankruptcy cases filed in Las Vegas, Nevada, early on October 19, 2021. Enclosed please find copies of the Notice of Bankruptcy Case Filing for each Debtor.

It is my understanding that you represent W. Lawrence Patrick, as receiver (the "Receiver") appointed in a U.S. District court case pending in the Central District of California as WB Music Corp. et al. v. Royce International Broadcasting Corp. et al., Case No. EDCV 16-600 JGB. Specifically, the Receiver is in control of the Debtors' radio station assets for radio stations identified by the call letters KFRH-FM, KREV-FM, and KRCK-FM (collectively the "Assets").

In that regard, this letter serves as notice of the 11 U.S.C. § 362(a) automatic stay that is now in effect with respect to the Debtors and their assets. Additionally, pursuant to 11 U.S.C. § 543(a) and (b), the Receiver: (1) may not take any further action in the administration of the Assets other than as required to preserve the Assets; (2) shall deliver to the Debtors all of the Assets, and (3) must file an accounting of the Assets for the time they were in the Receiver's custody or control.

The Assets are property of the Debtors' Chapter 11 estates, under the jurisdiction of the Nevada Bankruptcy Court, and the Receiver must deliver the Assets to the Debtors promptly. Please contact me immediately to arrange for an orderly turnover of the Assets. Thank you.

Very truly yours,

STEPHEN R. HARRIS, ESQ.

SRH/ng
Encl.
cc: Edward Stolz (via email)

**Steve Harris**

| From: | Rory Miller <rmiller@glaserweil.com> |
|---|---|
| Sent: | Thursday, November 4, 2021 11:10 AM |
| To: | Steve Harris |
| Cc: | Fred Heather; Edward Stolz |
| Subject: | RE: Silver State Broadcasting, LLC/ Golden State Broadcasting, LLC/ Major Market Radio LLC - Chapter 11 Cases 21-14978, 21-14979, 21-14980 |

We disagree with your positions, and would be violating the Receiver's obligations to the Court and the fiduciary responsibilities to the estate were we to surrender an iota of control to Mr. Stolz, and we will not do so absent a direct court order.

**From:** Steve Harris <steve@harrislawreno.com>
**Sent:** Thursday, November 4, 2021 11:08 AM
**To:** Rory Miller <rmiller@glaserweil.com>
**Cc:** Fred Heather <fheather@glaserweil.com>; Edward Stolz <edward_stolz@comcast.net>
**Subject:** RE: Silver State Broadcasting, LLC/ Golden State Broadcasting, LLC/ Major Market Radio LLC - Chapter 11 Cases 21-14978, 21-14979, 21-14980

Mr. Miller,

Thank you for your prompt response. You are of course entitled to your opinion and are free to tell the Nevada bankruptcy judge, or Nevada Article III judge, that you do not have to answer to them with respect to Chapter 11 cases pending in their courts.

That said, the Receiver's duty to turnover property of the estate under § 543(b) is mandatory, not permissive, and the Receiver has had notice of the Chapter 11 cases for approximately two weeks. Section 543(d) only excuses the Receiver's duty to turnover property of the estate upon the court's order after notice and a hearing. To date, the Receiver has not filed a motion in the bankruptcy court seeking to excuse his compliance with §§ 543(a) and (b). Thus, the Receiver is required to comply with §§ 543 (a) and (b).

Thank you,
Steve Harris

**Stephen R. Harris, Esq.**
**Harris Law Practice LLC**
6151 Lakeside Drive, Suite 2100
Reno, Nevada 89511
775-786-7600
steve@harrislawreno.com

**From:** Rory Miller <rmiller@glaserweil.com>
**Sent:** Wednesday, November 3, 2021 7:55 PM
**To:** Steve Harris <steve@harrislawreno.com>
**Cc:** Fred Heather <fheather@glaserweil.com>; Edward Stolz <edward_stolz@comcast.net>
**Subject:** Re: Silver State Broadcasting, LLC/ Golden State Broadcasting, LLC/ Major Market Radio LLC - Chapter 11 Cases 21-14978, 21-14979, 21-14980

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

1   Dariush G. Adli, SBN 204959
2     adli@adlilaw.com
    ADLI LAW GROUP, P.C.
3   700 South Flower St., Suite 1220
4   Los Angeles, California 90017
    Telephone:  (213) 623-6546
5   Facsimile:  (213) 623-6554

6
    Attorneys for Defendants
7   Royce International Broadcasting
8   Corporation, Playa Del Sol Broadcasters,
    Silver State Broadcasting, LLC, Golden
9   State Broadcasting, LLC, and Edward R.
10  Stolz, II

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

14  WB MUSIC CORP., *et al.*,          Case No. 5:16-cv-00600-JGB-DTB
15
            *Plaintiff,*               **DECLARATION OF ROBERT W.**
16                                     **MAHLMAN SUBMITTED IN**
                                       **SUPPORT OF MOTION TO**
17      v.                             **DISCHARGE THE RECEIVER,**
                                       **TERMINATE THE**
18                                     **RECEIVERSHIP, AND ENJOIN**
    ROYCE INTERNATIONAL               **SALE OF DEFENDANTS' RADIO**
19  BROADCASTING CORP., *et al.*,      **STATIONS**
20
            *Defendants.*              Hearing Date: March 8, 2021
21                                     Time: 9:00 AM
                                       Courtroom 1
22

23

24

25

26

27

28

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2273.201

DECLARATION OF ROBERT W. MAHLMAN

ADLI LAW GROUP, P.C.
(213) 623-6546

### **DECLARATION OF ROBERT W. MAHLMAN**

I, Robert W. Mahlman, hereby declare as follows:

1.    I am the President and a founding member of The Mahlman Company Media Brokers, which has operated since 1980.  Soon thereafter, The Mahlman Company also founded the National Association of Media Brokers, whose membership is comprised of many of the nation's most influential radio and television brokerages.

