STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone:  (775) 786-7600
Email: steve@harrislawreno.com
Attorney for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

*****

IN RE:

SILVER STATE BROADCASTING, LLC,

☐  AFFECTS THIS DEBTOR

☐  AFFECTS GOLDEN STATE BROADCASTING, LLC

☐  AFFECTS MAJOR MARKET RADIO LLC

☒  AFFECTS ALL DEBTORS

Case No. 21-14978-abl
(Chapter 11)

Jointly Administered with:

| 21-14979-abl | Golden State Broadcasting, LLC |
| 21-14980-abl | Major Market Radio LLC |

**REPLY TO OPPOSITION TO DEBTORS'
EMERGENCY JOINT MOTION FOR
ORDER DIRECTING COURT
APPOINTED RECEIVER TO TURNOVER
PROPERTY PURSUANT TO 11 U.S.C. §§
543(A) AND (B)**

Hearing Date:   December 20, 2021
Hearing Time:   9:30 a.m.
Est. Time:   1 hour
Set by:   Judge Landis per OST

COME NOW, SILVER STATE BROADCASTING, LLC, GOLDEN STATE BROADCASTING, LLC, and MAJOR MARKET RADIO LLC, Jointly Administered Debtors and Debtors-in-Possession herein (collectively "Debtors"), by and through their attorney, STEPHEN R. HARRIS, ESQ., of HARRIS LAW PRACTICE LLC, and respond to the OPPOSITION TO DEBTORS' JOINT MOTION FOR ORDER DIRECTING COURT APPOINTED RECEIVER TO TURNOVER PROPERTY PURSUANT TO 11 U.S.C. § 543(A) AND (B) [DE 77] ("Opposition") filed by federal receiver W. Lawrence Patrick ("Receiver"), as

1   well as any joinders filed by other parties[1].

2                          **INTRODUCTION**

3       1.   The Receiver continues his crusade of seeking to prolong his gravy-train of a

4   receivership where he has managed to incur approximately $600,000 in fees and costs long after

5   the Judgment, as amended, was paid by the Civil Action Defendants without the Receiver's effort.

6   The Receiver was not satisfied with just blocking the Debtors' attempts to terminate the

7   receivership in the District Court; now he tries to block the Debtors' attempts to reorganize under

8   the Bankruptcy Code.

9       2.   Apparently, the Receiver does not trust this Court's ability to manage its own cases

10  and the Debtors. The Receiver insists this Bankruptcy Court is going to just sit by and "be used

11  as [an] artifice by which to avoid payment of the Debtors' obligations." *Opposition* at 9:20–22.

12  In his mind, only the Receiver is qualified to ensure that the Debtors will pay their allowed

13  creditors, even though he has not paid any creditors to date and lacks the power to liquidate other

14  alleged creditors' claims against the Debtors. The Receiver insists only he can broker and

15  consummate a sale of the Debtors' Radio Station assets through the District Court even though

16  this Court routinely successfully oversees sales of assets, in a transparent way, after notice,

17  hearing, and usually with overbidding to maximize asset values.

18      3.   Indeed, the Receiver continues racking up his fees and costs trying to retain control

19  over the Debtors' Radio Stations and for what purpose? His mandate under the District Court

20  order appointing him was satisfied long ago. Who is the Receiver carrying water for considering

21  the Judgment creditors in the Civil Action are completely out of the picture because Mr. Stolz

22  paid them in full? Only one answer makes sense. The Receiver is seeking to prolong his reign

23  simply to pay himself more expeditiously from the Radio Station sales, and to collect a hefty

24  commission on the sale if it is consummated. That said, maybe it is to be expected that the

25  Receiver is looking after his own interests. But then he should come to this Court honestly and

26  admit the real reason for his continued efforts to maintain control over the Debtors' Radio

27

28  ―――――――――――――――
    [1] VCY America filed a Joinder to the Receiver's Opposition on December 14, 2021, the day after the Court-imposed deadline of December 13, 2021, at 5:00 p.m. VCY also introduced additional factual allegations not contained in the Receiver's Opposition.

1    Stations.

2        4.   The Receiver is not concerned about the Debtors' estate, including other creditors and

3    the equity holders. Indeed, the Receiver accuses the Debtors of not having a "path forward

4    following the District Court ordered-sale of the assets to VCY and without [discussing their]

5    longstanding efforts to hoodwink creditors and disobey court orders." *Opposition* at 2:13–15. Yet

6    it is the Receiver who is seeking to hoodwink this Court and has no path forward if he were

7    allowed to retain or sell the Debtors' Radio Stations. The Receiver has no ability to pay other

8    creditors except himself and maybe Bellaire (although that is highly debatable because of the

9    bizarre double-dipping subsequent state court receivership over the same assets).

10       5.   What is more, the Receiver is either woefully uninformed about the sale contract he

11   negotiated and presented to the District Court, or he is seeking to hoodwink this Court about the

12   status and terms of the proposed sale. The Asset Purchase Agreement ("APA"), attached hereto

13   as **Exhibit A**, expressly requires "Court Approval" of the sale "within three business days <u>after</u>

14   <u>the FCC Consent</u> is granted pursuant to the FCC's initial order." *See* APA §§ 1.9, 1.10, 1.11

15   (emphasis added). The Receiver admits the FCC has not consented to the sale, and so it is

16   impossible for the District Court to have provided the required final "Court Approval." Despite

17   this unambiguous language, the Receiver duplicitously alleges to this Court that the District Court

18   has entered a final, non-appealable sale order. *See Opposition* at 6:13–17.

19       6.   Based on the Receiver's unlawful control of the Debtors' assets post-petition, the

20   Debtors filed their EMERGENCY JOINT MOTION FOR ORDER DIRECTING COURT

21   APPOINTED RECEIVER TO TURNOVER PROPERTY PURSUANT TO 11 U.S.C. §§ 543(a)

22   AND (b) [DE 30] ("Turnover Motion"), seeking an Order compelling the Receiver to return the

23   Debtors' Radio Station assets to them as required under 11 U.S.C. § 543(a) and (b).

24       7.   Almost a week later and after ignoring his duties under § 543 for almost five weeks,

25   the Receiver filed his own EMERGENCY MOTION TO EXCUSE TURNOVER IN FAVOR OF

26   RECEIVER AND TO DISMISS/ABSTAIN, OR, ALTERNATIVELY, FOR STAY RELIEF

27   AND/OR CONVERSION [DE 45] ("Receiver's Motion"). On December 13, 2021, the Debtors

28   filed their OPPOSITION TO EMERGENCY MOTION TO EXCUSE TURNOVER IN FAVOR

1  OF RECEIVER AND TO DISMISS/ABSTAIN, OR, ALTERNATIVELY, FOR STAY RELIEF

2  AND/OR CONVERSION [DE 80] ("Opposition to Receiver's Motion").

3      8.   The Receiver's Opposition to the Debtors' Turnover Motion contains many of the

4  same arguments and factual allegations found in the Receiver's Motion, and also seeks dismissal

5  of these Chapter 11 cases, relief from stay, abstention, or conversion. This is all relief that the

6  Receiver has to seek through a motion—not in his Opposition to the Debtor's Turnover Motion.

7  Nonetheless, because the Receiver improperly raised those issues in his Opposition rather than

8  just addressing them in his Receiver's Motion, the Debtors are forced to respond. Thus, to avoid

9  duplication and requiring this Court to read the same long material twice, the Debtors incorporate

10  all the allegations and legal arguments contained in their Opposition to Receiver's Motion.

11      9.   As the Debtors explained in their Turnover Motion, in their Opposition to Receiver's

12  Motion, and now in this Reply, the Receiver's retention of the Debtors' Radio Stations is not in

13  the best interests of the estate, creditors, or equity holders. The Receiver is also not a trustee or

14  examiner and is barred from administering assets in these Chapter 11 cases under 11 U.S.C. §

15  105(b). For these reasons, the Court should grant the Debtors' Turnover Motion by compelling

16  the Receiver to "pack his bags" once and for all under the mandatory provisions of 11 U.S.C. §§

17  543(a) and (b).

18                          **LEGAL ARGUMENT**

19   **A.  The Receiver should not be excused from the mandatory turnover provisions of**

20   **11 U.S.C. § 543 because he lacks authority to administer the Debtors' assets**

21   **under the Code.**

22      The Receiver continues to argue that he should essentially be vested with the powers of a

23  trustee in these Chapter 11 cases to administer the Debtors' Radio Station assets. But the Receiver

24  does not qualify as a trustee, and this Court is prohibited from appointing a receiver under 11

25  U.S.C. § 105(b). Thus, if the Court excused the Receiver's turnover requirements, the Receiver

26  literally has no power to do anything with the Radio Stations other than to hold them to preserve

27  them for a limited time.

