STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone: (775) 786-7600
Email: steve@harrislawreno.com
Attorney for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\*\*\*\*\*

IN RE:

SILVER STATE BROADCASTING, LLC,

☐    AFFECTS THIS DEBTOR

☐    AFFECTS GOLDEN STATE BROADCASTING, LLC

☐    AFFECTS MAJOR MARKET RADIO LLC

☒    AFFECTS ALL DEBTORS

_____/

Case No. 21-14978-abl
(Chapter 11)

Jointly Administered with:

| 21-14979-abl | Golden State Broadcasting, LLC |
| 21-14980-abl | Major Market Radio LLC |

**REPLY TO OBJECTION TO JOINTLY ADMINISTERED DEBTORS' FIRST MOTION TO EXTEND EXCLUSIVITY PERIODS UNDER 11 U.S.C. § 1121(D)(1)**

Hearing Date:    March 16, 2022
Hearing Time:    1:30 p.m.

COME NOW, SILVER STATE BROADCASTING, LLC, GOLDEN STATE BROADCASTING, LLC, and MAJOR MARKET RADIO LLC, Jointly Administered Debtors and Debtors-in-Possession herein (collectively "Debtors"), by and through their attorney, STEPHEN R. HARRIS, ESQ., of HARRIS LAW PRACTICE LLC, and reply to the OBJECTION TO JOINTLY ADMINISTERED DEBTORS' FIRST MOTION TO EXTEND EXCLUSIVITY PERIODS UNDER 11 U.S.C § 1121(D)(1) [DE 134] ("Objection") filed by former federal receiver W. Lawrence Patrick ("Receiver"), and VCY AMERICA, INC.'S JOINDER TO RECEIVER W. LAWRENCE PATRICK'S OPPOSITION TO DEBTORS' JOINTLY ADMINISTERED DEBTORS' FIRST MOTION TO EXTEND EXCLUSIVITY PERIODS UNDER 11 U.S.C § 1121(D)(1) [DE 136] ("Joinder"), filed by VCY America, Inc.

("VCY").

## INTRODUCTION

1.  On February 16, 2022, the Debtors filed their Jointly Administered Debtors' First Motion to Extend Exclusivity Periods Under 11 U.S.C. § 1121(d)(1) [DE 124] ("Motion"). The Motion seeks an extension of the Debtors' plan exclusivity periods for thirty days after the deadline for the Receiver to file his § 543 accountings with this Court.

2.  Rather than fulfilling his receivership fiduciary duties by focusing his efforts on accounting for the Debtors' assets and complying with his turnover duties, the Receiver instead once again shows his true colors through his Objection. Not satisfied by the exorbitant fees and costs he claims to have incurred as Receiver in the Civil Action[1], the Receiver continues to promote his collusive proposed sale with VCY so he can claim a brokerage commission. Indeed, the Receiver's Proof of Claim alleges that he is owed $190,000 for a "brokerage commission." *See* Claim 5, 21-14978-abl. More remarkably, the Receiver's Proof of Claim also claims that the Debtors owe him for Fox Rothschild's legal fees and costs of $134,302.53. *See id.* Fox Rothschild only started representing the Receiver after the Debtors' Chapter 11 cases were filed. Thus, the Receiver has already incurred legal fees of $134,302.53 in this Chapter 11 case in his attempt to obstruct the Debtors' reorganization and shirk his duties under 11 U.S.C. § 543. To add insult to injury, the Receiver also seeks to charge the Debtors for his obstructive conduct. Apparently, it is easy to litigate with other people's money and assets.

3.  Under 11 U.S.C. §§ 1121(b) and 1125, it is improper for a creditor to solicit support for his proposed plan at this stage of a bankruptcy case. Indeed, courts have sanctioned creditors who in similar circumstances filed and circulated a proposed plan during the debtor's exclusivity period and before a disclosure statement was approved. *See In re Charles St. African Methodist Episcopal Church of Boston*, 499 B.R. 126, 133–134 (Bankr. E.D. Mass. 2013). Nevertheless, the Receiver's Objection solicits support for his proposed plan, in plain violation of these provisions of the Code.

---

[1] *WB Music Corp., et al. v. Royce International Broadcasting Corp., Playa Del Sol Broadcasters, Silver State Broadcasting, LLC, Golden State Broadcasting, LLC, and Edward R. Stolz, II*, Case No. 5:16-cv-00600-JGB (the "Civil Action"), in the United States District Court Central District of California ("District Court").

4.   Notably, the Court's January 31 oral ruling on the Debtors' Turnover Motion was only sixteen days before the end of the Debtors' initial 120-day exclusivity period. Ample cause exists to extend the Debtors' exclusivity period for a reasonable time considering the Debtors have been deprived of information and control of their primary assets since their Chapter 11 filings. Indeed, the Receiver has still not turned over many of the assets he took control over;[2] he cancelled the Debtors' business email accounts and digital streams, and he appears to have abandoned other assets in leased premises claiming now that the Debtors owe the property owner for storage expenses. *See February 25, 2022, letter from Zachary Williams* attached hereto as **Exhibit A**. The Receiver is also uncertain of the location of other assets, providing the Debtors only with his "information and belief" as to where the assets are located. *See id.* Although the Receiver alleges that he never took possession of many of the Radio Station[3] assets, the Debtors have records showing which assets were turned over to him, as well as communications from Receiver's legal counsel confirming receipt of many of the assets. Debtors are in the process of compiling the necessary records to rebut the Receiver's allegations.

