STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone: (775) 786-7600
E-Mail: steve@harrislawreno.com
Attorneys for Jointly Administered Debtors

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

\* \* \* \* \*

IN RE:

SILVER STATE BROADCASTING, LLC

☐ AFFECTS THIS DEBTOR.

☐ AFFECTS GOLDEN STATE
BROADCASTING, LLC

☐ AFFECTS MAJOR MARKET RADIO
LLC

☒ AFFECTS ALL DEBTORS.

_____/

Case No. 21-14978-abl
(Chapter 11)

Jointly Administered with:

| 21-14979-abl | Golden State Broadcasting, LLC |
| 21-14980-abl | Major Market Radio LLC |

Hearing Date:    TBD
Hearing Time:    TBD

## **DEBTORS' DISCLOSURE STATEMENT**

Dated:            May 2, 2022

Filed by:         STEPHEN R. HARRIS, ESQ.
                  HARRIS LAW PRACTICE LLC
                  6151 Lakeside Drive, Suite 2100
                  Reno, Nevada 89511
                  Telephone: (775) 786-7600

                  Attorney for Jointly Administered Debtors

# I. <u>INTRODUCTION</u>

SILVER STATE BROADCASTING, LLC, GOLDEN STATE BROADCASTING, LLC, and MAJOR MARKET RADIO LLC, Jointly Administered Debtors and Debtors-in-Possession herein ("Debtors") in the above-captioned Chapter 11 cases, provide herewith the information contained in this DEBTORS' DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") to all known creditors and other parties in interest of the Debtors in order to disclose that information deemed material, important, and necessary to the creditors to arrive at a reasonably informed decision in exercising their rights to vote for acceptance of the Plan of Reorganization.

Together with this DEBTORS' DISCLOSURE STATEMENT, each creditor should also have received a copy of the DEBTORS' PLAN OF REORGANIZATION ("PLAN"), a form Ballot on which creditors and other parties in interest who are entitled to vote may cast their respective votes, and a copy of the ORDER APPROVING DEBTORS' DISCLOSURE STATEMENT which indicates that the Bankruptcy Court has approved this DEBTORS' DISCLOSURE STATEMENT for circulation to creditors in that it contains information of a kind and of sufficient detail, as far as its reasonably practicable, to enable creditors and other parties in interest to make an informed decision about the PLAN.  As indicated in the Instructions accompanying the Ballot, which is the form on which you may cast your vote to accept or reject the PLAN, the Ballot must be mailed to Debtors' counsel in time to ensure that your Ballot will be received by the due date.  Ballots received after the due date may not be counted.

You are urged to carefully read this DEBTORS' DISCLOSURE STATEMENT and the DEBTORS' PLAN OF REORGANIZATION before deciding to accept or reject the PLAN. Particular attention should be directed to the provisions of the PLAN affecting your rights as well as the Liquidation Analysis which describes the results which would be obtained in the event the Debtors' business is discontinued and its assets liquidated.

## II. <u>THE CHAPTER 11 CONFIRMATION PROCESS</u>

The Chapter 11 confirmation process is governed, in large part, by the Bankruptcy Code. Under the Bankruptcy Code, to be confirmed, the DEBTORS' PLAN OF REORGANIZATION must be accepted by at least one (1) Class of Creditors whose claims against the Debtors will be

"impaired" under the PLAN. Claimants who are scheduled to receive full payment on their Claims without modification or changes to their right to payment are deemed to have accepted the PLAN and do not vote. Only Creditors whose Claims are "impaired" or their right to payment terms is modified or changed are entitled to vote in favor of accepting or rejecting the PLAN. A Class of claims is "impaired" if the amount to be paid to the Class provides the Claimants in that Class with less than full payment of the Allowed Claims in that Class or the terms for repayment are extended beyond the contractual due date or some other contractual terms are changed. Acceptance by such Class requires that at least one-half of the Creditors in the Class who cast accepting votes on the PLAN and hold at least two-thirds of the total dollar amount of the Claims in that Class casting votes on the PLAN.

### III. DISCLAIMER

**NO REPRESENTATIONS CONCERNING THE DEBTORS, THEIR FUTURE BUSINESS OPERATIONS OR VALUE OF PROPERTY, ARE AUTHORIZED BY THE DEBTORS, OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN OF REORGANIZATION WHICH ARE NOT CONTAINED HEREIN OR IN THE PLAN OF REORGANIZATION SHOULD NOT BE RELIED ON BY ANY CREDITOR OR OTHER PARTY IN INTEREST. ALTHOUGH THE FINANCIAL INFORMATION CONTAINED HEREIN IS BELIEVED TO BE ACCURATE, IT HAS NOT BEEN SUBJECTED TO ANY CERTIFIED AUDIT AND IS NOT WARRANTED OR REPRESENTED TO BE ERROR FREE.**

### IV. DEBTORS' HISTORY

On October 19, 2021, Silver State Broadcasting, LLC ("Silver State"), Golden State Broadcasting, LLC ("Golden State"), and Major Market Radio LLC ("Major Market") (collectively "Debtors") filed their Chapter 11 voluntary petitions as Case Nos. 21-14978-abl, 21-14979-abl, and 21-14980-abl, respectively.