2.    The Mahlman Company has and I have assisted many buyers, sellers, and investors in the acquisition and sales of radio and television broadcast properties. Since 1985, The Mahlman Company has successfully closed on radio and television transactions, in an amount exceeding One Billion Dollars.

3.    I know the fundamentals of the industry, its financing and its regulatory processes, I regularly work with buyers, sellers and investors and their counsel, and I have provided expert testimony in various legal matters since inception.

4.    Within the past twenty-four months, the Mahlman Company formally engaged to sell KREV-FM, San Francisco on behalf of Golden State Broadcasting. Simultaneously, The Mahlman Company was also formally engaged to sell KFRH-FM, Las Vegas on behalf of Silver State Broadcasting.   This brokerage made substantial progress in identifying buyers and in negotiating on both properties by the conclusion of the engagement.

5.    My company evaluates the worth of broadcast properties based upon, among other things, comparable sales in the identical market.  This is not unlike the valuation process in the residential real estate industry, where comparable home sales in the neighborhood set a market price.

6.    In the case of the larger-sized markets, broadcast stations command larger prices than the smaller-sized markets.  Here, The Mahlman Company marketed these stations in two of the largest broadcast markets, namely, San Francisco which is the fourth largest market, and Las Vegas which is the thirty-first largest market in

1

2273.201

the nation.  These are among the most desirable properties, broadcast markets and commercial centers in the United States.

7.    The turn-over of radio stations is characterized by high demand and limited supply, particularly in the largest and most desirable markets.  In San Francisco, the  previous sale prices of KREV-FM, based upon prevailing market values, reveal the following transactions for this single station:

| 2004 | to Flying Bear Licensing | $33,700,000.00 |
| 2003 | to Three Point Media (Devine/Buzil) | $33,700,000.00 |
| 2000 | to RCI Acquisition (SBS/Alarcon) | $30,000,000.00 |
| 1998 | to Citicasters/Clear Channel | $20,000,000.00 |
| 1998 | to KZSF Licensing (Z-Spanish/Bustos) | $20,000,000.00 |
| 1997 | to Radio One | $20,000,000.00 |

Accordingly, the *average* at-market sales for KREV-FM amounted to $26,233,333.33.  Since then, only two unrelated FM stations located in San Francisco were sold, averaging $62,500,000.00 each, as follows:

| 2005 | Family Stations to CBS | KEAR | $100,000,000.00 |
| 2012 | Inner City to Entercom | KBLX | $25,000.000.00 |

8.    Only two sales comparables of Las Vegas full-market radio broadcast stations exist within the approximate past two decades.  They  consist of the following transactions:

| 1999 | Radio Vision to Univision | KISF | $25,000,000.00 |
| 2009 | Beasley to Silver State | KFRH | $15,700,000.00 |

9.    The widely-held assumptions which continue to define the value of large-market U.S. radio broadcast stations in relation to comparable in-market transactions, include (a) market size; (b) scarcity of properties in a given market; (c) station performance; (d) signal reach; and (e) sales of other radio stations in that same market.

/ / /

ADLI LAW GROUP, P.C.
(213) 623-6546

2273.201

2

DECLARATION OF ROBERT W. MAHLMAN

10.     Notwithstanding Covid-19 whose impact upon the consumer economy has dulled many areas of commercial activity, radio broadcasting transactions and business are well-poised to fully recover, given its undiminished weekly coverage of *ninety-two percent* of America's population.  Therefore, we see a strong demand for radio broadcast stations in large markets, when, and if, they should become available for sale.

11.     Based upon market comparables and other factors, The Mahlman Company supports a likely pricing for KREV-FM at $15,000,000.00.  In addition, The Mahlman Company also supports a likely pricing for KFRH-FM at $15,000,000.00.

12.     I have reviewed the valuation of these two properties, plus a third broadcast property proposed by Larry Patrick.  Based upon every historic and recognized pricing metric including market comparables, his number is grossly underestimated.

I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct.  Executed this _____ day of February 2021.

 Please see next page for signature
Robert W. Mahlman

ADLI LAW GROUP, P.C.
(213) 623-6546

DECLARATION OF ROBERT W. MAHLMAN

2273.201

a strong demand for radio broadcast stations in large markets, when, and if, they should become available for sale.

11. Based upon market comparables and other factors, The Mahlman Company supports a likely pricing for KREV-FM at $15,000,000.00.  In addition, The Mahlman Company also supports a likely pricing for KFRH-FM at $15,000,000.00.

12. I have reviewed the valuation of these two properties, plus a third broadcast property proposed by Larry Patrick.  Based upon every historic and recognized pricing metric including market comparables, his number is grossly underestimated.

I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct.  Executed this _23_ day of January 2021..

Robert W. Mahlman
Declarant

4

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing documents with the Clerk of the Court for the United States District Court for the Central District of California by using the CM/ECF system on February 3, 2021:

**DECLARATION OF ROBERT W. MAHLMAN SUBMITTED IN SUPPORT OF MOTION TO DISCHARGE THE RECEIVER, TERMINATE THE RECEIVERSHIP, AND ENJOIN SALE OF DEFENDANTS' RADIO STATIONS**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF System.

I certify under penalty of perjury that the foregoing is true and correct. Executed February 3, 2021 at Los Angeles, California.

Date: February 3, 2021                    */s/ Dariush G. Adli*
                                          Dariush G. Adli

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2273.201

CERTIFICATE OF SERVICE