28      The Receiver's arguments are nonsensical because he also alleges the Radio Station assets

1  mostly consist of intangible FCC licenses. Thus, they are not the type of physical assets that the

2  Code contemplates may require special underline temporary protection by a receiver. Also according to the

3  Receiver, the other related Radio Station assets were "in shambles." *Opposition* at 10:19–20.

4  Thus, the Receiver can easily return the "shambles" to the Debtors—they do not require the

5  Receiver's "special" brand of protection.

6      The Receiver's past conduct shows that his manner of "protecting" assets is to neglect his

7  duties to create an inventory list, and then direct his agents to abscond with assets that he has no

8  right to administer. As Mr. Stolz testified in his Declaration [DE 31], some of his personally

9  owned radio equipment not subject to the receivership mysteriously disappeared from atop Mt.

10  Potosi, Nevada. *See Stolz Declaration* ¶15–17. Mr. Stolz later saw his missing equipment at

11  VCY's operations in Indio Peak, California. *Id.* When the Civil Action Defendants' counsel then

12  asked the Receiver's counsel for an inventory or equipment list of the receivership estate,

13  Receiver's counsel revealed the Receiver had not prepared an inventory or equipment list. *Id.*

14      Ironically, the Receiver also accuses the Debtors' principal of mismanaging the Debtors'

15  Radio Stations because Mr. Stolz testified the revenues in the past were "meager." *Opposition* at

16  10:12–16. But Mr. Stolz has testified in his Declaration [DE 31] that the Radio Stations were

17  generating approximately $50,000 in monthly revenue when the Receiver took possession of

18  them. *Stolz Declaration* ¶ 10. Mr. Stolz admits this amount is less than they could generate. *Id.*

19  Yet it is still underline ten times more than the amount of revenue the Receiver is collecting for the Radio

20  Stations through his Local Marketing Agreement ("LMA") with VCY. *See id.*

21      As a result, if the Receiver accuses Mr. Stolz of mismanaging the Radio Stations because

22  they generated $50,000 per month in revenue, then the Receiver's "management" of generating

23  only $5,000 per month in revenue goes beyond gross mismanagement—it is egregiously gross

24  mismanagement. And to the extent that the Receiver has continued to operate the Radio Stations

25  through VCY post-petition without Court approval, he is also unlawfully carrying out his

26  egregiously gross mismanagement.

27  **1. The Receiver cannot pay the Debtors' creditors.**

28      As stated above in the introduction, the Receiver purports to be greatly concerned about

1   paying the Debtors' creditors, yet he lacks any legal authority do so regardless of these Chapter

2   11 cases. The only creditors which the Receiver could pay under the District Court's receivership

3   were the Judgment creditors who Mr. Stolz directly paid in November 2020, at which time the

4   receivership should have been promptly terminated. The Receiver also has no ability to liquidate

5   other alleged creditors' claims against the Debtors.

6          As the Debtors explained in their Turnover Motion, the District Court's record shows that

7   Mr. Stolz promptly tried to pay the Judgment creditors who refused to accept payment, and then

8   he promptly sought permission from the District Court to deposit payment in the court's registry.

9   The Civil Action Defendants were represented by legal counsel, Mr. Adli, at all relevant times

10  and relied on him to do whatever was procedurally necessary for the money to be paid from the

11  court's registry to the Judgment creditors. The fact that did not occur more quickly is hardly the

12  Debtors' fault, and for that reason, they have disclosed potential malpractice claims against Mr.

13  Adli on their Schedules.

14         But despite the Civil Action Defendants' unfortunate legal representation, a debtor's

15  nonpayment of prepetition debts is not a basis on which a receiver's compliance with § 543 is

16  excused. Indeed, all bankrupt debtors have unpaid prepetition debts of some type or another—

17  that is the point of bankruptcy relief. The Receiver does not provide any legal authority supporting

18  the notion that nonpayment of some prepetition debts amounts to "mismanagement," especially

19  with solvent debtors who clearly have the required assets with which to satisfy claims in a

20  bankruptcy proceeding.

21         The Receiver also alleges in his Opposition that he has allegedly not paid creditors only

22  "because of the Debtors['] repeated attempts to obstruct the sale to VCY." *Opposition* at 4:26–

23  28. Yet notably absent is any explanation from the Receiver as to which creditors he would have

24  paid, and under what legal authority. The Receiver was not appointed as a receiver over the

25  Debtors' entities—only as a receiver over specific, discrete assets to satisfy the District Court

26  Judgment that Mr. Stolz already paid directly.

27         Indeed, other than Bellaire, the Receiver does not explain which other creditors he would

28  pay because he knows he cannot pay the Debtors' creditors, other than himself and any creditors

1 | that arose directly out of the receivership estate. Moreover, if the "Receiver's Accounting Report"
2 | is any indication of how the Receiver manages estates, he has not segregated the assets to make
3 | sure creditors of one Debtor are not paid from assets of another Debtor. For example, the Receiver
4 | alleges he wants to pay Bellaire the amount of its outstanding state court judgment. Yet only one
5 | Debtor, Golden State, is liable under the Bellaire judgment, but the Receiver proposed to
6 | improperly pay it from commingled receivership assets of all three Debtors.

7 | **2.  The Debtors' leases are the Debtors' obligations that should be paid from the**
8 | **Debtors' Radio Station revenues.**

9 | In trying to explain why the Receiver ignored the Debtors' contractual obligations even
10 | though he controlled the bulk of the Debtors' assets, the Receiver incorrectly alleges that "Mr.
11 | Stolz has admitted that the lease payments were not related to the operations subject to the
12 | receivership." *Opposition* at 5:6–7.

13 | Mr. Stolz did not admit that the <u>lease obligations</u> were unrelated to the Debtors' operations
14 | or assets subject to receivership. The transcript quoted by the Receiver shows that Mr. Stolz said
15 | the <u>checks he wrote</u> to make the lease payments were drawn on <u>accounts</u> that were unrelated to
16 | the broadcasting stations. He did not say the lease obligations were unrelated to the Radio
17 | Stations. Mr. Stolz testified to exactly what the Debtors have alleged—Mr. Stolz has made lease
18 | payments personally because the leases would otherwise be in default since the Receiver had
19 | control of the Radio Station assets but was not paying the lease obligations which are the Debtors'
20 | contracts. *See* Debtors' Schedules G.

21 | **3.  The Receiver can prepare a final accounting based on all his activity to date in**
22 | **the receivership estate.**

23 | Incredibly, the Receiver alleges that the District Court must have a final accounting from
24 | the Receiver which he could not prepare until the <u>Debtors</u> stopped litigating. Yet the only thing
25 | the Debtors were trying to do was get closure in the receivership and obtain some clarity about
26 | how much they needed to finally pay for any reasonable accrued receivership expenses and
27 | claims.

28 | To an outside observer, the events that occurred in the District Court were at worst,

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

1    inequitable to the Debtors, and at best, illogical. In any event, the Debtors' Chapter 11 cases

2    immediately terminated the Receiver's authority to control the Debtors' Radio Station assets. The

3    Receiver can, and must, absolutely comply with § 543 and prepare and file with this Court a final

4    accounting. 11 U.S.C. § 543(c)(2) provides for a procedure to approve any of the Receiver's

5    reasonable compensation. Instead, the Receiver is here trying to extend his appointment, and

6    indeed seeking relief from stay to prolong the District Court litigation (because he has not quite

7    had enough yet), while at the same time accusing the Debtors of refusing to stop litigating.

8       **4. The Debtors did file a response to the Receiver's request to submit proposed sale**

9          **documents *in camera*.**

10       The Receiver first alleges there are no proceeds from the Radio Station assets with the

11   sale still pending. *Opposition* at 5:26–27. This is highly doubtful. The Receiver entered into the

12   LMA with VCY which was supposed to generate some revenue for the Radio Stations, though

13   much less than reasonable revenue. The Receiver must account for <u>all</u> the Debtors' Radio Station

14   assets, including business revenues and expenses. Is the Receiver alleging that the Radio Stations

15   have not produced a single dollar or paid a single operating expense during all the time he has

16   managed the receivership estate?

17       Next, the Receiver alleges that the Civil Action Defendants did not respond to the

18   Receiver's request for *in camera* review of the proposed purchase offer until after the District

19   Court granted the *in camera* request. *Opposition* at 6:1–3. That may be true, but again, the Debtors

20   relied on their legal counsel to respond. The Debtors' response to the District Court's order

21   authorizing submission of the purchase offer *in camera* also expressly stated that "they have a

22   right to potentially object and to be heard prior to the Court's approval of any offer for sale of any

23   of the radio station(s)." *See* District Court DE 305. What is more, no court should have allowed

24   any process where substantially all the Debtors' assets would be sold under secret terms, without

25   notice, a hearing, or opportunity to object to the sale terms. Especially where the purpose of the

26   sale was purportedly to satisfy a judgment that had been paid.