5.   The Receiver was responsible for preserving and accounting for the Radio Station assets and he failed to do so. Rather than preserving the Debtors' assets, the Receiver single-handedly and through his agents, dismantled, neglected, and abandoned certain of the physical assets, apparently believing they were not worth his consideration because he cared only about the FCC licenses he was trying to sell to VCY.  (For example, evidently the Receiver did not preserve much of the Debtors' studio equipment because VCY planned to operate the Stations remotely, from Wisconsin.)  The Debtors have found some of their physical assets have been vandalized, parted out, burned/ charred, with wiring severed, and equipment torn out of housings and strewn about the transmitter room. Other assets which Mr. Stolz has located were converted, transported across state lines without notice to the Debtors, and found at different locations. It is

---

[2] The Debtors' FCC licenses were transferred back to them by the FCC as a result of the Debtors' application efforts through their FCC counsel, Barry Wood, Esq. The Receiver "cooperated" in the sense that at least he did not interfere with the process. But otherwise, the Receiver has not proactively returned the Debtors' Radio Station assets; he either alleges that he never had control over assets, or he states only that he believes the assets can be found in certain locations. Even this information was painfully extracted from the Receiver by the Debtors after multiple written requests. *See* **Exhibit A** attached hereto.

[3] The Debtors' FCC licenses under call signs KFRH-FM, KREV-FM, and KRCK-FM (collectively the "Radio Stations").

evident now that the Receiver believed that he would never have to return or account for the Debtors' physical assets.

6.   As a result of the Receiver's actions, the Debtors are now trying to cobble back their Radio Station assets piece by piece, rebuilding pieces by hand, and replacing the damaged or missing equipment with new pieces or with equipment on hand owned by Mr. Stolz or his other non-debtor entities. The Debtors are essentially having to build their business operations practically from the ground up.  Due to Mr. Stolz's diligent efforts, the Palm Springs station has been restored and is currently back on the air with news/talk programming. The Radio Stations' prior regular music programming requires new talent and programming, including program syndication agreements to replace those which were canceled by the Receiver when he took control of the Radio Stations.  Thus, the Debtors are working on restoring those relationships and agreements.

7.   Mr. Stolz is working on reconstructing the Las Vegas FM station and expects to have that station back on the air in approximately twenty days. During the Receiver's tenure, the San Francisco station lost its studio facility, its communication links, and its regular programming. Thus, Mr. Stolz is working diligently to restore those operations as well and expects to have the San Francisco station back on the air in early April.

8.   The Debtors are also in the process of reviewing filed Proofs of Claim with their counsel to formulate a plan of reorganization.  Debtors were uncertain of the claims they would be facing after the Receiver's control of their operations, and indeed, alleged claims keep multiplying, as evidenced by the Receiver's bloated Proofs of Claim filed in each of the Debtors' Chapter 11 cases.

9.   Finally, in its oral ruling on January 31, 2022, the Court stated that it intended to set some new plan exclusivity dates for the Debtors (*see Motion* at 6:5–9).  That approach is reasonable and logical based on the history and facts of these cases.

///

///

///

## **LEGAL ARGUMENT**

**A. The Receiver and VCY violated 11 U.S.C. §§ 1121 and 1125(b) by filing and touting Receiver's proposed plan.**

The main purpose of the Receiver's Objection appears to have been to present his proposed competing plan of reorganization to this Court and the Debtors' creditors. But under 11 U.S.C. § 1121, only the Debtors may propose a plan during their exclusivity period. *See* 11 U.S.C. § 1121(b). The Debtors filed their Motion to extend their exclusivity period timely.  Until the Court adjudicates that Motion, it was wholly improper for the Receiver to attempt to influence the Court and creditors with his proposed plan.

Moreover, the Receiver in his Objection also touts his proposed plan in violation of 11 U.S.C. § 1125(b) because the Court has not yet approved a disclosure statement. *See* 11 U.S.C. § 1125(b). And through its Joinder, VCY is complicit with the Receiver in his misconduct.

Courts have considered actions like these egregious enough to impose monetary sanctions. For example, in one case the court sanctioned a creditor for attaching a proposed plan to its filed motion seeking to terminate the debtors' exclusivity period. *See In re Charles*, 499 B.R. at 128, 133. In so holding, the court there stated that Section 1121(b) "creates not only a bright line, but a 'third rail': don't file a plan during the exclusivity period." *Id.* at 133. It did not matter that the plan was not formally filed as a separate document; the harm was done when the proposed plan was attached as an exhibit to the creditor's motion. *Id.*

The creditor there argued that the error was "harmless," but the court disagreed, reasoning that "the possibilities for mischief . . . are large . . . The burden cannot fall on a debtor to prove that ill effects have occurred or will occur. The burden of uncertainty is on the party that created it by doing what the statute prohibits." *Id.* Here too, the damage is done by the Receiver and VCY's improper filing of a proposed plan. They must bear the burden of the uncertainty of the harm they caused.