Each of the Debtors is an independent radio broadcasting company. Silver State owns the FCC licenses for FM radio station KFRH N. Las Vegas, Nevada, AM radio station KBET,

Winchester, Nevada and associated local translator facilities, while Debtor Major Market owns the FCC licenses for FM radio station KRCK-FM, licensed to Mecca, California and two associated FM translator stations licensed to Palm Desert, California. Debtor Golden State is the licensee of FM broadcast station KREV, Alameda, California. Most of the value in the bankruptcy estates consists of the FCC licenses for foregoing radio broadcast stations (collectively the "Radio Station Group"). Three of the radio stations (KFRH, KREV and KRCK-FM, the "Radio Stations") are the Debtors' primary assets. They were the subject of a receivership action in the District Court[1] commencing July of 2020. At that time, pursuant to an order of the District Court and the ensuing grant by the FCC of a set of "short form" assignment applications, the licenses for the core Radio Stations were assigned to Receiver W. Lawrence Patrick ("Receiver").

Prior to the Receiver's control, the Radio Stations broadcast regular programming and generated revenues of approximately $80,000 per month. After the Receiver took control, he dismantled the Radio Stations' programming, sales, marketing, streaming, websites, email accounts, and technical and engineering operations, and allowed them to be managed by VCY under an LMA for the egregiously low price of $5,000 per month for all three Core Radio Stations. VCY instantly supplanted decades of the Radio Stations' history, ratings, audiences, and revenues stemming from mass-appeal, commercial, community-based popular music formats by a non-commercial 24-hour financial solicitation, non-profit gospel format. The Receiver's actions damaged the Debtors' long-standing sales and marketing agreements and programming relationships. The Receiver also ignored the Radio Stations' existing financial obligations during his tenure, such as utilities, payroll, and lease rents, even though he had taken control of the Radio Station assets and revenues.

The Debtors filed their Chapter 11 cases on October 19, 2021, because the Receiver was irreparably damaging their Radio Stations and seeking to unnecessarily sell the Radio Stations to VCY for far less than their market value.

---

[1] United States District Court Central District of California, Case No. 5:16-cv-00600-JGB, *WB Music Corp., et al. v. Royce International Broadcasting Corp., Playa Del Sol Broadcasters, Silver State Broadcasting, LLC, Golden State Broadcasting, LLC, and Edward R. Stolz, II*

After the bankruptcy filings, the Receiver refused to voluntarily turn over the Debtors' assets causing the Debtors to file their *Emergency Joint Motion for Order Directing Court Appointed Receiver to Turnover Property Pursuant to 11 U.S.C. § 543(a) and (b)* (DE 30) ("Turnover Motion"). In turn, the Receiver filed his *Emergency Motion to Excuse Turnover in Favor of Receiver and to Dismiss/Abstain, or, Alternatively, for Stay Relief and/or Conversion* (DE 45) ("Excuse Motion"). The Debtors' Turnover Motion and the Receiver's Excuse Motion were both set for hearing on December 20, 2021, pursuant to an order of the Court. After hearing oral argument, the Honorable Judge Landis continued the hearings to January 31, 2022, at 1:30 p.m., to enter his oral ruling. On February 7, 2022, this Court entered its *Order Granting Debtor's Emergency Motion for Turnover* (DE 115) ("Turnover Order") and its *Order Denying Receiver's Emergency Motion to Excuse Turnover* (DE 116). Pursuant to the Turnover Order, the deadline for the Receiver to prepare, sign, and file with this Court an accounting of any property of the Debtors, or proceeds, product, offspring, rents, or profits of such property that, at any time came into the possession, custody, or control of the Receiver (the "Accounting"), was April 8, 2022 (the "Accounting Deadline").

## V.  DESCRIPTION AND VALUATION OF ASSETS

The Debtors' known personal property assets (there are no real property assets) which existed on the Petition Date, are generally described as follows:

**Silver State Broadcasting, LLC:**

| Description | Est. Market Value |
| --- | --- |
| Radio licenses for K276GW (translator), KFRH FM (full service), and KBET AM (full service) | $20,000,000 |
| Potential malpractice claims in excess of $50,000 against Jeffrey J. Whitehead, Esq. | $ Unknown |
| Potential malpractice claims against Dariush G. Adli, Esq. | $ 6,000,000 |
| Claims for breach of fiduciary duty and other possible Causes of action against W. Lawrence Patrick | $ 6,000,000 |

**Golden State Broadcasting, LLC:**

| Description | Est. Market Value |
|---|---|
| Security deposit with Executive Park Properties, LLC | $ 16,000 |
| Radio license for KREV FM (full service) | $15,000,000 |
| Potential malpractice claims against Dariush G. Adli, Esq. | $ 6,000,000 |
| Claims for breach of fiduciary duty and other possible | |
| Causes of action against W. Lawrence Patrick | $ 6,000,000 |

**Major Market Radio LLC:**

| Description | Est. Market Value |
|---|---|
| Security deposit with Suresh Shah | Unknown |
| Radio license for KRCK-FM (full service), K238AK (translator), and K251BX (translator) | $ 5,000,000 |
| Potential malpractice claims against Dariush G. Adli, Esq. | $ 6,000,000 |
| Claims for breach of fiduciary duty and other possible | |
| Causes of action against W. Lawrence Patrick | $ 6,000,000 |

## VI. SIGNIFICANT POST-PETITION EVENTS

The following significant events have occurred post-petition:

The Debtors obtained Court approval to employ Harris Law Practice LLC as their general bankruptcy counsel. *See* DE 114. On November 19, 2021, this Court entered in each case an *Order Authorizing Joint Administration of Cases*, jointly administering Silver State, Golden State, and Major Market, and designating Silver State, as the lead case (Case No. 21-14978).