27       No trustee in bankruptcy would ever dream to attempt to sell the estate's assets under

28   those circumstances. Even where a purchase agreement might have some confidential

information, measures can be taken to protect those pieces of information from the public while still providing interested parties with due process. It is shameful that the <u>Receiver launched </u>and participated in such a stealthy sale process, especially after claiming to be an experienced bankruptcy trustee who should know better. Even more egregiously, the Receiver and VCY then turned around and filed the very "confidential" documents with the FCC's public record anyway as part of their application to obtain the FCC's consent to the proposed sale.

### 5. The Receiver filed its status report with the FCC only after the Debtors had filed their Turnover Motion.

The Receiver also alleges that the Debtors offer baseless hearsay when they alleged in their Turnover Motion that the Receiver was still trying to sell the FCC licenses without this Court's approval. Yet the Debtors filed their Turnover Motion on November 17, 2021, and the Receiver did not file his status report with the FCC until November 24, 2021—seven days later.

Moreover, has the Receiver instructed VCY to cease operating the Radio Stations as he had to do under §§ 543(a) and 362(a) immediately upon learning of the Chapter 11 petitions? Has the Receiver continued to strategize about the proposed sale with VCY post-petition? Those are all efforts to sell the Debtors' assets in violation of the Bankruptcy Code. The Receiver forgets that he is simply an instrument of a prepetition debt collection process. Just as any creditor must cease <u>all</u> collection efforts against the Debtors and their property under 11 U.S.C. § 362, so too was the Receiver required to do so.

### 6. The Debtors need not obtain Court approval to borrow money on an unsecured basis in the ordinary course under 11 U.S.C. § 364(a).

The Receiver alleges that the Debtors have defied fundamental bankruptcy disclosures by taking "undisclosed" post-petition loans from Mr. Stolz. *Opposition* at 6:24–28. Yet the Receiver fails to understand the Bankruptcy Code which does not require that the Debtors obtain Court approval under § 364(a) for ordinary course of business unsecured loans. Of course Mr. Stolz has had to fund the Debtors' post-petition obligations because the Receiver has control of the Debtors' primary assets and fails to pay the Debtors' contractual obligations, like the leases, which did not magically go away just because the Receiver took control of the Radio Station assets.

1    **7. The Debtors are establishing DIP accounts**.

2    The Debtors did not previously open DIP accounts because they have not had money post-

3    petition to deposit in any bank accounts. Mr. Stolz, through the Debtors' parent Royce

4    International Broadcasting, has paid the Debtors' post-petition contractual obligations because

5    the Receiver has had control of the Debtors' primary assets, but is not paying the Debtors'

6    contractual expenses. That said, the Debtors are in the process of establishing DIP accounts and

7    expect to have those opened on or about the time of the hearing on their Turnover Motion.

8    **8. The Receiver continues to duplicitously insist that the District Court entered a**

9    **final order approving his proposed sale of the Radio Station assets to VCY.**

10    The Receiver's final allegation highlights exactly why this Court should compel the

11    Receiver to immediately turnover the Debtors' Radio Stations. The Receiver accuses Mr. Stolz

12    of failing to acknowledge the existence of a nonexistent District Court "final order" approving

13    the Receiver's proposed sale of the Radio Stations to VCY. *Opposition* at 6:14–16. The only

14    explanation is that the Receiver either has no idea what the terms of his own proposed sale are, or

15    he is trying to defraud this Court.

16    The Receiver contends that the November 9, 2020, order is a "Sale Order," that it is

17    "final," and that it is "non-appealable." In the same breath, the Receiver complains that "the

18    Debtors did not Appeal." *Opposition* at 6:14–16.

19    Presumably, by "sale order," the Receiver wants this Court to believe that the District

20    Court has approved the sale of the Radio Stations and no further court approval was needed to

21    consummate the sale. Nothing could be further from the truth. The APA itself, drafted by the

22    Receiver's counsel, does away with the notion that the District Court has approved the sale. The

23    APA states, in relevant part:

24    > 1.9 <u>Closing</u>. The consummation of the sale and purchase of the Station
    > Assets pursuant to this Agreement (the "<u>Closing</u>") shall take place within

25    > ten (10) business days **after the date the Court Approval** (defined
    > below) has been issued, provided that the FCC Consent (defined below)

26    > is Final.

27    APA ¶ 1.9, attached as **Exhibit A**.

28    The APA defines "Court Approval" as:

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

1.11 <u>Court Approval</u>. Buyer [VCY America] and Seller [W. Lawrence Patrick] acknowledge that Closing and the performance of the obligations of Seller and Buyer under this Agreement are **subject to approval by the Court.** Within three (3) business days **after the FCC Consent** is granted pursuant to the FCC's initial order, **Seller [W. Lawrence Patrick] shall seek an order from the Court authorizing the sale of the Station Assets** upon the terms and conditions set forth in this Agreement **("Court Approval").** Seller shall use commercially reasonable efforts to secure **Court Approval** as promptly as possible.

*Id.* ¶ 1.11 (emphasis added).

The language in the APA is a clear as can be. No "sale order" exists, for if it did, the Receiver would not need "Court Approval" after the "FCC's Consent" to consummate the sale. Moreover, the Receiver admits, and nobody disputes, that the FCC has not yet consented to the proposed sale. Thus, it is impossible for the District Court to have entered a final order on its "Court Approval" which first requires the FCC's Consent as a pre-condition.

To the extent that the Receiver seeks to interpret the APA to mean anything but what the APA plainly says, it is worth noting that "[a]mbiguity in a contract is construed against the drafter." *Coker Equip. Co. v. Wittig*, 366 F. App'x 729, 731 (9th Cir. 2010)

Despite the contractual requirement for "Court Approval" that has not yet been obtained, even if the District Court had approved the sale, it is undisputed that the sale has not been approved by the FCC or consummated. Thus, the Radio Station assets were still the Debtors' property on the Petition Date and property of their estates under §541. This Court has exclusive jurisdiction over the Debtors' property wherever located, as of the Petition Date. *See* 28 U.S.C. §§ 151 and 157; Local Rule 1001(b).

As of October 19, 2021, any District Court order approving a non-consummated sale of the Debtors' assets is not enforceable or controlling here because the Debtors would still have to obtain this Court's approval of any asset sale under 11 U.S.C. § 363(b)(1). Astonishingly, the Receiver alleges the importance of the District Court's imaginary "final sale order," but provides no legal authority for how the District Court's sale order, if it existed, could be used instead of a sale order from this Court under the Bankruptcy Code.

Lastly, debtors can reject unexpired leases and executory contracts in Chapter 11 under

1    11 U.S.C. § 365(a) so they can reorganize by terminating contracts that are not in the estate's best

2    interest. Thus, the Bankruptcy Court has final authority to authorize the Debtors' rejection of any

3    prepetition unexpired executory contracts, assuming the Debtors are bound by the Receiver's

4    contracts, which they contend is not the case. The Receiver was not appointed as receiver over

5    the Debtors' legal entities nor acting under their direction or authority, thus under agency

6    principles the Debtors are not bound by the Receiver's contractual obligations. In any event, that

7    is an argument for another day.

8         The Receiver and VCY were both aware that the Civil Action Defendants vigorously

9    opposed the continuation of the receivership after payment of the Amended Judgment on

10   November 9, 2020. Despite that, the Receiver and VCY proceeded forward with trying to push

11   the proposed sale for an entire year with the knowledge that the receivership could (and should

12   have) terminated at any time. The parties, with full awareness of the tenuous nature of the

13   receivership estate, bore the risk that the sale would be cancelled. They cannot now complain that

14   this Court should sacrifice the best interests of the entire estate for the Receiver and VCY's benefit

15   just because they worked on closing the proposed sale for the past year. Any due diligence and

16   other expenses incurred by VCY are simply the cost of trying to "get a good deal" by purchasing

17   assets through a quasi-foreclosure situation.

18        **9.  The Receiver seeks relief from the automatic stay improperly through his**

19            **Opposition but cannot meet the standards under 11 U.S.C. § 362(d)(2).**

20        The Receiver attempts to improperly seek relief from stay through his Opposition. As the

21   Debtors previously noted, they opposed the Receiver's lift stay request in their Opposition to

22   Receiver's Motion. At any rate, one more point is important to note.

23        The Receiver alleges that he is entitled to relief from the automatic stay under 11 U.S.C.

24   § 362(d)(1) to proceed with litigation based on the *Curtis* factors. The Debtors disagree and have

25   shown in their Opposition to Receiver's Motion that the *Curtis* factors weigh strongly against

26   granting relief from stay. That said, the Receiver purposely sought relief under the wrong

27   standard. There is no "litigation" pending under the traditional definition contemplated when

28   applying the *Curtis* factors. The receivership was a post-judgment *in rem* collection effort against

1   the Debtors' assets, and nothing more.