The Ninth Circuit B.A.P. likewise affirmed monetary sanctions against a party for "touting his own plan in a letter to creditors before a disclosure statement ha[d] been approved." *Duff v. United States Trustee (In re California Fid.)*, 198 B.R. 567, 570 (B.A.P. 9th Cir. 1996). The

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

1  creditor there argued that no solicitation occurred because he was merely expressing his views

2  about his plan and did not specifically request an official vote. *Id.* at 572. The court disagreed,

3  finding that his letter describing the terms of his plan "pertained to the virtues of his plan and the

4  alleged weaknesses of the joint plan." *Id.* at 573.

5      Here, the Receiver likewise touts the virtues of his proposed plan in his Objection even

6  though this court has not yet approved a disclosure statement. *See Objection* ¶ 12. Indeed, the

7  Receiver in his Declaration also criticizes any plan the Debtors will file by claiming the Debtors

8  cannot fund their plan. *See Patrick Declaration* [DE 135] ¶ 16. The Receiver goes on to attest in

9  his sworn Declaration, under penalty of perjury, that the "[d]ebtors have made no attempt

10  whatsoever to negotiate with their creditors." *Id.* ¶ 17. This is flatly false. For example, Silver

11  State has recently negotiated a deal with its Las Vegas landlord, DIG, to resolve its Proof of

12  Claim, and the parties are working on executing a stipulation to that effect.

13      Lastly, a California bankruptcy court terminated a debtor's counsel's employment when

14  the attorney served copies of an unapproved disclosure statement on all creditors. *See In re*

15  *Wilson*, 2013 Bankr. LEXIS 5138 *, 2013 WL 6404776 (Bankr. N.D. Cal. Dec. 6, 2013). There,

16  the court agreed with the Ninth Circuit B.A.P. that "violation of § 1125(b) of the Code and Rule

17  3017(a) is a very serious matter. It may justify monetary fines." *Id.* at *3. The court compared the

18  chapter 11 process as "essentially the marketing of securities," because "creditors are solicited to

19  give up their right to a liquidation dividend and instead invest their claims in a reorganized

20  debtor." *Id.* at *1. The Bankruptcy Code protects this process by having strict rules governing

21  plan solicitations and disclosure statements. Because debtor's counsel there was inexperienced in

22  bankruptcy law, the court terminated his employment and ordered the debtor to find new counsel

23  instead of imposing monetary sanctions. *Id.* *4.

24      These cases all demonstrate how serious the Receiver and VCY's actions are. The

25  Receiver and VCY do not have inexperienced counsel nor are their actions harmless. Instead, the

26  Receiver and VCY sought to purposely undermine and taint the Debtors' reorganization process

27  by improperly and prematurely interjecting the Receiver's proposed plan, touting its virtues, and

28  criticizing the Debtors' ability to fund their own plan.

1    In summary, the Receiver's Objection and VCY's Joinder should be properly overruled,

2    with the Court scheduling a future hearing to consider monetary sanctions against them for

3    violating 11 U.S.C. §§ 1121(b) and 1125(b).

4    **B. Ample cause exists to grant Debtors a reasonable extension of their plan**

5        **exclusivity period.**

6    As stated previously and in the Debtors' Motion, ample cause exists for a reasonable

7    extension of the Debtors' exclusivity period. This Court is well aware of the history of these

8    Chapter 11 cases and the Receiver's control of the Debtors' Radio Station operations before the

9    Chapter 11 filing. Indeed, because the Receiver has not yet turned over many of the Debtors'

10   assets or filed his accountings[4], the Receiver and VCY have more information than the Debtors

11   about: (1) alleged pre-petition claims arising from Radio Station operations, (2) the nature and

12   condition of the Debtors' assets, (3) whether any preference payments were made, and so on. The

13   Debtors intend to propose a thoughtful and feasible plan, disclosing the status of their assets,

14   business operations, and their alleged creditors' claims, including those claims that are disputed.

15   After making educated calculations of their allowed claims, the Debtors can have a better

16   idea of whether they can pay those claims through new value, business revenues, or a combination

17   of liquidation and business revenues.   Analysis of the *Adelphia* factors also shows that cause

18   exists to extend Debtors' exclusivity.

19   First, the Debtors' case is complex because the Debtors were not in control of their assets

20   or business operations for over a year pre-petition and for the first four months post-petition. The

21   Debtors still do not have possession of many of their assets from the Receiver, and only received

22   a bare-bones "financial accounting" on March 4, 2022, to indicate if any preference payments

23   were made by the Receiver which may have to be addressed in any plan. The Debtors are dealing

24   with the fall-out from the Receiver's failure to inventory, manage, and account for their Radio

25   Station assets in the manner expected of any court-appointed fiduciary.

26   Second, the Debtors could not have put together a complete plan under any reasonable

27

28   [4] The Receiver alleges to have provided Debtors with a "full financial accounting." *See* **Exhibit A** attached hereto. The "full financial accounting" is woefully inadequate, lacking among other things, any information about incurred but unpaid Radio Station liabilities during the receivership.

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

standard in only sixteen days after this Court's oral ruling directing the Receiver to turn over their assets. Indeed, even today the Debtors are still struggling to get their physical and intangible assets back from the Receiver. Debtors are also still missing information about what transpired with their Radio Stations during the Receiver's tenure.