As indicated previously, the Court also granted the Debtors' Turnover Motion requiring the Receiver to immediately turn over to the Debtors all of their assets and file an Accounting with the Court by April 8, 2022.

The Receiver has done very little to comply with his duties under the Turnover Order. Debtors' counsel filed applications with the FCC seeking assignment of their licenses to the Debtors (FCC Licensing Management System File Nos. 0000130807, 00001308 and 0000130810). The FCC granted the applications, and the licenses are once again in the Debtors' names. The Receiver also delivered to Debtors' counsel a check made payable to "Royce

International" in the sum of $1,418.64. But the Receiver failed to inventory and turn over all of the remaining Radio Station equipment which was located at the Debtors' leasehold premises when the Receiver took control of the Radio Stations. The Receiver has additionally refused to account for damage and destruction of broadcast equipment or theft of broadcast equipment, which was used by the Radio Stations prior to the Receiver's control but was damaged or dissipated during the Receiver's period of control. Further, the Receiver has failed to return keys to the Debtors for the premises and for a vehicle, incapacitating it. None of the Debtors' documents, computer files, passwords, email accounts, streaming broadcasts, or other intangibles have been returned. After numerous requests, the Receiver only responds that he "believes" equipment should be at various locations, or he claims he never took possession even though he fought the Debtors tooth-and-nail in the District Court to obtain control of the Radio Stations, not just the FCC licenses. Indeed, District Court documents which the Receiver has filed in this Chapter 11 case show that the Debtors and Mr. Stolz complied with providing the Receiver with keys, passwords, leasehold information, documents, and other information.

Additionally, on March 11, 2022, the Receiver filed his accounting [DE 141], but it does not comply with the specific requirements for an Accounting set forth in the Turnover Order. For example, the Accounting is supposed to be itemized by each Debtor, for each month of the receivership, and disclose at a minimum all the information contained in the standard U.S. Trustee's general Monthly Operating Report forms. Yet the Receiver's purported accounting fails to contain any information about the Debtors' assets in his control on a month-to-month basis, accrued Radio Station liabilities on a month-to-month basis, nor is there a separate accounting for each Debtor. In light of the Receiver's failure to comply with the Turnover Order, the Debtors will have to file a motion for order to show cause as to why he should not be held in contempt for failing to comply with the Turnover Order.

Because of the inadequacy of the Receiver's purported accounting, the Debtors have also filed a motion seeking to take the Rule 2004 examination of the Receiver to obtain additional information about the Debtors' financial condition during the receivership. The Rule 2004 examination is scheduled for May 19, 2022, at 10:30 a.m. After the Debtors obtain more details

about their assets and financial condition during the pre-petition receivership period, they may amend this Disclosure Statement as may be necessary.

The Debtor will also be filing an application to employ special FCC counsel, Wood & Maines, PC, as well as any other special litigation counsel or accountants as may be necessary to carry out the administration of these cases.

## VII. ADMINISTRATIVE AND UNCLASSIFIED CLAIMS

### ADMINISTRATIVE CLAIMS:

All costs and expenses of administration in this case, including any actual and necessary expenses of preserving or liquidating the assets of the Debtors' estate, all allowances, including professional fees and costs, approved by the Court, and any other costs and expenses entitled to priority pursuant to 11 U.S.C. § 507(a)(1) of the Bankruptcy Code and 28 U.S.C. § 1930, shall be paid in full on or before the Effective Date of the Plan.  The holders of these claims include the attorneys and accountants for the Debtors, unpaid post-petition accounts payable (if any), and all fees to be paid to the Office of the United States Trustee.  The estimated administrative expenses for the Debtors' reorganization proceeding are collectively $760,000 to $1,230,000, and consist of the following:

| | |
|---|---|
| $0.00 | Trustees fees that are owed the U.S. Trustee's Office for the applicable quarters of 2021 and 2022 prior the Confirmation Date [payment is anticipated to be made when due]; |
| $100,000 to $250,000 per Debtor | Estimated unpaid professional fees for the Debtors' general bankruptcy attorney, Stephen R. Harris, Esq., of Harris Law Practice LLC, calculated as of the Confirmation Date; |
| $80,000 to $ 100,000 | Estimated professional fees for the Debtors' special FCC counsel, Wood & Maines, PC, calculated as of the Confirmation Date; |
| $380,000 | Estimated administrative claims of Edward Stolz and Royce International Broadcasting for post-petition loans made to Debtors in the ordinary course of business under 11 U.S.C. § 364(a) calculated as of the Confirmation Date; and |
| $0.00 | Post-petition accounts payable with [all post-petition administrative expenses are expected to be paid in full in the normal course of business prior to the Confirmation Date]. |

Professional fees, both legal and accounting, shall continue to accrue up through and subsequent to the Confirmation Date, with final amounts owing subject to Court approval.