2   Even the Receiver admits that what he means by "litigation" is "completion of the

3   receivership sale and distributions [that] will finally resolve all outstanding issues among the

4   Debtors, the Receiver, and the Debtors' sole secured creditor." *Opposition* at 18:1–2.

5   Accordingly, the Receiver is seeking to foreclose on the Debtors' assets, which requires him to

6   seek relief from stay under 11 U.S.C. § 362(d)(2).

7   But the Receiver could not seek relief under § 362(d)(2) because the plain language of the

8   statute only provides for relief from stay if the debtor "does not have equity in the property and it

9   is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). It is evident for anybody

10  to see that the Debtors' Radio Stations have equity, even based on the Receiver's low-ball

11  proposed sale price of $6 million. It is also evident that the Radio Stations are necessary for the

12  Debtors' reorganization because they are the Debtors' primary assets with which to pay all their

13  remaining creditors and equity holders.

14  For these and many other reasons, the Court cannot grant the Receiver relief from stay.

15  But it is worthwhile noting that the Receiver's sneaky tactics of ignoring § 362(d)(2) did not go

16  unnoticed.

17  **10. For all the reasons set forth by the Debtors in their Opposition to Receiver's**

18  **Motion, the Court should not abstain, dismiss, or convert their cases.**

19  As previously noted, the Receiver through his Opposition is also improperly seeking

20  abstention, dismissal, or conversion of these Chapter 11 cases. To avoid duplication, the Debtors

21  hereby incorporate the allegations and legal arguments from their Opposition to Receiver's

22  Motion.

23  **CONCLUSION**

24  Based on the foregoing, it is plain to see that the Receiver has not met his substantial

25  burden of proof to support excusing his compliance with 11 U.S.C. § 543(a) and (b) or any of the

26  relief he seeks. The Receiver is not a trustee or examiner in these cases, nor does he have any

27  authority under the Bankruptcy Code to administer the Debtors' assets even if he were allowed

28  to retain them temporarily. Finally, this Court and the Bankruptcy Code are precisely the best

1   forum in which the Debtors can marshal their assets, liquidate claims against them, and ultimately

2   pay allowed creditors in a fair and orderly manner. The Receiver cannot do that regardless of the

3   Chapter 11 cases. For these reasons, the Debtors respectfully request this Court grant their Motion

4   for Turnover.

5          DATED this 17th day of December 2021.

6

7                                          HARRIS LAW PRACTICE LLC

8                                          /s/ Stephen R. Harris

9                                          STEPHEN R. HARRIS, ESQ.
                                           Attorney for Debtors

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of December 28, 2020 between W. Lawrence Patrick ("Seller"), solely in his capacity as court-appointed receiver for certain radio station-related assets previously owned and operated by Silver State Broadcasting LLC, Golden State Broadcasting LLC and Major Market Radio LLC (collectively, the "Prior Owners"), and VCY America, Inc., a Wisconsin non-profit corporation ("Buyer").

Recitals

A.  Seller was appointed as receiver for certain radio station-related assets previously owned and operated by the Prior Owners pursuant to the Order Appointing W. Lawrence Patrick as Receiver in Aid of Post-Judgment Execution entered into on July 6, 2020 and issued by the United States District Court Central District of California (the "Court") in *WB Music Corp., et al., v. Royce International Broadcasting Corp., et. al.*, Case No: 5:16-cv-00600-JGB (SPx) (the "Receivership Order").

B.  Subject to the Receivership Order, Seller operates the following radio broadcast stations (collectively, the "Stations") pursuant to certain authorizations issued by the Federal Communications Commission (the "FCC"):

KRCK-FM, Mecca, California (FCC Facility ID No. 52808)
KREV(FM), Alameda, California (FCC Facility ID No. 36029)
KFRH(FM), North Las Vegas, Nevada (FCC Facility ID No. 19062)

C.  Pursuant to the terms and subject to the conditions set forth in this Agreement and the Receivership Order, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Station Assets (defined below).

Agreement

NOW, THEREFORE, taking the foregoing into account, and in consideration of the mutual covenants and agreements set forth herein, the parties, intending to be legally bound, hereby agree as follows:

ARTICLE 1:    SALE AND PURCHASE

1.1    Station Assets.  On the terms and subject to the conditions hereof, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase and acquire from Seller, all right, title and interest of Seller in and to all assets, properties, interests and rights of Seller, real and personal, tangible and intangible, that are used or held for use in the operation of the Stations, except the Excluded Assets (defined below) (collectively, the "Station Assets"), including, without limitation, the following:

(a)     all licenses, permits and other authorizations issued to Seller by the FCC with respect to the Stations (the "FCC Licenses"), including those described on *Schedule 1.1(a)* attached hereto, including any renewals or modifications thereof between the date hereof and Closing (defined below);

(b)     all of Seller's equipment, transmitters, antennas, cables, towers, and other tangible personal property of every kind and description that are used or held for use in the transmission systems of the Stations (the "Tangible Personal Property"), including, without limitation, those items listed on *Schedule 1.1(b)* attached hereto;

(c)     all agreements used in the operation of the Stations that are listed on *Schedule 1.1(c)* attached hereto (the "Station Contracts");

(d)     all of Seller's rights in and to the Stations' call letters and Seller's rights in and to the trademarks, trade names, service marks, copyrights, domain names, computer software, programs and programming material, jingles, slogans, logos, Facebook, Twitter and other social media accounts, and other intangible property that is used or held for use in the operation of the Stations, including, without limitation, those listed on *Schedule 1.1(d)* attached hereto (the "Intangible Property");

(e)     Seller's rights in and to all the files, documents, records, and books of account (or copies thereof) relating to the operation of the Stations, including the Stations' local public files, blueprints, technical information and engineering data, and logs; and

(f)     all claims (including warranty claims), deposits, prepaid expenses, and Seller's goodwill in, and the going concern value of, the Stations.

1.2     Liens.  The Station Assets shall be transferred to Buyer free and clear of liens, claims and encumbrances ("Liens") except for the (a) Assumed Obligations (defined below); (b) statutory liens for taxes not yet due and payable; and (c) any outstanding Liens on the Station Assets existing prior to Seller's assumption of the Stations from the Prior Owners pursuant to the Receivership Order, which Liens shall be satisfied upon Closing as set forth in Section 1.5 hereof (the Liens described in (a) and (b) above are referred to herein as the "Permitted Encumbrances").

1.3     Excluded Assets.  Notwithstanding anything to the contrary contained herein, the Station Assets shall not include (a) Seller's cash and cash equivalents; (b) Seller's insurance policies; (c) Seller's employee benefit plans; (d) the Stations' accounts receivable and any other rights to payment of cash consideration for goods or services sold or provided prior to the Effective Time (defined below), or otherwise arising during or attributable to any period prior to the Effective Time; or (e) any assets set forth on *Schedule 1.3* (collectively, the "Excluded Assets").

1.4     Assumed Obligations.  On the Closing Date, Buyer shall assume the obligations of Seller arising after Closing under the Station Contracts (collectively, the "Assumed Obligations").  Except for the Assumed Obligations, Buyer does not assume

- 2 -

and will not be deemed by execution and delivery of this Agreement or any agreement, instrument or document delivered pursuant to or in connection with this Agreement or otherwise by reason of the consummation of the transactions contemplated hereby, to have assumed, any liabilities, obligations or commitments of Seller of any kind, whether or not disclosed to Buyer, including, without limitation, any liability or obligation of Seller under any contracts not included in the Station Contracts (the "Retained Liabilities").

     1.5   Purchase Price. The purchase price to be paid for the Station Assets shall be the sum of Six Million Dollars ($6,000,000) which amount shall be increased or decreased by the proration amount referred to in Section 1.7 below (the "Purchase Price"). The Purchase Price shall be paid by Buyer to Seller at Closing as follows:

     (a)   Buyer shall pay to Seller in cash in immediately available funds $5,400,000; and

     (b)   the Escrow Agent (defined below) shall retain $600,000 in escrow pursuant to the terms of Section 1.6(d) below (the "Held Funds").

     1.6   Deposit; Post-Closing Escrow.

     (a)   Within one (1) business day following the date hereof, Buyer shall deposit the sum of Six Hundred Thousand Dollars ($600,000) (the "Deposit") with Truist Bank (the "Escrow Agent") pursuant to an Escrow Agreement (the "Escrow Agreement") of even date herewith among Buyer, Seller and the Escrow Agent. At Closing, the Deposit shall be credited toward the Purchase Price but shall be retained by the Escrow Agent and shall constitute the Held Funds pursuant to Section 1.6(c) below.

     (b)   If this Agreement is terminated by Seller pursuant to Section 10.1(c), then the Deposit shall be disbursed to Seller as liquidated damages and the sole and exclusive remedy of Seller (and any interest accrued thereon shall be disbursed to Buyer). Seller hereby waives all other legal and equitable remedies it may otherwise have as a result of any breach or default by Buyer under this Agreement. If this Agreement is terminated for any other reason, the Deposit and any interest accrued thereon shall be disbursed to Buyer. The parties shall each instruct the Escrow Agent to disburse the Deposit and all interest accrued thereon to the party or parties entitled thereto and shall not, by any act or omission, delay or prevent any such disbursement.