Third, the Debtors have progressed in good faith towards reorganization by expending significant effort to retake possession of their Radio Station assets with little or no cooperation from the Receiver who has suddenly disavowed that he was ever in charge of the assets after billing ridiculously high fees and costs for his alleged management of the assets during the receivership. The Debtors promptly petitioned the FCC for assignment of their licenses, and Mr. Stolz quickly had the Palm Spring station back on the air and expects to have the Las Vegas and San Francisco stations back on air as previously explained.

Fourth, the Debtors, through their principals, have paid their bills as they become due. In fact, Silver State has recently negotiated a thirty-day lease holdover with its Las Vegas landlord which includes an agreed upon payment for rent and resolution of DIG's Proof of Claim. Another unresolved story is whether the Receiver paid the Debtors' Radio Station bills when he was in control of the assets and operations. The Debtors are still obtaining information about operating expenses that the Receiver failed to pay, but for now, they are aware that the PG&E utilities were shut down for non-payment of a year's worth of electricity during the Receiver's tenure; the Comcast internet bills were not paid; and other vendors are emerging who claim to have been "stiffed" by the Receiver.  These were all regular operating expenses that were paid in the ordinary course before the Receiver took control of the Radio Stations. If the Receiver could not generate sufficient revenues to pay even the basic operating expenses, it is of his own doing. The Receiver's Local Programming and Management Agreement with VCY apparently generated a mere pittance in revenues for the Radio Stations ($5,000 per month total for all three stations) in contrast to what they should have generated.

Fifth, the Debtors have multiple reasonable prospects for filing a viable plan. The Debtors can fund their plan through new value, through business revenues, or through partial liquidation.

Sixth, the Debtors have already resolved one claim with Silver State's Las Vegas landlord

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

even though the rent for that leased space should have also been paid by the Receiver when he took control of the Radio Stations. Negotiations with other creditors may be possible, but claims are still being filed as late as March 4, so the total extent of claims is yet unknown.

Seventh, considering the Receiver's initial refusal to turn the Radio Station licenses and other assets over to the Debtors, not a lot of time has elapsed in these cases. As this Court is aware, the Debtors' exclusivity period was set to expire only sixteen days after this Court's oral ruling on the Debtors' Turnover Motion. The Court itself indicated it would set new exclusivity periods at the status hearing scheduled for March 3, 2022. But since the status hearing would not be held until after termination of the exclusivity date, the Debtors could not wait for the status hearing and had to file their Motion.

Eighth, the Debtors are not seeking an extension to pressure creditors to submit to their reorganization demands because a reasonable extension will have no effect on any relationship between the Debtors and their creditors. If the Receiver had promptly complied with his mandate under 11 U.S.C. § 543 as he was required to, then the Debtors could have been four months' farther along in their reorganization process. Any delays fall squarely on the Receiver's shoulders because he impeded the Debtors' reorganization from the moment he learned that Debtors had filed their Chapter 11 cases. The Receiver cannot now complain about delays that directly result from his own actions.

Ninth, there are many unresolved contingencies, including unknown claims, potential preference payments, missing physical assets that the Receiver has not turned over, and the lack of complete accountings from the Receiver to understand what transpired with the Radio Stations for over a year pre-petition.

In summary, all factors weigh in favor of granting the Debtors a reasonable extension of their plan exclusivity periods, and the Court should grant an extension for cause.

## CONCLUSION

Based on the foregoing, the Debtors respectfully request that this Court extend their plan exclusivity periods for 30 days after the deadline for the Receiver to file his § 543 accountings, or alternatively, some other reasonable extension. The Debtors additionally request that this Court

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511

1  schedule a future hearing to consider sanctions against the Receiver and VCY for violating 11

2  U.S.C. §§ 1121(b) and 1125(b).

3          DATED this 9th day of March 2022.

4

5                                        HARRIS LAW PRACTICE LLC

6                                        /s/ Stephen R. Harris

7                                        _____
                                         STEPHEN R. HARRIS, ESQ.
8                                        Attorney for Debtors

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511



**Fox Rothschild LLP**
ATTORNEYS AT LAW

One Summerlin
1980 Festival Plaza Dr.
Suite 700
Las Vegas, NV 89135
Tel (702) 262-6899  Fax (702) 597-5503
www.foxrothschild.com

BRETT AXELROD
Direct No: 702.699.5901
Email: BAxelrod@FoxRothschild.com

March 4, 2022

*Via e-mail: steve@harrislawreno.com*
Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive, Suite 2100
Reno, Nevada 89511

Re:    In re Silver State Broadcasting, LLC – Case No. BK-S-21-14978-nmc
       Receivership Accounting and Inventory of Assets

Dear Mr. Harris:

Enclosed please find the Receiver's response to Debtors' three checklists itemizing the known radio station equipment and related items for turnover set forth in your correspondence of February 11, 2022 (the "First Letter") and February 23, 2022 (the "Second Letter"), as well as the Receiver's full financial accounting. The Receiver disputes all asset values provided in the First Letter and Second Letter, as the Debtors have provided no basis as to how the assets were valued.