<u>UNCLASSIFIED PRIORITY CLAIMS</u>:

1. **Description**. The Debtors' priority claims are as follows:

| Name | Scheduled Amount | Proof of Claim Amount | Allowed Priority Amount |
|------|------------------|----------------------|--------------------------|
|      |                  |                      |                          |

Pursuant to the Debtors' Plan, the treatment and disposition of the unclassified priority claims, now totaling $0, will be as follows: Any claim discrepancy will be resolved by the claim objection process, with the stipulated amount and/or Court decreed amount owing used to calculate that particular creditors' allowed claim being paid by the Debtors.   All unclassified priority creditors shall be paid 100% of their allowed claim amount, with statutory interest thereon, over a one (1) year time period commencing on the Effective Date of the Plan.  The payments shall be made monthly, equally amortized over twelve (12) months, with statutory interest accrued thereon, but without any penalties. At the option of the Debtors, any allowed priority claims may be paid on a shortened time schedule from the one (1) year described hereinabove. In the event the Debtors fail to make the payments as set forth hereinabove, the allowed priority creditors, if any, shall have the right to proceed with any administrative remedies available to them, fifteen (15) days after written notice of default has been given to the Debtors and their attorney, Stephen R. Harris, Esq.

**VIII. <u>CLASSIFICATION OF CLAIMS AND INTERESTS</u>**

Pursuant to Section 1122 of the Bankruptcy Code, claims against the estate have been divided into the following classifications for purposes of administration and voting on the Plan:

1. **CLASS 1 CLAIM [BELLAIRE TOWERS HOMEOWNERS ASSOCIATION]**: This Class consists of the allowed secured claim of Bellaire Towers Homeowners Association in the amount of $364,003.32 as of February 7, 2022, arising from a

judgment entered against Golden State on July 22, 2014, and recorded with the California Secretary of State on November 21, 2014.

2.    **CLASS 2A CLAIMS [DISPUTED UNSECURED CLAIMS AGAINST ALL DEBTORS]**: This class consists of disputed unsecured claims collectively against all three Debtors to the extent such disputed unsecured claims may be proven and allowed by the Court. The Class 2A Claims, calculated as of the Petition Date, are detailed as follows:

| Creditor Claims: | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| W. Lawrence Patrick | $0.00 | $1,248,348.09 | $0.00 |
| VCY America, Inc. | $0.00 | $255,467.99 | $0.00 |
| Total | $0.00 | $1,503,816.08 | $0.00 |

3.    **CLASS 2B CLAIMS [DISPUTED UNSECURED CLAIMS AGAINST ONLY SILVER STATE]**: This class consists of disputed unsecured claims against Silver State to the extent such disputed unsecured claims may be proven and allowed by the Court. The Class 2B Claims, calculated as of the Petition Date, are detailed as follows:

| Creditor Claims: | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| Dan Alpert | $0.00 | $29,102.50 | $0.00 |
| Crown Cast MU LLC | $0.00 | $1,227,872.98 | $0.00 |
| DIG MCC, LLC* | $0.00 | $69,570.22 | $0.00 |
| Peter A. Jackson | $0.00 | $10,075.09 | $0.00 |
| Naylor & Braster | $0.00 | $18,304.20 | $0.00 |
| Whitehead & Burnett | $0.00 | $1,000,000 | $0.00 |
| Total | $0.00 | $2,354,924.99 | $0.00 |

*This Proof of Claim was resolved by Stipulation between the parties. *See* DE 143.

4.     **CLASS 2C CLAIMS [DISPUTED UNSECURED CLAIMS AGAINST SILVER STATE AND GOLDEN STATE]**: This class consists of disputed unsecured claims collectively against Silver State and Golden State to the extent such disputed unsecured claims may be proven and allowed by the Court.  The Class 2C Claims, calculated as of the Petition Date, are detailed as follows:

| Creditor Claims: | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| Mincin Law, PLLC | $0.00 | $37,644.73 | $0.00 |
| Total | $0.00 | $37,644.73 | $0.00 |

3.     **CLASS 3 EQUITY INTERESTS OF DEBTORS**:  This Class 3 consists of the shareholder's equity interests in the Debtors specifically: Royce International Broadcasting, Inc. as to a 100% stock ownership interest in each Debtor.

## IX. TREATMENT OF CLASSES

1.     **CLASS 1 CLAIMS [BELLAIRE TOWERS HOMEOWNERS ASSOCIATION**: The Class 1 Allowed claim in the total amount of $364,003.32, calculated as of the Petition Date, shall be paid in full, with statutory judgment interest, by Golden State on or before the Effective Date of the Plan.  Accordingly, the Class 1 Allowed claim is <u>unimpaired</u> under the PLAN.

2.     **CLASS 2A CLAIMS [DISPUTED UNSECURED CLAIMS AGAINST ALL DEBTORS]:**  The Class 2A Disputed Unsecured Claims, estimated in the total amount of $0.00 shall be resolved through the formal claim objection process or by agreement of the parties. Any allowed claims that result shall be paid in full by all three Debtors equally on the later of the Effective Date, or within five business days after any order allowing the claims becomes final and unappealable. Accordingly, the Class 2A Allowed claims are <u>unimpaired</u> under the PLAN.

3.     **CLASS 2B CLAIMS [DISPUTED UNSECURED CLAIMS AGAINST**

1  **ONLY SILVER STATE]:**  The Class 2B Disputed Unsecured Claims, estimated in the total

2  amount of $0.00 shall be resolved through the formal claim objection process or by agreement of

3  the parties. Any allowed claims that result shall be paid in full by Silver State on the later of the

4  Effective Date, or within five business days after any order allowing the claims becomes final and

5  unappealable. Accordingly, the Class 2B Allowed claims are <u>unimpaired</u> under the PLAN.