     (c)   On the Closing Date, the Escrow Agent shall retain the Held Funds pursuant to the Escrow Agreement for the purpose of maintaining sufficient funds necessary to replace and/or repair any Tangible Personal Property as provided under Section 5.8 (the "Tangibles"). Expenditures from the Held Funds shall be made as follows: upon joint written instructions to the Escrow Agent to disburse the amount set forth in such joint written instructions from the Held Funds to Buyer or Seller, or to another party as directed by Buyer and Seller.

     (d)   All such expenditures shall be subject to the Receivership Order and the jurisdiction of the Court. The parties shall each instruct the Escrow Agent to disburse the

Held Funds to the party or parties entitled thereto and shall not, by any act or omission, delay or prevent any such disbursement.  The Held Funds shall remain available and on hand until such time that the parties agree, in each party's reasonable discretion, that all matters concerning the Tangibles have been satisfied.  At such time, the parties shall each instruct the Escrow Agent to disburse any remaining Held Funds.  All interest accrued on the Held Funds following Closing shall be for the benefit of Seller.

(e)     Seller hereby agrees to retain, for a period of six (6) months following the Closing Date, Four Hundred Thousand Dollars ($400,000) of the Purchase Price for payment(s) to Buyer in the applicable amount(s), promptly upon Buyer's request, (i) in the event that the Held Funds are insufficient to replace and/or repair any Tangibles provided, however, that any disbursement in excess of the Held Funds shall be solely at Seller's reasonable discretion and subject to any approval by the Court; and (ii) to satisfy any of Seller's indemnification obligations under Section 9.2 hereof.

1.7     <u>Prorations and Adjustments</u>.

(a)     All prepaid and deferred income and expenses relating to the Station Assets and arising from the operation of the Stations shall be prorated between Buyer and Seller in accordance with generally accepted accounting principles as of 11:59 p.m. on the day immediately preceding the Closing Date (the "<u>Effective Time</u>").

(b)     Such prorations shall include, without limitation, any property taxes (except transfer taxes as provided by Section 11.1), music and other license fees, and other amounts under Station Contracts and similar prepaid and deferred items.  Seller shall receive a credit for all of the Stations' deposits.  Prorations and adjustments shall be made no later than ninety (90) calendar days after Closing.  There shall be no proration or adjustment for employee leave or other employee matters.

(c)     Notwithstanding anything to the contrary contained herein, there shall be no adjustment for and Seller shall remain solely liable for any contracts or agreements not included in the Assumed Obligations.

1.8     <u>Allocation</u>.  After Closing, Buyer and Seller shall allocate the Purchase Price in accordance with the respective fair market values of the Station Assets and the goodwill being purchased and sold in accordance with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>").  The allocation shall be determined by mutual agreement of the parties.  Buyer and Seller each further agrees to file its federal income tax returns and its other tax returns reflecting such allocation as and when required under the Code.  If the parties cannot agree on the allocation of the Purchase Price, the parties shall hire Bond & Pecaro, Inc. to determine such allocation, which will be binding on the parties.  The parties shall instruct the appraiser to deliver its report within ninety (90) days after its appointment.  Buyer and Seller shall each be responsible for one-half of the cost of such appraisal.

1.9     <u>Closing</u>.  The consummation of the sale and purchase of the Station Assets pursuant to this Agreement (the "<u>Closing</u>") shall take place within ten (10) business days

- 4 -

after the date the Court Approval (defined below) has been issued, provided that the FCC Consent (defined below) is Final.  Buyer may, in its sole discretion, elect to proceed to Closing prior to the FCC Consent becoming Final (defined below), but in any case Closing is subject to the satisfaction or waiver of the last of the conditions required to be satisfied or waived pursuant to Articles 6 or 7 below (other than those requiring a delivery of a certificate or other document, or the taking of other action, at the Closing). The date on which the Closing is to occur is referred to herein as the "Closing Date."

1.10    FCC Consent.

(a)    Within five (5) business days after the date of this Agreement, Buyer and Seller shall file an application (the "FCC Application") requesting FCC consent to the assignment of the FCC Licenses from Seller to Buyer (the "FCC Consent").  Seller and Buyer shall diligently prosecute the FCC Application.  Each party shall promptly provide the other with a copy of any pleading, order or other document served on it relating to the FCC Application, and shall furnish all information required by the FCC.  Buyer and Seller shall notify each other of all documents filed with or received from any governmental agency with respect to this Agreement or the transactions contemplated hereby.  Buyer and Seller shall furnish each other with such information and assistance as the other may reasonably request in connection with their preparation of any governmental filing hereunder.

(b)    Seller shall, at its expense, timely take any action requested by the FCC with respect to any pending FCC enforcement or other matters related to the Stations, including, without limitation, entering into a tolling agreement, establishing an escrow or making other arrangements satisfactory to the FCC.

(c)    Concurrently with the filing of the FCC Application, Buyer shall file an application with the FCC requesting a modification of the Stations' FCC License status from commercial to non-commercial, contingent on consummation of the transactions contemplated by the FCC Application.

1.11    Court Approval.  Buyer and Seller acknowledge that Closing and the performance of the obligations of Seller and Buyer under this Agreement are subject to approval by the Court.  Within three (3) business days after the FCC Consent is granted pursuant to the FCC's initial order, Seller shall seek an order from the Court authorizing the sale of the Station Assets upon the terms and conditions set forth in this Agreement ("Court Approval").  Seller shall use commercially reasonable efforts to secure Court Approval as promptly as possible.

ARTICLE 2:    SELLER REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer as follows:

2.1    Authorization.  The Receivership Order is a valid order from the Court appointing Seller to serve as receiver and take possession of the assets of the Prior Owners, and Seller has taken possession of such assets.  Subject to Court Approval,

Seller has the power and authority to execute, deliver and perform this Agreement, and to deliver the documents to be made pursuant hereto (the "Seller Authorization") and such actions do not require any further authorization or consent of Seller. This Agreement and the documents to be made pursuant hereto are legal, valid and binding agreements of Seller enforceable in accordance with their respective terms, except in each case as such enforceability may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

   2.2 <u>No Conflicts</u>. The execution, delivery and performance by Seller of this Agreement and the documents to be made pursuant hereto does not conflict with the Receivership Order, or any other contract or agreement to which Seller is a party or by which it is bound, or any law, judgment, order, or decree to which Seller is subject, and does not require the consent, approval or authorization, or filing with, any third party or any court or governmental authority, except the FCC Consent, Court Approval and counter-party consent to assign those Station Contracts designated on *Schedule 1.1(c)*.

   2.3 <u>FCC Licenses</u>.

   (a) Seller is the holder of the FCC Licenses listed and described on *Schedule 1.1(a)*. Such FCC Licenses constitute all of the authorizations required under the Communications Act of 1934, as amended (the "Communications Act"), or the rules, regulations and policies of the FCC for the present operation of the Stations. The FCC Licenses are in full force and effect and have not been revoked, suspended, canceled, rescinded or terminated and have not expired, except as set forth on *Schedule 1.1(a)*. There is not pending or, to Seller's knowledge, threatened any action by or before the FCC to revoke, suspend, cancel, rescind or modify any of the FCC Licenses (other than proceedings relating to FCC rules of general applicability), and there is no order to show cause, notice of violation, notice of apparent liability, or notice of forfeiture or complaint pending or, to Seller's knowledge, threatened against Seller or the Stations by or before the FCC.

   (b) To Seller's knowledge, all reports and filings required to be filed with, and all regulatory fees required to be paid to, the FCC with respect to the Stations (including, without limitation, all required equal employment opportunity reports) have been timely filed and paid. Seller maintains public files for the Stations as required by FCC rules.

   (c) To Seller's knowledge, the operation of the Stations do not expose workers or others to levels of radio frequency radiation in excess of the "Radio Frequency Protection Guides" recommended in "American National Standard Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields 3 kHz to 300 GHz" (ANSI/IEEE C95.1-1992), issued by the American National Standards Institute, and renewal of the FCC Licenses would not constitute a "major action" within the meaning of Section 1.1301, *et seq.*, of the FCC's rules.

2.4    Taxes.  Seller has filed all foreign, federal, state, county and local income, excise, property, sales, use, franchise and other tax returns and reports which are required to have been filed by it under applicable law in connection with the Stations' business, and has paid all taxes which have become due pursuant to such returns or pursuant to any assessments which have become payable.

2.5    Personal Property.  *Schedule 1.1(b)* contains a list of all material items of Tangible Personal Property included in the Station Assets.