Should you have any questions or concerns, please contact me.

Sincerely,

FOX ROTHSCHILD LLP

*/s/Brett A. Axelrod*
Brett A. Axelrod, Esq.

*/Enclosure*

131412095.1



**Fox Rothschild** LLP
ATTORNEYS AT LAW

March 4, 2022
Page 2

cc: W. Lawrence Patrick

## I.    Preliminary Statement to Checklist Responses

Following the Receiver's appointment on July 6, 2020, empowering him to assume the management of Mr. Stolz's radio stations and all contracts, bank accounts, and assets, Mr. Stolz immediately began to interfere in the Receiver's ability to carry out his duties.  On July 31, 2020 **[Dkt. Entry 286]**[1], the Receiver filed an emergency ex parte motion regarding Mr. Stolz's interference, and on August 4, 2020 **[Dkt. Entry 287]** the District Court ordered Mr. Stolz to appear on August 17, 2020 and bring with him the keys to the stations, bank accounts, leases and related documents requested by the Receiver. At the hearing on August 17, 2020, Mr. Stolz appeared but did not bring with him working keys to the stations or the other requested documents. The District Court then issued an order on August 17, 2020 directing Mr. Stolz to comply with its orders and stating that failure to comply would result in sanctions. **[Dkt Entry 295]**.

On August 24, 2020, the Receiver filed a request to hold Mr. Stolz in contempt for his failure to comply with the District Court's August 17, 2020 order, requiring that Mr. Stolz turn over keys, bank accounts, leases, and other relevant materials necessary for the Receiver to manage the stations and be in a position to consummate a sale of the stations for the benefit of creditors **[Dkt Entry 296]**. On September 2, 2020, the District Court found Mr. Stolz in contempt, and ordered him to surrender to the U.S. Marshall to be jailed until he complied with the Court's August 4 and 17 orders. **[Dkt Entry 297]**.

Notwithstanding the District Court's prior orders compelling Mr. Stolz to refrain from interfering with the Receiver and to provide the Receiver with essential documents, including leases, and bank records, and once again keys to the facilities, Mr. Stolz again stonewalled and refused to comply with those orders.  In response to yet another ex parte motion for contempt filed by the Receiver **[Dkt Entry 360, 360-1, 360-2, 360-3, 361]** on January 28, 2021, the Court again found Mr. Stolz in contempt – **[Dkt Entry 363]** and ordered Mr. Stolz to again surrender to the U.S. Marshall unless he complied with those earlier court orders.

Following a lengthy report filed by the Receiver on February 1, 2021, as to Mr. Stolz's continuing failure to comply and his obstruction and interference with the Receiver **[Dkt Entry**

---

[1] All Docket Entries refer to Case Number 5:16-cv-00600-JGB in the United States District Court Central District of California Eastern Division, and are available for production upon request.



Fox Rothschild LLP
ATTORNEYS AT LAW

March 4, 2022
Page 3

365] the District Court on February 2, 2021 issued a warrant for Mr. Stolz's arrest **[Dkt Entry 368]**. Mr. Stolz failed to surrender to the United States Marshall and on February 17, 2021 the District Court again found Mr. Stolz in contempt for continuing to disobey its orders and fined Mr. Stolz $10,000 for "each day he does not surrender." **[Dkt Entry 379]**

On February 24, 2021, the District Court ordered Mr. Stolz to appear in court on February 26, 2021 and to "avoid being remanded into custody at that time" – **[Dkt Entry 388]** – Mr. Stolz was ordered to again provide certain previously ordered documents and things, including the turning over of all bank accounts for the stations and once again all keys to the stations' facilities. However, in lengthy reports to the District Court filed on March 4, 5 & 9, 2021, by the Receiver, it was abundantly clear that Mr. Stolz refused to comply with court orders to cease his efforts to hamper and interfere in the Receiver's efforts to carry out his responsibilities to manage and sell the stations. **[Dkt Entry 400, 403, 406]**.

No list of equipment nor keys to the various locations were turned over by Mr. Stolz to the Receiver as ordered by the District Court on numerous occasions. In several cases, the actual addresses for the station's studios, offices, and actual transmitter site (KRKC-FM), were not correct. In other cases, particularly for KREV-FM and KRCK-FM, the studios and offices were subsequently reclaimed by eviction against Mr. Stolz prior to the Receivership's start. After repeated orders from the District Court that keys be provided by Mr. Stolz, the few keys that were provided were not labeled, did not work for any of the transmitter buildings or studio office locations, thus proving to be largely inoperable.

In addition, it is the Receiver's belief that Mr. Stolz continued to enter the studios and transmitter sites on multiple occasions during the receivership, contrary to the orders of the District Court. It is unknown what equipment may have been removed or altered by Mr. Stolz during his visits.

In the cases as outlined below, equipment on the list was not operational during the time of the Receivership. The Nautel transmitter on Mt. Potosi, for instance, has not been operational for years prior to the receivership. According to Mr. Stolz, this transmitter was damaged by a water leak in the ceiling of the transmitter building on Mt. Potosi. However, after inspecting the site and having discussions with the building representative as well as the senior executives of Nautel, the manufacturer of the transmitter, it was concluded by them that there was no water damage as claimed, but that Mr. Stolz damaged the transmitter himself while attempting to re-wire circuits and make other internal changes to the unit. They explained that they had told Mr. Stolz years ago that his mistakes shorted out the transmitter and that no repairs would be covered by their warranty. It is not the responsibility of the receivership estate to pay for Mr. Stolz's negligence.