6      **4.**     **CLASS 2C CLAIMS [DISPUTED UNSECURED CLAIMS AGAINST**

7  **SILVER STATE AND GOLDEN STATE]:**  The Class 2C Disputed Unsecured Claims,

8  estimated in the total amount of $0.00 shall be resolved through the formal claim objection

9  process or by agreement of the parties. Any allowed claims that result shall be paid in full equally

10  by Silver State and Golden State on the later of the Effective Date, or within five business days

11  after any order allowing the claims becomes final and unappealable. Accordingly, the Class 2C

12  Allowed claims are <u>unimpaired</u> under the PLAN.

13      **5.**     **CLASS 3 EQUITY INTERESTS OF DEBTOR:**  The equity interests of the

14  shareholders of the Debtors existing on the Petition Date shall remain unchanged.  Accordingly,

15  the Class 3 equity interests of the Debtors are <u>unimpaired</u> under the Plan.

16  

**X. BAR DATE FOR FILING CLAIM**

17      The bar date for filing a proof of claim in this case was February 16, 2022, for all creditors

18  (except a governmental unit).  The bar date for objecting to claims will be sixty (60) days after

19  the date on which the PLAN is confirmed by the Court.  All unsecured claims which are listed as

20  disputed in the PLAN or who believe that the amounts listed in the PLAN are incorrect, shall file

21  proofs of claim in this case by the bar date set forth above.  Failure to file a proof of claim by a

22  disputed claimant or a claimant who disagrees with the amount listed in the PLAN within such

23  time period will result in the amount listed in the PLAN being established as the amount owing

24  to such creditor, and such creditor will participate in the PLAN, based upon its claim listed in the

25  PLAN.

26  **XI. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN**

27      1.     **Funding of Proposed Plan Payments**

28      The Debtors shall fund the proposed Plan payments through ongoing Radio Station Group

revenues, proceeds of the sale of Golden State's KREV FM license and related radio station assets, or funds provided by Edward Stolz from his personal assets. If claims are paid from the sale of Golden State's KREV FM, then Golden State will advance intercompany unsecured loans to the other Debtors so they can pay their allowed claims under the Plan. Alternatively, Golden State will make a distribution to its parent, Royce International Broadcasting, which in turn will make capital contributions to the other Debtors to fund their Plan payments. Debtors will consult with their tax accountant to determine which method is most appropriate for accounting purposes. But because Golden State is solvent, its creditors are not prejudiced by distribution of excess proceeds to fund the other Debtors' Plan payments.

Despite the Receiver's actions in dismantling the Debtors' operations, the Debtors have returned two of the Radio Stations back to the airwaves, with the third one to resume operations momentarily. The relaunch of operations has required the Debtors to resolve lease and utilities obligations that accrued under the Receiver but were not paid by Receiver; acquisition of new broadcast equipment to replace that which was dissipated, vandalized, or damaged under the Receiver's stewardship; and development of a fully featured program service, computer servers, and remote access technologies and related infrastructure. KRCK Palm Springs was restored to air and has been broadcasting since February 22, 2022. KFRH/ Las Vegas was restored to air and has been broadcasting since April 20, 2022. KREV/ San Francisco has been re-tooled, re-equipped and Golden State anticipates restoration of 24-hour broadcasting on or about May 7, 2022.

The Radio Stations are now (or in the case of KREV, soon will be) programming with desirable formats, intended to attract affluent and diverse audiences and broad acceptance by the commercial advertising and media communities. These formats are close to those built over time by Debtor's Radio Stations prior to Receiver's decimation of those formats by supplanting that programming with VCY's 24-hour religious solicitations. Debtors' stations are now programming News/Talk and Popular Hit music, with broad acceptance and appeal. With the first appearance of critical rating data, Debtors will recruit advertising salespeople to market the stations to the advertising community. Currently, the firm of Broadcast Investment Analysts

identifies annual radio market advertising expenditures of approximately $214,000,000 per year in San Francisco, $146,000,000 in Las Vegas and $11,000,000 in Palm Springs.

Because the Radio Stations were in the Receiver's control during the prepetition period after July 20, 2020, and through the Petition Date, the Debtors do not have any financial statements to show recent historical Radio Station revenues. However, the Debtors have prepared projected operating budgets for the Radio Station Group, which are attached hereto as **Exhibit A**. The Debtors estimate they will have sufficient revenues to cover their operating expenses, but that may not be the case because they must re-establish their regular operations, ratings, and advertising revenues after the Receiver dismantled everything. Thus, Edward Stolz will provide interim financing, as needed, in the ordinary course of business as unsecured administrative expenses under 11 U.S.C. § 364(a) to cover any shortfalls.

In order to effectuate the sale of KREV FM, Golden State has retained the services of a nationally prominent broadcast media broker, Robert W. Mahlman ("Mahlman"). Golden State and Mahlman have entered into an Exclusive Station Brokerage and Marketing Agreement for an irrevocable period of ninety days, with the option of three additional 90-day renewal periods. The brokerage agreement provides for a sales commission of 5% of the first three million in purchase price, plus 2% of the remaining purchase price, or under an LMA, 5% of any monthly or quarterly LMA fee, which will be applied to reduction of the brokerage fee. Golden State will file its application with the Court to employ Mahlman under 11 U.S.C. § 327(a).