2.6    Real Property.  Seller owns no real property in connection with the operation of the Stations.  *Schedule 1.1(c)* includes a description of any lease or similar agreement under which Seller is lessee or licensee of, or holds, uses or operates, any real property in the business or operation of the Stations (the "Real Property Leases").  To Seller's knowledge, no property leased under the Real Property Leases is subject to any pending or threatened suit for condemnation or other taking by any public authority.  Seller has delivered to Buyer true and complete copies of all title insurance policies, title insurance commitments and surveys in its possession (if any) that are applicable to the Real Property Leases.

2.7    Contracts.  *Schedule 1.1(c)* contains a list of all contracts used in the operation of the Stations to be assigned to and assumed by Buyer hereunder.  Each of the Station Contracts (including, without limitation, each Real Property Lease) is in effect and is binding upon Seller and, to Seller's knowledge, the other parties thereto (subject to bankruptcy, insolvency, reorganization or other similar laws relating to or affecting the enforcement of creditors' rights generally).  To Seller's knowledge, no party to any of the Station Contracts is in default thereunder in any material respect.  Except as disclosed in *Schedule 1.1(c)*, there are no Station Contracts between Seller and any affiliate of Seller.  Seller has delivered to Buyer true and complete copies of each Station Contract (including each Real Property Lease), together with all amendments thereto.

2.8    Environmental.  To Seller's knowledge, no hazardous or toxic substance or waste (including, without limitation, petroleum products) or other material regulated under any applicable environmental, health or safety law has been generated, stored, transported or released on, in, from or to the Station Assets.  Seller has complied and is in compliance in all material respects with all environmental, health and safety laws applicable to the Stations or the Station Assets.  Seller has not received in respect of the Stations or Station Assets any notice or claim to the effect that it is or may be liable under any environmental, health or safety law.  To Seller's knowledge, neither the Stations nor any Station Assets are the subject of any investigation by any governmental authority with respect to a violation of any environmental, health or safety law.  Seller has delivered to Buyer true and complete copies of all environmental reports and assessments in its possession (if any) that are applicable to the Stations.

2.9    Intangible Property.  Seller has all right, title and interest in and to all trademarks, service marks, trade names, copyrights and all other intangible property necessary to the conduct of the Stations as presently operated.  *Schedule 1.1(d)* contains a description of all material Intangible Property.  To Seller's knowledge, Seller's use of the

- 7 -

Intangible Property does not infringe upon any third party rights, and Seller has received no notice of any claim that any Intangible Property or the use thereof conflicts with, or infringes upon, any rights of any third party (and there is no basis for any such claim of conflict). To Seller's knowledge, no Intangible Property is the subject of any pending or threatened legal proceedings claiming infringement or unauthorized use. The Stations have the exclusive right to use the Intangible Property.

2.10 <u>Station Assets</u>. Except for the Excluded Assets, the Station Assets constitute all the assets used or held for use in the business or operation of the Stations. The Station Assets are sufficient to permit Buyer to operate the Stations as currently conducted by Seller. Seller has good and marketable title to the Station Assets, free and clear of Liens, except for Permitted Encumbrances. At Closing, Seller will transfer to Buyer good and marketable title to the Station Assets, free and clear of Liens, except for Permitted Encumbrances. Seller maintains sufficient insurance policies with respect to the Stations and the Station Assets and will maintain such policies in full force and effect until Closing.

2.11 <u>Compliance with Law</u>. Seller has complied and is in compliance with all laws, regulations, rules, writs, injunctions, ordinances, franchises, decrees or orders of any court or of any foreign, federal, state, municipal or other governmental authority which are applicable to the Stations or the Station Assets. There is no action, suit or proceeding pending or, to Seller's knowledge, threatened against Seller in respect of the Stations or the Station Assets. To Seller's knowledge, there are no claims or investigations pending or threatened against Seller in respect of the Stations or the Station Assets. Seller has all permits, licenses and other governmental authorizations necessary to conduct the business and operation of the Stations as currently conducted by it.

2.12 <u>No Finder</u>. Other than Seller, pursuant to the Receivership Order, no broker, finder or other person is entitled to a commission, brokerage fee or other similar payment in connection with this Agreement or the transactions contemplated hereby as a result of any agreement or action of Seller or any party acting on Seller's behalf. Payment of such brokerage fees shall be Seller's sole cost and expense.

2.13 <u>Disclosure</u>. This Agreement and the documents made pursuant hereto do not and will not contain any untrue statement of material fact by Seller or omit to state a material fact required to be made by Seller in order to make the statements herein and therein not misleading in light of the circumstances in which they are made.

ARTICLE 3: <u>BUYER REPRESENTATIONS AND WARRANTIES</u>

Buyer represents and warrants to Seller as follows:

3.1 <u>Organization</u>. Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and if such qualification is necessary, is (or will be at Closing) qualified to do business in each jurisdiction in which the Station Assets are located. Buyer has the requisite power and authority to execute, deliver and perform this Agreement and the documents to be made pursuant hereto.

3.2     Authority.  The execution, delivery and performance of this Agreement and the documents to be made pursuant hereto have been duly authorized and approved by all necessary action of Buyer (the "Buyer Authorization") and do not require any further authorization or consent of Buyer.  This Agreement and the documents to be made pursuant hereto are legal, valid and binding agreements of Buyer enforceable in accordance with their respective terms, except in each case as such enforceability may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

3.3     No Conflicts.  The execution, delivery and performance by Buyer of this Agreement and the documents to be made pursuant hereto does not conflict with any organizational documents of Buyer or any law, judgment, order, or decree to which Buyer is subject, and does not require the consent, approval or authorization, or filing with, any third party or any court or governmental authority, except the FCC Consent.

3.4     Qualification.  Buyer is legally, financially and otherwise qualified to hold the FCC Licenses under the Communications Act and the rules, regulations and policies of the FCC, including with respect to multiple ownership, as they exist on the date of this Agreement.

3.5     No Finder.  No broker, finder or other person is entitled to a commission, brokerage fee or other similar payment in connection with this Agreement or the transactions contemplated hereby as a result of any agreement or action of Buyer or any party acting on Buyer's behalf.  Payment of any broker engaged by Buyer shall be Buyer's sole cost and expense.

3.6     Disclosure.  This Agreement and the documents made pursuant hereto do not and will not contain any untrue statement of material fact by Buyer or omit to state a material fact required to be made by Buyer in order to make the statements herein and therein not misleading in light of the circumstances in which they are made.

ARTICLE 4:   SELLER COVENANTS

4.1     Covenants.  From the date hereof until Closing  Seller shall, subject to the Receivership Order:

(a)     operate the Stations in the ordinary course of business consistent with past practice and keep its books and accounts, records and files in the ordinary course, and preserve the business and goodwill of the Stations and the Station Assets;

(b)     consistent with Section 5.8, use commercially reasonable efforts to bring the Stations into compliance in all material respects with the Communications Act, FCC rules, regulations and policies, and all other applicable laws, rules and regulations, and maintain the FCC Licenses in full force and effect, and timely file and diligently prosecute any necessary applications for renewal of the FCC Licenses;

(c)    preserve intact the Station Assets and maintain in effect its current insurance policies with respect to the Stations and the Station Assets;

(d)    at the request of Buyer, from time to time give Buyer access during normal business hours to all of the Stations' employees, facilities, properties, accounts, books, deeds, title papers, insurance policies, licenses, agreements, contracts, commitments, records and files, equipment, machinery, fixtures, furniture, vehicles and all other Station Assets, and provide Buyer all other information concerning the Stations as Buyer may reasonably request (any investigation or examination by Buyer shall not in any way diminish any representations or warranties of Seller made in this Agreement);

(e)    pay accounts payable in the ordinary course of business consistent with past practice;

(f)    not, without the prior written consent of Buyer:

(i)    sell, lease or otherwise dispose of any Station Assets except for non-material dispositions in the ordinary course of business of items which are replaced by assets of comparable or superior kind, condition and value, or as provided in Section 5.8;

(ii)    create, assume or permit to exist any Liens on the Station Assets, and not dissolve, liquidate, merge or consolidate with any other entity, except for Permitted Encumbrances;

(iii)    modify any of the FCC Licenses; or

(iv)    amend or terminate any of the Station Contracts, or enter into any contract, lease or agreement with respect to the Stations except for ordinary course cash time sales agreements and any other agreements entered into in the ordinary course of business that will be paid and performed in full before Closing.

ARTICLE 5:    JOINT COVENANTS

Buyer and Seller hereby covenant and agree as follows, subject to the Receivership Order:

5.1    Confidentiality.  Subject to the requirements of applicable law, all non-public information regarding the parties and their business and properties that is disclosed in connection with the negotiation, preparation or performance of this Agreement shall be confidential and shall not be disclosed to any other person or entity, except on a confidential basis to the parties' attorneys, accountants, investment bankers, investors and lenders, and their respective attorneys for the purpose of consummating the transaction contemplated by this Agreement.