Fox Rothschild LLP
ATTORNEYS AT LAW

March 4, 2022
Page 4

All of the equipment identified in the First Letter is located at the sites where it was originally found, except for the BE FMi106 HD transmitter, the BE FM60/250 exciter and the Inovonics RDS generator which were all moved from the non-functioning Mt. Potosi site to the current VCY rack at Indio Hill. The BE transmitter is inoperable, and the BE exciter is operational when removed from service. The operational status of the RDS generator is unknown.

The Receiver has a fiduciary duty to disclose that VCY has informed the Receiver that the KREV transmitter is only capable of running at approximately half power at present. In December 2021, through no fault of the Receiver or VCY, there was a massive power blackout and brownout at the transmitter site. This damaged the NV7.5 transmitter. VCY purchased a used smaller transmitter to stay on the air. VCY also purchased all new power supplies for the NV7.5 transmitter and new firmware from Nautel, which had not been updated for a very long time. There is still damage to the fans in the PA modules.

The other equipment at each station's transmitter sites has not been removed, other than the slight relocation of the equipment racks in the same building in San Francisco and Arden Peak. In these cases, new racks owned by VCY were installed for remote equipment. In some cases, such as at Arden Peak, the KFRH STL antenna and the 950 mHz yagi antenna were removed because Mr. Stolz never had a valid STL license for this microwave link.

In addition, some racks and equipment that have been installed at the transmitter sites belong to VCY. Although VCY and the Receiver have a validly executed Local Programming and Marketing Agreement, which expires on March 16, 2022, VCY has removed all of its equipment from the Debtors' premises. VCY also has valid and enforceable leases for each of the transmitter sites but has already removed its equipment and vacated the premises. Mr. Stolz and his counsel can contact the respective landlords and VCY if he wants to either gain access or transfer these leases to his companies.

The Receiver has included a full financial accounting attached to this letter as **Exhibit 1**. The only true asset that remains in the Receiver's possession are the minimal funds currently held in the Receiver's account. These funds can be disbursed at any moment upon direction of the Debtors as to the proper recipient of the funds and proper forwarding information.

Lastly, the Receiver believes that the Debtors have grossly inflated the alleged value of their equipment. The Debtors have provided no basis for the value of their assets. The overwhelming majority of equipment found within the studios and transmitter sites was outdated or inoperable. The Receiver has reason to believe that the Debtors have included equipment values that would be correct only if a new version, or pristine version of each item was



Fox Rothschild LLP
ATTORNEYS AT LAW

March 4, 2022
Page 5

purchased. This practice grossly inflates the real market value of the equipment and assets provided in the First Letter and the Second Letter.

## II.    Responses to the Checklist Attached to the First Letter

Numbers                                          Explanation

1-5          Nothing was ever used or removed from this site. The property owner notified the receiver some 18 months ago that it was retaking possession of the space and would store anything found there in a storage unit. Mr. Stolz should contact the property owner. He has a claim well into six figures for past due rent, interest and legal fees owed by Mr. Stolz.

6-8          Equipment is described above and is currently located at the Indio Peak transmission site. That site is on a lease with VCY and not the Receiver.

9-11         Same response as to 1-5 above.

13-14        Same response as to 1-5 above.

15-18        Nothing was ever removed from the Via Austi site which also houses Mr. Stolz's AM station and a translator. No office equipment or file cabinets were ever used or removed by the Receiver. The Receiver never was furnished the title, key or possession of the van associated with this site by Mr. Stolz as ordered by Judge Bernal. The van was never used by the Receiver or his contact personnel.

19-21        Mr. Stolz never turned over keys to any of these sites. The owner of the Mt. Potosi and Mt. Arden site provided access to these sites upon request. Mr. Stolz provided inaccurate location and ownership information for the Indio Peak transmitter site. VCY finally gained access by finding the correct site and then contacting that property owner. VCY then executed a lease for this site. The Receiver does not have any keys to this site.

22-23        The Receiver terminated the e-mail accounts used by the stations as well as other digital streams. Thus, there are no corresponding passwords. Further, there is no HD license for the Palm Desert site, although Mr. Stolz has misrepresented to the FCC that such a license exists. The Receiver will not provide the password for the receivership bank account as it is connected to other non-receivership accounts.



Fox Rothschild LLP
ATTORNEYS AT LAW

March 4, 2022
Page 6

24-32  This site was inoperable through the receivership, and it is believed that all the equipment remains in place there, subject to any relocation or removal by Mr. Stolz during his unauthorized visits.

33  The Nautel transmitter was severely damaged and is inoperable due to misuse by Mr. Stolz as outlined above. Mr. Stolz appears to be attempting to have someone else pay for his mistakes with this unit. The Nautel engineers lay the blame square on him for this damage. In its current condition, it is worth little to nothing other than for spare parts and the cabinet.

34-37  Same response as 24-32 above.