While KREV is licensed to the community of Alameda, California, its transmitting facilities are located in San Francisco, which is the nation's number four radio market by size and revenue. From its antenna location on the "Candlestick" tower, KREV reaches millions of listeners both on the Peninsula and across San Francisco Bay in Oakland, Berkeley, and other East Bay communities. KREV is expected to command a price commensurate with the market's three most recent (pre-Pandemic) radio broadcast transactions, namely, $25,000,000, $100,000,000, and $143,000,000, respectively. The market is dominated by large station group owners, and very few independently owned radio stations remain in the same market other than KREV. This causes KREV to be qualified as the only non-consolidated entity available for sale

in the Nielsen rated number 4 market.

Alternatively, Golden State is also seeking to enter into an agreement with Mahlman by which to offer a Local Marketing Agreement ("LMA") for the sale of 24-hour programming time over KREV/ San Francisco.  It is Golden State's understanding that various San Francisco FM stations have offered to make their airtime available under LMA arrangements for between $200,000 and $300,000 per month, per station, as was reportedly the case in 2019 with stations KOIT and KMVQ.  Additionally, Golden State also intends to enter into an agreement with Mahlman by which to offer KREV's HD (high-definition digital) subchannel for lease.  Currently, San Francisco FM HD subchannels generally lease for between $10,000 and $20,000 per month.

### 2. Post-Confirmation Default

In the event the Debtors become delinquent in duty or obligation under the Plan, the affected creditor or creditors may provide written notice of such default to the Debtors and their counsel.  The Debtors shall thereafter have fifteen (15) business days from receipt of said notice in which to cure the default.  In the event such default remains uncured, the affected creditor or creditors shall be entitled to foreclose upon any collateral (if a secured creditor) or take other appropriate action.  The Debtors shall have the right to bring the issue of default before the Bankruptcy Court.  At any hearing, the Bankruptcy Court may consider the reason for the default and the ability of the Debtors to cure the default in a reasonable period of time.  The Bankruptcy Court may also consider conversion of the case to a Chapter 7 of the Bankruptcy Code or dismissal of the same is in the best interest of creditors.

### 3. Professionals' Fees

After the Confirmation Date of the Plan, the Debtors and any other professional, such as Debtors' general bankruptcy counsel, any special purpose counsel or accountants, will not be required to apply to the Court for compensation for services rendered post-confirmation. Post-confirmation compensation of the Debtors' professionals shall be at their normal hourly rate(s) and customary cost charges.

### 4. Distribution

All cash proceeds shall be distributed in the foregoing manner except amounts necessary

to pay disputed claims against the Debtors in the event they are allowed, which shall be held as a reserve and paid as such claims are determined by agreement between the parties or as are judicially determined.

5.    **Taxes**

Unless otherwise provided in the Plan, all taxes are paid current and there are no tax liens on real or personal property owned by the Debtors.

## XII. PROVISIONS GOVERNING DISTRIBUTION AND DISCHARGE

1.    THE DISBURSING AGENT.

The Debtors are ultimately responsible for making all distributions pursuant to the Plan. To assist it in discharging those responsibilities, Debtors shall use their Debtor-in-Possession bank accounts for all funds which are to be distributed to creditors under this Plan.

2.    UNCLAIMED DISTRIBUTIONS.

Any property to be distributed pursuant to the Plan, if not claimed by the distributee within one (1) year after the payment, shall be returned to the Debtors.

3.    EFFECT OF CONFIRMATION.

Upon confirmation and performance of the Plan, the Debtors shall be discharged from any debt that arose before the date of Confirmation, and any debt of a kind specified in §§ 502(g), 502(h), or 502(I) of the Bankruptcy Code, to the full extent permitted by Bankruptcy Code § 1141(d).    In addition, pending execution of the Plan, and unless the Court has otherwise expressly ordered or the Plan otherwise expressly provides, all creditors and parties in interest shall be stayed from proceeding against the Debtors' assets including stay of default proceedings.

4.    EXCULPATION.

Neither the Unsecured Creditors' Committee, if any, nor Debtors nor any of their respective members, officers, directors, employees, representatives, professionals or agents, will have or incur any liability to any Creditor for any act or omission in connection with or arising out of the Reorganization Case, including, without limitation, prosecuting confirmation of this Plan, consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for breach of fiduciary duty, gross negligence, willful misconduct or fraud.

### XIII. **POST-CONFIRMATION INJUNCTION**

No entity may commence, continue or assert any claim, counterclaim, crossclaim, affirmative defense, defense, set off, recoupment, or any action of any kind or nature (collectively "Potential Actions") against Debtors. Confirmation of the Plan shall constitute a permanent injunction against and irrevocable release of any and all Potential Actions. Confirmation of the PLAN shall constitute a permanent injunction against and irrevocable release of any and all Potential Actions.