5.2    Announcements.  Prior to Closing, no party shall, without the prior written consent of the other, issue any press release or make any other public announcement concerning the transactions contemplated by this Agreement, except to the extent that

such party is so obligated by law, in which case such party shall give advance notice to the other, and except as necessary to enforce rights under or in connection with this Agreement. Notwithstanding the foregoing, the parties acknowledge that this Agreement and the terms hereof will be filed with the FCC Application and thereby become public.

      5.3    <u>Control</u>. Consistent with FCC rules, control, supervision and direction of the operation of the Stations prior to Closing shall remain the responsibility of Seller as the holder of the FCC Licenses.

      5.4    <u>Risk of Loss</u>. The risk of loss of or damage to any of the Station Assets shall remain with Seller at all times until 12:01 a.m. local time on the day of Closing, and prior to Closing, Seller shall repair and replace any lost or damaged Station Assets.

      5.5    <u>Broadcast Interruption</u>. If prior to Closing any of the Stations are off the air or operating at a power level that results in a material reduction in coverage (a "<u>Broadcast Interruption</u>"), then Seller shall return the applicable Station to the air and restore prior coverage as promptly as possible. Notwithstanding anything herein to the contrary, if prior to Closing there is a Broadcast Interruption in excess of twenty-four (24) hours, then Buyer may postpone Closing until the date five (5) business days after the applicable Station returns to the air and prior coverage is restored in all material respects, subject to <u>Section 10.1</u>.

      5.6    <u>Employees</u>. Buyer will not hire any employees of the Stations at Closing.

      5.7    <u>Final Order</u>. For purposes of this Agreement, the term "<u>Final</u>" shall mean that action shall have been taken by the FCC (including action duly taken by the FCC's staff, pursuant to delegated authority) which shall not have been reversed, stayed, enjoined, set aside, annulled or suspended; with respect to which no timely request for stay, petition for rehearing, appeal or certiorari or sua sponte action of the FCC with comparable effect shall be pending; and as to which the time for filing any such request, petition, appeal, certiorari or for the taking of any such sua sponte action by the FCC shall have expired or otherwise terminated.

      5.8    <u>Equipment and Operation of Stations</u>. Seller and Buyer shall work jointly to identify any transmission equipment and other essential equipment included among the Tangible Personal Property that is in need of repair or replacement in order to bring the Stations into compliance and reliable, stable, manufacturer-supported, and good operating condition in accordance with the FCC Licenses, the Communications Act and the rules, regulations and policies of the FCC, such equipment to (a) be in good operating condition and repair, free from material defect or damage, (b) function in the manner and purposes for which it was intended and (c) if any such equipment is replaced prior to Closing, such equipment to be maintained by Seller in accordance with industry standards. Following Closing, any such equipment shall be replaced upon mutual agreement of the parties using funds from the Held Funds referenced in <u>Section 1.5</u> above, provided, however, that if the Held Funds are insufficient to replace such equipment, Seller shall be responsible for any such additional fees and expenses associated with the same as specified in <u>Section 1.6</u> above.

5.9    Lien Searches.  Seller shall, at Seller's expense, obtain UCC, judgment, fixture and tax lien search reports, dated no earlier than thirty (30) days prior to Closing, identifying any active Liens encumbering the Station Assets (arising prior to Seller's receivership) and shall provide such lien searches to Buyer so that the Liens may be extinguished upon Closing.

ARTICLE 6:    SELLER CLOSING CONDITIONS

The obligation of Seller to consummate the Closing is subject to satisfaction of the following conditions at or prior to Closing:

6.1    Bringdown.  The representations and warranties of Buyer made in this Agreement shall be true and correct in all material respects as of Closing, Buyer shall have performed the obligations to be performed by it under this Agreement at or prior to Closing in all material respects, and Seller shall have received a certificate dated as of the Closing Date from Buyer (executed by an authorized officer) to the effect that the conditions set forth in this Section 6.1 have been satisfied (the "Buyer Bringdown Certificate").

6.2    Proceedings.  Neither Seller nor Buyer shall be subject to any court or governmental order or injunction restraining or prohibiting the consummation of the transactions contemplated hereby.

6.3    FCC Consent.  The FCC Consent shall have been granted.

6.4    Court Approval.  Court Approval shall have been issued.

6.5    Deliveries.  Buyer shall have made the deliveries to be made by it at Closing under this Agreement.

ARTICLE 7:    BUYER CLOSING CONDITIONS

The obligation of Buyer to consummate the Closing is subject to satisfaction of the following conditions at or prior to the Closing:

7.1    Bringdown.  The representations and warranties of Seller made in this Agreement shall be true and correct in all material respects as of Closing, Seller shall have performed the obligations to be performed by it under this Agreement at or prior to Closing in all material respects, and Buyer shall have received a certificate dated as of the Closing Date from Seller to the effect that the conditions set forth in this Section 7.1 have been satisfied (the "Seller Bringdown Certificate").

7.2    Proceedings.  Neither Seller nor Buyer shall be subject to any court or governmental order or injunction restraining or prohibiting the consummation of the transactions contemplated hereby.

7.3    FCC Consent.  The FCC Consent shall have been granted and shall have (at Buyer's option) become Final.

- 12 -

7.4 <u>Court Approval</u>.  Court Approval shall have been issued.

7.5 <u>Deliveries</u>.  Seller shall have made the deliveries to be made by it at Closing under this Agreement.

7.6 <u>New Leases</u>.  Buyer shall have completed its negotiations for new leases with each of the applicable landlords under the Real Property Leases.

7.7 <u>Liens</u>.  Any Liens that are not Permitted Encumbrances shall have been released or payoff letters agreeing to release said Liens shall have been delivered by the lienholders.

ARTICLE 8: <u>CLOSING DELIVERIES</u>

8.1 <u>Seller Deliveries</u>.  At Closing, Seller shall deliver or cause to be delivered to Buyer:

(a) the Seller Bringdown Certificate;

(b) the Court Approval;

(c) an Assignment of FCC Licenses assigning the FCC Licenses from Seller to Buyer;

(d) an Assignment and Assumption of Contracts assigning the Station Contracts to Buyer;

(e) an Assignment of Marks assigning the Stations' registered marks (if any) to Buyer;

(f) domain name transfers assigning the Stations' domain names from Seller to Buyer following customary procedures of the domain name administrator;

(g) endorsed vehicle titles conveying the vehicles (if any) included in the Tangible Personal Property to Buyer;

(h) a bill of sale conveying the Station Assets to Buyer;

(i) customary payoff letters and other appropriate documents necessary to release all Liens (if any) (except for Permitted Encumbrances) on the Station Assets; and

(j) any other documents and instruments of conveyance, assignment and transfer that may be reasonably necessary to convey, transfer and assign the Station Assets to Buyer, free and clear of Liens, except for Permitted Encumbrances.

8.2 <u>Buyer Deliveries</u>.  At the Closing, Buyer shall deliver to Seller:

(a) the Purchase Price in accordance with the terms of this Agreement;

(b)      a certified copy of the Buyer Authorization;

(c)      the Buyer Bringdown Certificate;

(d)      an Assignment and Assumption of Contracts assuming the obligations arising after Closing under the Station Contracts;

(e)      domain name transfers assigning the Stations' domain names from Seller to Buyer following customary procedures of the domain name administrator; and

(f)      any other documents and instruments of assumption that may be reasonably necessary to assume the Assumed Obligations.

ARTICLE 9:   SURVIVAL AND INDEMNIFICATION

9.1      Survival.  The representations and warranties in this Agreement shall survive Closing for a period of twelve (12) months from the Closing Date at which time they shall expire and be of no further force or effect, except (a) those under Section 2.4 (Taxes) and Section 2.8 (Environmental), which shall survive until the expiration of any applicable statute of limitations, (b) those with respect to title to the Station Assets, which shall survive indefinitely, and (c) that if within such applicable period the indemnified party gives the indemnifying party written notice of a claim for breach thereof describing in reasonable detail the nature and basis of such claim, then such claim shall survive until the resolution of such claim.  The covenants and agreements in this Agreement shall survive Closing until performed.

9.2      Indemnification.

(a)      From and after Closing, Seller shall defend, indemnify and hold harmless Buyer from and against any and all losses, costs, damages, liabilities and expenses, including reasonable attorneys' fees and expenses ("Damages") incurred by Buyer arising out of or resulting from:

(i)      any breach by Seller of its representations and warranties under this Agreement (without reference to any materiality exceptions);

(ii)      any default by Seller of its covenants and agreements under this Agreement (without reference to any materiality exceptions);

(iii)      the Retained Liabilities; or

(iv)      without limiting the foregoing, the business or operation of the Stations prior to Closing (including any third party claim arising from such operations).