## III.  Receiver's Responses to the First Checklist Attached to the Second Letter

<u>Numbers</u>                                           <u>Explanation</u>

1-18  To the best of my knowledge, all of these items remain at the locations noted.

19  Only VCY has keys to the transmitter site as they are the lessee under the current agreement.

20  I was never provided keys to the Palm Desert studio and office site.

21-22  To the best of my knowledge, both of these items remain at the location noted.

22-23  No HD licenses were established for the Mecca, CA station and I did not have or use any passwords for e-mail services, streamers, websites or HD accounts.

24-30  To the best of my knowledge, all of these items remain at the location noted.

31  This will not be covered nor required by the court.  In fact, VCY bought and installed an $8,000 filter required by the FAA to eliminate interference from the FM signal at Arden.  VCY must be reimbursed for this filter that is currently in place at the Arden.

131412095.1



Fox Rothschild LLP
ATTORNEYS AT LAW

March 4, 2022
Page 7

### IV.    Receiver's Responses to the Second Checklist Attached to the Second Letter

| Numbers | Explanation |
|---|---|
| 1-15 | To the best of my knowledge, all of these items remain at the San Francisco transmitter site. |
| 16-18 | Keys were never provided to these three sites. The studio site was foreclosed by the property owner prior to my appointment as receiver. The lessor at the San Francisco site has given notice that Mr. Stolz will not be allowed on the property without his paying all of the past due rent. |
| 19 | The receiver did not maintain any corporate e-mail accounts, streamers or websites for the stations. All previous e-mail accounts were terminated. |
| 20-32 | To the best of my knowledge, all of these items remain at the San Francisco transmitter site. |

131412095.1

# **Exhibit 1**

Profit & Loss Statement
Receivership for KFRH, KRCK and KREV Radio
July, 2020 to February, 2022

Revenues

| | |
|---|---|
| Stolz Contempt Judgment | $   5,000.00 |
| LMA Fees—VCY America | $ 62,500.00 |
| Stolz Turnover of Accounts | $   1,041.01 |
| | |
| Total Revenues | $ 68,541.01 |

Expenses

| | |
|---|---|
| Autotel-Nevada Lease Payment (check #101) | $   1,500.00 |
| W. Lawrence Patrick travel expenses (check #102) | $   9,828.23 |
| Reimbursement to Patrick Communications, LLC for 2021 FCC Regulatory Fees (check #103) | $ 21,015.00 |
| Reimbursement to W. Lawrence Patrick, Receiver, for 2020 FCC Regulatory Fees ($21,100.00) and BLM fees for Arden Peak transmitter site in 2020 ($3,542.14) (check #104) | $ 24,643.14 |
| Scarrino & Shubert, PLLC for legal fees (check #105) | $ 10,000.00 |
| Bank Service Charges | $      136.00 |
| | |
| Total Expenses | $ 67,122.37 |
| | |
| Amount to be Disbursed: | $   1,418.64 |

1

# Judgment Amounts Owed, Legal Fees, Receivership Fees, and Retention payments approved by Federal Judge Jesus Bernal in the Stolz matter

Judgment

Judgment entered in favor of the Bellaire
Towers Homeowners Association               $ 364,003.32[1]

Receivership Legal Fees

Glaser Weil Fink Jacobs Howard Avechen & Shapiro
    (primary receivership counsel)           $ 365,968.10

Sciarrino & Shubert (FCC counsel)           $ 172,100.00

Fox Rothschild, LLP  (bankruptcy counsel)   $  91,999.53

                            Total Due:       $ 630,067.63

W. Lawrence Patrick, Receiver
    Monthly accrued fees due                 $  150,000.00

                            Total Due        $  150,000.00

---

[1] This judgment continues to accrue interest at the rate of $50.56 daily.  The above figure is accurate as of February 7, 2022.

<u>Retention Payments Due</u>

James Palomares                                     $  40,000.00

Albert Ramirez                                      $   20,000.00

                              Total Due:            $  60,000.00


**Total Due of all Charges**          **$ 1,204,070.95**

## Profit & Loss Statement Details
## Receivership for KFRH, KRCK and KREV Radio
## July, 2020 to February, 2022

<u>Revenues</u>

| | | |
|---|---|---|
| 9/20 | Stolz Contempt Payment | $ 5,000.00 |
| 3/21 | Stolz Bank Account Receipt | $ 1,041.01 |
| 6/21 | VCY LMA Fees [$ 2,500.00 for half of March; $5,000.00 for April, May and June, 2021] | $ 17,500.00 |
| 9/21 | VCY LMA Fees [$5,000.00 for July, August and September, 2021] | $ 15,000.00 |
| 1/22 | VCY LMA Fees [$5,000.00 for October, November, and December, 2021 and January, February, 2022] | $ 30,000.00 |
| | Total | $ 68,541.01 |

<u>Expenses</u>

| | | |
|---|---|---|
| 6/21 | Autotel-Nevada (check #101) | $ 1,500.00 |
| 8/21 | W. Lawrence Patrick (check #102) | $ 9,828.23 |
| 9/21 | American Express (check #103) | $ 21,015.00 |
| 1/22 | Patrick Communications (check #104) | $ 24,643.14 |
| 1/22 | Scarrino & Shubert, PLLC (check #105) | $ 10,000.00 |
| 7/21 | Bank Service Charge | $ 41.00 |
| 9/21 | Bank Service Charge | $ 25.00 |
| 11/21 | Bank Service Charge | $ 38.00 |
| 1/22 | Bank Service Charge | $ 32.00 |
| | Total | $ 67,122.37 |