### XIV. **EXECUTORY CONTRACTS AND LEASES**

Reservation of Rights. The Debtors reserve the right to assume or reject, pursuant to §365 of the Code, any executory contract or unexpired lease not assumed or rejected prior to the Confirmation Date. All executory contracts and unexpired leases not specifically assumed or rejected as of the Confirmation Date or as to which an application to reject shall not be pending on the Confirmation Date shall be deemed rejected by the Debtors. Debtors hereby assume or rejects their leases and executory contracts as follows:

VCY entered into a pre-petition Local Marketing Agreement ("LMA") with the Receiver to manage the Debtors' Radio Stations. The Receiver also entered into an asset purchase agreement with VCY for the sale of the Radio Stations. The Receiver was not appointed as receiver over the Debtor LLC entities, only the Radio Stations themselves. Thus, Debtors contend that the Receiver was not their agent, and they are not liable under the LMA or purchase agreement. What is more, VCY unilaterally abandoned its obligations under the LMA on or about February 1, 2022. Nonetheless, out of an abundance of caution, the Debtors hereby reject any agreements that the Receiver entered into with VCY, as well as rejecting any other executory contracts or leases entered into by the Receiver which may be unknown to the Debtors.

### XV. **MISCELLANEOUS PROVISIONS**

Notice. Any notice described in or required by the terms of this PLAN or the Code and Rules shall be deemed to have been properly given when actually received or if mailed, five days after the date of mailing, if such shall have been sent by certified mail, return receipt requested, and if sent to:

The Debtors, addressed to:
STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511

Headings.  the headings used herein are inserted for convenience only and neither constitute a portion of the PLAN nor in any manner affect the construction of the provisions of the PLAN.

Severability.  Should any provision of this Plan be determined to be unenforceable following the Effective date, such determination shall in no way limit or affect the enforceability of any and all other provisions of this Plan.

Governing Law.  Except to the extent that the Code or other applicable federal law is applicable, the rights, duties and obligations arising under this Plan shall be governed by and construed in accordance with the laws of the State of Nevada.

Successors and Assigns.  The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon and shall inure to the benefit of the successors and assigns of such person.

Designation of Managers.  Edward Stolz and Debby Naiman shall continue to serve as the Co-Managers of the Debtors and shall be initially compensated with a gross salary of $0 from the Debtors, although they may be paid a salary by the Debtors' parent company, Royce International Broadcasting, Inc.

## XVI. PROCEDURES FOR RESOLVING CONTESTED CLAIMS

Claims Objections.  Objections to Claims shall be filed with the Court and served upon each holder of a Claim to which objection is made no later than sixty (60) days after the Confirmation Date.

Payment Procedures.  Payments to the holder of a Claim to which objection has been made that ultimately becomes an Allowed Claim shall be made in accordance with the provision of the PLAN with respect to the Class of Creditors to which the holder of such an Allowed Claim belongs.  However, interest, if any, on any funds reserved for a contested claim shall inure to the benefit of the holder of such an Allowed Claim.

Avoidance Actions.  To the extent appropriate, the Debtors shall have the right to bring any and all avoidance actions, the same to be commenced with 90 days of the Confirmation date. Proceeds of all avoidance actions shall vest in the Debtor pursuant to 11 U.S.C. §1141.

## XVII. CONFIRMATION REQUEST

The Debtors request that the PLAN be confirmed in accordance with the provisions of §1129(a) and/or §1129(b) of the Code.

## XVIII. RETENTION OF JURISDICTION

Notwithstanding confirmation of this PLAN, the Court will retain jurisdiction for the following purposes, and each of them:

1.    The Court will retain jurisdiction to determine the allowability and payment of any claim(s) upon any objection(s) thereto (or other appropriate proceedings) by the Debtors or by any other party in interest entitled to proceed in that manner.  As part of such retained jurisdiction, the Court will continue to determine the allowability of Administrative Claims and any request(s) for payment(s) thereof, including professional fees and costs which are Administrative Claims.

2.    The Court will retain jurisdiction to determine any dispute(s) which may arise regarding the interpretation of any provision(s) of this PLAN.

3.    The Court will retain jurisdiction to facilitate the consummation of this PLAN by entering, consistent with the provisions of this PLAN, any further necessary or appropriate order(s) regarding the enforcement of this PLAN and any provision(s) thereof.

4.    The Court will retain jurisdiction to adjudicate any cause(s) of action or other proceeding(s) presently pending or otherwise referenced here or elsewhere in this PLAN, including, but not limited to, the adjudication of any and all "core proceedings" under 28 U.S.C. § 157(b), which may be pertinent to this Reorganization Case, and which the Debtors may deem it appropriate to initiate and prosecute in aid of its reorganization.

5.    The Court will retain jurisdiction to enter an appropriate final decree in this Reorganization Case.

6.    The Court will retain jurisdiction to enter an appropriate final decree, and any interim order(s), in any adversary proceedings which may be initiated during this Chapter 11

proceeding.

## XIX. **FEASIBILITY OF DEBTORS' PLAN**

Debtors believe that the PLAN is feasible based on the desirable location of the Debtors' FCC broadcasting licenses and the millions of people reached by their signals. It will take some time for the Debtors to return their Radio Station operations and revenues to the levels they were before the Receiver dismantled the operations. However, they have already succeeded in putting all but one of the Radio Stations back on the air.  This last of the Radio Stations will return to the air very shortly.  Once their regular programming is rated by listeners, the Debtors will be in a position to sell advertising to generate revenues. Additionally, the liquidation value of Golden State's KREV FM station is estimated at more than $15,000,000, which is significantly more than the amount required to pay all allowed creditors' claims.

## XX. **LIQUIDATION ANALYSIS**

Debtors are proposing a PLAN based partially on business revenues and on a partial liquidation of assets, specifically, KREV FM.

The PLAN must provide that a nonconsenting impaired claimant or interest holder of a consenting class receive at least as much as would be available had the debtor filed a Chapter 7 petition instead.