Notwithstanding the foregoing or anything else herein to the contrary, after Closing, (1) Seller shall have no liability to Buyer under Section 9.2(a)(i) until Buyer's aggregate Damages exceed Ten Thousand Dollars ($10,000), after which such threshold

- 14 -

amount shall be included in, not excluded from, any calculation of Damages, and (2) the maximum aggregate liability of Seller under Section 9.2(a)(i) shall be an amount equal to the Purchase Price.

(b)     From and after Closing, Buyer shall defend, indemnify and hold harmless Seller from and against any and all Damages incurred by Seller arising out of or resulting from:

(i)     any breach by Buyer of its representations and warranties under this Agreement;

(ii)     any default by Buyer of its covenants and agreements under this Agreement;

(iii)     the Assumed Obligations; or

(iv)     without limiting the foregoing, the business or operation of the Stations after Closing (including any third party claim arising from such operations).

9.3     Procedures.

(a)     The indemnified party shall give prompt written notice to the indemnifying party of any demand, suit, claim or assertion of liability by a third party that is subject to indemnification hereunder (a "Claim"), but a failure to give such notice or delaying such notice shall not affect the indemnified party's rights or the indemnifying party's obligations, except to the extent the indemnifying party's ability to remedy, contest, defend or settle with respect to such Claim is thereby prejudiced.

(b)     The indemnifying party shall have the right to undertake the defense or opposition to such Claim with counsel reasonably satisfactory to the parties. In the event that the indemnifying party does not undertake such defense or opposition in a timely manner, the indemnified party may undertake the defense, opposition, compromise or settlement of such Claim with counsel selected by it at the indemnifying party's cost.

(c)     Notwithstanding anything herein to the contrary:

(i)     the indemnified party shall have the right, at its own cost and expense, to participate in the defense, opposition, compromise or settlement of any Claim, and shall have the right to consult with the indemnifying party and its counsel concerning any Claim, and the indemnifying party and the indemnified party shall cooperate in good faith with respect to any Claim; and

(ii)     the indemnifying party shall not, without the indemnified party's written consent, settle or compromise any Claim or consent to entry of any judgment which does not include a release of the indemnified party from all liability in respect of such Claim.

ARTICLE 10:  <u>TERMINATION AND REMEDIES</u>

     10.1   <u>Termination</u>.  This Agreement may be terminated prior to Closing as follows:

         (a)    by mutual written consent of Buyer and Seller;

         (b)    by written notice of Buyer to Seller if Seller:

             (i)    does not perform the obligations required to be performed by it under this Agreement on the Closing Date; or

             (ii)    otherwise breaches in any material respect any of its representations or warranties or defaults in any material respect in the performance of any of its covenants or agreements contained in this Agreement and such breach or default is not cured within the Cure Period (defined below);

         (c)    by written notice of Seller to Buyer if Buyer:

             (i)    does not perform the obligations required to be performed by it under this Agreement on the Closing Date, all conditions to its obligation to do so having been satisfied or waived; or

             (ii)    otherwise breaches in any material respect any of its representations or warranties or defaults in any material respect in the performance of any of its covenants or agreements contained in this Agreement and such breach or default is not cured within the Cure Period;

         (d)    by written notice of Buyer to Seller, or of Seller to Buyer, if the FCC denies the FCC Application or upon order of the Court; or

         (e)    by written notice of Buyer to Seller, or of Seller to Buyer, if the Closing does not occur by the date one (1) year after the date of this Agreement.

     The term "<u>Cure Period</u>" as used herein means a period commencing the date Buyer or Seller receives from the other written notice of breach or default hereunder and continuing until the earlier of (1) fifteen (15) calendar days thereafter or (2) the Closing Date.  Termination of this Agreement shall not relieve any party of any liability for breach or default under this Agreement prior to the date of termination.  Notwithstanding anything contained herein to the contrary, <u>Sections 1.6</u> (Deposit), <u>5.1</u> (Confidentiality), <u>5.2</u> (Announcements) and <u>11.1</u> (Expenses) shall survive any termination of this Agreement.

     10.2   <u>Specific Performance</u>.  In the event of a breach or threatened breach by Seller of any representation, warranty, covenant, obligation or agreement under this Agreement, at Buyer's election, in addition to any other remedy available to it, Buyer shall be entitled to an injunction restraining any such breach or threatened breach and to enforcement of this Agreement by a decree of specific performance requiring Seller to

fulfill its obligations under this Agreement, in each case without the necessity of showing economic loss or other actual damage and without any bond or other security being required.

ARTICLE 11: <u>MISCELLANEOUS</u>.

11.1    <u>Expenses</u>.  Each party shall be solely responsible for all costs and expenses incurred by it in connection with the negotiation, preparation and performance of and compliance with the terms of this Agreement, except that all governmental taxes, fees and charges applicable to the request for FCC Consent shall be shared equally by Buyer and Seller, and Seller shall be solely responsible for all governmental taxes, fees and charges applicable to the transfer of the Station Assets under this Agreement.

11.2    <u>Further Assurances</u>.  After Closing, each party hereto shall execute all such instruments and take all such actions as any other party may reasonably request, without payment of further consideration, to effectuate the transactions contemplated by this Agreement, including, without limitation, the execution and delivery of confirmatory and other transfer documents in addition to those to be delivered at Closing.

11.3    <u>Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.  Seller may not assign any of its rights or delegate any of its obligations hereunder, and any such attempted assignment or delegation without such consent shall be void.  Buyer may assign its right to acquire the Station Assets (in whole or in part) without Seller's consent, but any such assignment shall not relieve Buyer of any obligations under this Agreement.

11.4    <u>Notices</u>.  Any notice pursuant to this Agreement shall be in writing and shall be deemed delivered on the date of personal delivery or confirmed facsimile transmission or confirmed delivery by a nationally recognized overnight courier service, or on the third (3rd) day after prepaid mailing by certified U.S. mail, return receipt requested, and shall be addressed as follows (or to such other address as any party may request by written notice):

| | |
|---|---|
| if to Seller, then to: | W. Lawrence Patrick, Receiver<br>199 Carter View Drive<br>Cody, WY  82414<br>Email: <u>larry@patcomm.com</u> |
| with a copy (which shall not constitute notice) to: | Sciarrino & Shubert, PLLC<br>330 Franklin Road<br>Ste. 135A-133<br>Brentwood, TN 37027-3280<br>Attn:  Dawn M. Sciarrino, Esq.<br>Email: <u>dawn@sciarrinolaw.com</u> |

if to Buyer, then to:                    VCY America, Inc.
                                         3434 W. Kilbourn Ave.
                                         Milwaukee, WI 53208
                                         Attention:  James R. Schneider, Executive Director
                                         Email: jims@vcyamerica.org

with a copy (which shall not             Wiley Rein LLP
constitute notice) to:                   1776 K Street, N.W.
                                         Washington, DC  20006
                                         Attention:  Wayne Johnsen and K. Dickerson
                                         Email: WJohnsen@wiley.law and
                                         KDickerson@wiley.law

　　　　11.5    Severability.  If any court or governmental authority holds any provision in this Agreement invalid, illegal or unenforceable under any applicable law, then, so long as no party is deprived of the benefits of this Agreement in any material respect, this Agreement shall be construed with the invalid, illegal or unenforceable provision deleted and the validity, legality and enforceability of the remaining provisions contained herein shall not be affected or impaired thereby.

　　　　11.6    Governing Law.  The construction and performance of this Agreement shall be governed by the laws of the State of California without giving effect to the choice of law provisions thereof.  The prevailing party in a lawsuit brought to enforce the performance or compliance of any provision of this Agreement may recover reasonable attorneys' fees and costs from the non-prevailing party.

　　　　11.7    Miscellaneous.  No amendment or waiver of compliance with any provision hereof or consent pursuant to this Agreement shall be effective unless in a writing signed by the party against whom enforcement of such amendment, waiver, or consent is sought.  This Agreement constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements and understandings with respect to the subject matter hereof.  Nothing in this Agreement expressed or implied is intended or shall be construed to give any rights to any person or entity other than the parties hereto and their respective successors and permitted assigns.  This Agreement may be executed in separate counterparts, each of which shall be deemed to be an original and all of which together constitute one and the same agreement.

                    [SIGNATURE PAGE FOLLOWS]

4844-5299-9121.2

- 18 -

## SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first set forth above.

BUYER:                              VCY AMERICA, INC.

                                   By: _____
                                        Name: James R. Schneider
                                        Title:   Executive Director


SELLER:                            _____
                                   W. Lawrence Patrick, solely in his capacity as court-
                                   appointed receiver for Silver State Broadcasting LLC,
                                   Golden State Broadcasting LLC and Major Market
                                   Radio LLC

## SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first set forth above.

BUYER:                       VCY AMERICA, INC.


By: _____
    Name: James R. Schneider
    Title:  Executive Director


SELLER:

W. Lawrence Patrick, solely in his capacity as court-appointed receiver for Silver State Broadcasting LLC, Golden State Broadcasting LLC and Major Market Radio LLC