<u>Receiver's Accrued Fees</u>

| | | |
|---|---|---|
| July, 2020 | Receivership fees accrued | $  7,500.00 |
| August, 2020 | Receivership fees accrued | $  7,500.00 |
| September, 2020 | Receivership fees accrued | $  7,500.00 |
| October, 2020 | Receivership fees accrued | $  7,500.00 |
| November, 2020 | Receivership fees accrued | $  7,500.00 |
| December, 2020 | Receivership fees accrued | $  7,500.00 |
| January, 2021 | Receivership fees accrued | $  7,500.00 |
| February, 2021 | Receivership fees accrued | $  7,500.00 |
| March, 2021 | Receivership fees accrued | $  7,500.00 |
| April, 2021 | Receivership fees accrued | $  7,500.00 |
| May, 2021 | Receivership fees accrued | $  7,500.00 |
| June, 2021 | Receivership fees accrued | $  7,500.00 |
| July, 2021 | Receivership fees accrued | $  7,500.00 |
| August, 2021 | Receivership fees accrued | $  7,500.00 |
| September, 2021 | Receivership fees accrued | $  7,500.00 |
| October, 2021 | Receivership fees accrued | $  7,500.00 |
| November, 2021 | Receivership fees accrued | $  7,500.00 |
| December, 2021 | Receivership fees accrued | $  7,500.00 |
| January, 2022 | Receivership fees accrued | $  7,500.00 |
| February, 2022 | Receivership fees accrued | $  7,500.00 |
| | Total | $ 150,000.00 |

2/3/22, 11:09 AM                                                            U.S. Bank

Return

# Find Past Check or Deposit Slip Images

## View Image

Account Stolz Receivership - 3241
Check Number 101
Date Processed 6/14/2021
Amount $1,500.00

Review Back

| Print  | Save

CASH ONLY IF ALL CHECK AND SECURITY FEATURES LISTED ON BACK INDICATE NO TAMPERING OR COPYING

**William L. Patrick**
Proprietorship/Receiver
KFRH(FM), KREV(FM), KRCK(FM)
199 Carter View Drive, Cody, WY 82414

U.S. Bank, National Association
1132 Beck Avenue
Cody, WY 82414
99-7011/3070

0101

June 4, 2021

PAY TO THE
ORDER OF        Autotel-Nevada                                $ **1,500.00**

One thousand, five hundred and 00/100 ************************************  DOLLARS

PROTECTED AGAINST FRAUD

MEMO     Arden Peak lease payments                    William L. Patrick

⑈000101⑈ ⑆ ⑆ 115⑆ ⑈ 23241⑈

Cancel

Done

2/4/22, 11:03 AM                                                                                    U.S. Bank

Return

# Find Past Check or Deposit Slip Images

## View Image

Account Stolz Receivership - 3241
Check Number 102
Date Processed 8/31/2021
Amount $9,828.23

Review Back

| Print  | Save



Cancel

Done



**William L. Patrick**
Proprietorship/Receiver
KFRH(FM), KREV(FM), KRCK(FM)
199 Carter View Drive, Cody, WY 82414

U.S. Bank, National Association
1112 Beck Avenue
Cody, WY 82414
99-7011/3070

0103

9/15/2021

PAY TO THE
ORDER OF     American Express                                        $ *21,015.00*

Twenty-one thousand, fifteen and 00/100 ***************************************************************** DOLLARS

Pre-payment for AMEX charge for Royce
FCC regulatory fees for 2021

⑈000¡03⑈  ⑈  ⑈⑈ 15⑈  324⑈

Intuit® CheckLock™ Secure Check     Details on Back



William L. Patrick
Proprietorship/Receiver
KFRH(FM), KREV(FM), KRCK(FM)
199 Carter View Drive, Cody, WY 82414

U.S. Bank, National Association
1102 Beck Avenue
Cody, WY 82414
99-701/3070

0104

Jan. 22, 2022

PAY TO THE
ORDER OF    Patrick Communications, LLC                    $  * 24,643.14 *

Twenty-four, thousand, six hundred, forty-three and 14/200  ***************                    DOLLARS

MEMO    Reimbursement to PC, LLC for 2020 FCC regulatory
fees ($21,100.00) and BLM use fees for Arden Peak
transmitter site lease in 2020 ($3,542.14) in 2020



William L. Patrick
Proprietorship/Receiver
KFRH(FM), KREV(FM), KRCK(FM)
199 Carter View Drive, Cody, WY 82414

0105

U.S. Bank, National Association
1132 Beck Avenue
Cody, WY 82414
98-7/011/3070

Jan. 25, 2022

PAY TO THE
ORDER OF    Sciarrino & Shubert                    $ **10,000.00**

Ten thousand and no hundredths *************************************************************************    DOLLARS

MEMO    Legal Fees—Stolz

Intuit® CheckLock™ Secure Check    Details on Back