In a Chapter 7 case, the general rule is that the Debtors' assets are sold by a trustee. Unsecured creditors share in the proceeds of sale only after secured creditors and administrative claimants are paid.  Certain unsecured creditors get paid before other unsecured creditors do. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the total amount of allowed claims.  A creditor would recover from the assets of the bankruptcy estate less under Chapter 7 than under Chapter 11 for two reasons.  First, the Debtors' Plan proposes to pay all allowed unsecured creditors in full, which is not guaranteed in a Chapter 7 case.  Second, in a Chapter 7 case a trustee is appointed and is entitled to compensation from the bankruptcy estate in an amount no more than 25% of the first $5,000 of all money disbursed, 10% on any amount over $5,000 but less than $1,000,000, 5% on all amounts over $1,000,000 but less than $3,000,000, and reasonable compensation not to exceed 3% on any

amount over $3,000,000, thus diminishing monies available for payment to unsecured creditors. In a Chapter 7 case, the general rule is that the Debtors' assets are sold by a trustee. Unsecured creditors share in the proceeds of sale only after secured creditors and administrative claimants are paid.  Certain unsecured creditors get paid before other unsecured creditors do.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the total amount of allowed claims.

Respectfully submitted this 2nd day of May 2022.

STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE LLC

/s Stephen R. Harris

Attorney for Jointly Administered Debtors

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

HARRIS LAW PRACTICE LLC
6151 Lakeside Drive
Suite 2100
Reno, NV 89511
775 786 7600

**SG&A OPERATING EXPENSES**

**KFRH**

| | 3RD, 4TH Q 2022 | 2023 | 2024 |
|---|---|---|---|
| BLDGS / LEASES | 14,400 | 28,800 | 28,800 |
| UTILITIES | 1,080 | 2,160 | 2,160 |
| SALARIES | 22,800 | 40,600 | 53,800 |
| PYRL TAX | 1,824 | 3,648 | 4,704 |
| EQUIP / TOOLS | 2,000 | 4,000 | 4,000 |
| INSUR | 2,000 | 4,000 | 4,000 |
| LICENSES | 2,040 | 8,160 | 12,240 |
| MAINT | 1,000 | 2,000 | 2,000 |
| MKTG | 1,000 | 2,000 | 2,000 |
| OFC EXP / SUPPLIES | 500 | 1,000 | 1,000 |
| TVL / ENT | 500 | 1,000 | 1,000 |

PROJECTED MONTHLY OPEX    4,095        8,114        9,642

PROJECTED MONTHLY GRS    95,000      104,500    120,175

BIA/KELSEY PROJECTED NATIONAL/LOCAL RADIO REVENUE, LAS VEGAS NV

        85,000,000        90,100,000        95,506,000

**SG&A OPERATING EXPENSES**

**KRCK**

|  | 3RD, 4TH Q 2022 | 2023 | 2024 |
|---|---|---|---|
| BLDGS / LEASES | 23,466 | 46,932 | 46,932 |
| UTILITIES | 4,200 | 8,400 | 8,400 |
| SALARIES | 0 | 18,000 | 18,000 |
| PYRL TAX | 0 | 350 | 350 |
| EQUIP / TOOLS | 2,000 | 2,000 | 2,000 |
| INSUR | 1,000 | 3,500 | 3,500 |
| LICENSES | 500 | 3,800 | 4,100 |
| MAINT | 1,000 | 1,000 | 1,000 |
| MKTG | 1,000 | 2,000 | 2,000 |
| OFC EXP / SUPPLIES | 500 | 200 | 200 |
| TVL / ENT | 500 | 500 | 500 |

| | | | |
|---|---|---|---|
| PROJECTED MONTHLY OPEX | 5,694 | 7,223 | 7,249 |
| PROJECTED MONTHLY GRS | 40,000 | 47,250 | 50,000 |

BIA/KELSEY PROJECTED NATIONAL/LOCAL RADIO REVENUE, PALM SPRINGS, CA

| | | |
|---|---|---|
| 11,000,000 | 11,550,000 | 12,127,500 |

**SG&A OPERATING EXPENSES**

**KREV**

|  | 3RD, 4TH Q 2022 | 2023 | 2024 |
|---|---|---|---|
| BLDGS / LEASES | 36,000 | 72,000 | 72,000 |
| UTILITIES | 7,040 | 15,550 | 15,550 |
| SALARIES | 0 | 18,000 | 18,000 |
| PYRL TAX | 0 | 350 | 350 |
| EQUIP / TOOLS | 2,000 | 2,000 | 2,000 |
| INSUR | 1,000 | 3,500 | 3,500 |
| LICENSES | 500 | 3,800 | 4,100 |
| MAINT | 1,000 | 1,000 | 1,000 |
| MKTG | 1,000 | 2,000 | 2,000 |
| OFC EXP / SUPPLIES | 500 | 200 | 200 |
| TVL / ENT | 500 | 500 | 500 |

| PROJECTED MONTHLY OPEX | 8,257 | 9,908 | 9,817 |
|---|---|---|---|
| PROJECTED MONTHLY GRS | 100,000 | 224,000 | 246,400 |

BIA/KELSEY PROJECTED NATIONAL/LOCAL RADIO REVENUE, SAN FRANCISCO, CA:

|  | 204,400,000 | 214.500,000 | 223.900,000 |
|---|---|---|---|