GARMAN TURNER GORDON LLP
GREGORY GARMAN, ESQ.
Nevada Bar No. 6654
Email: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
Email: tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
Email: mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: 725.777.3000
*Attorneys for Michael Carmel,*
*Chapter 11 Trustee*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | CASE NO. BK-21-14978-ABL |
| SILVER STATE BROADCASTING, LLC, | Chapter 11 |
| ☐ AFFECTS THIS DEBTOR | *Jointly Administered with:* |
| ☐ AFFECTS GOLDEN STATE BROADCASTING, LLC | Golden State Broadcasting, LLC Case No. 21-14979-ABL |
| ☐ AFFECTS MAJOR MARKET RADIO, LLC | Major Market Radio, LLC Case No. 21-14980-ABL |
| ☒ AFFECTS ALL DEBTORS | Hearing Date: August 9, 2023 Hearing Time: 1:30 p.m. |

**TRUSTEE'S MOTION FOR ENTRY OF ORDERS: (A)(I) APPROVING BID PROCEDURES RELATING TO SALE OF DEBTORS' STATION ASSETS; (II) SCHEDULING A HEARING TO CONSIDER THE SALE; (III) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION; (IV) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; AND (V) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING THE SALE OF DEBTORS' STATION ASSETS OUTSIDE OF THE ORDINARY COURSE OF BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (II) AUTHORIZING THE ASSUMPTION, SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) <u>GRANTING RELATED RELIEF</u>**

Michael Carmel, in his capacity as the Chapter 11 trustee ("<u>Trustee</u>") of the bankruptcy estates of Silver State Broadcasting, LLC, Golden State Broadcasting, LLC, and Major Market Radio, LLC (collectively, the "<u>Debtors</u>" or "<u>Seller</u>"), hereby seeks entry of:

(a)    An order in the form attached hereto as **Exhibit "A"** (the "Bid Procedures Order"), thereby (i) approving the *Bid Procedures* attached hereto as **Exhibit "C"** (the "Bid Procedures"), including the bid protections for VCY America, Inc., a Wisconsin non-profit corporation ("VCY"), (ii) scheduling a hearing (the "Sale Hearing") on the proposed sale of Debtors' Station Assets (defined below) (the "Sale") and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice (the "Auction Notice") of an in-Court auction for the Station Assets (as defined below) (the "Auction"), (iv) establishing procedures to determine cure amounts and deadlines for objections to the assumption and assignment of executory contracts and unexpired leases (the "Assumed Contracts and Leases") and approving the associated notice (the "Assumption Notice"), and (v) granting related relief; and

(b)    An order substantially in the form attached hereto as **Exhibit "B"** (the "Sale Order"), thereby (i) authorizing and approving the sale of the Station Assets (defined below) in one or more transactions for the highest and best offer(s) at the Auction pursuant to the *Asset Purchase Agreement* in substantially the form attached hereto as **Exhibit "F"** (the "APA"),[1] (ii) authorizing the sale free and clear of all liens, claims, encumbrances, and interests, (iii) authorizing the assumption and assignment of the Assumed Contracts and Leases, and (iv) granting related relief.

The Motion is supported by the following memorandum of points and authorities, the declaration of Michael Carmel (the "Carmel Decl.") filed concurrently herewith, any additional evidence submitted and argument entertained by the Court at the Bid Procedures and Sale Hearings, as well as the documents and evidence previously submitted to the Court in these cases.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  STATUS OF THE CASE AND JURISDICTION

1.    On October 19, 2021 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases").  See, e.g., ECF No. 1.

---

[1] All capitalized, undefined terms shall have the meanings ascribed to them in the APA attached hereto as **Exhibit F.**

2.    On November 19, 2021, this Court entered its *Order Authorizing Joint Administration of Cases.*  See ECF No. 37.

3.    On March 6, 2023, this Court entered its Order directing the appointment of a Chapter 11 trustee for the Debtors' estates and on March 10, 2023, the Trustee was appointed as the Chapter 11 trustee for Debtors' estates.  See ECF Nos. 419, 420, 422.

4.    The Court has jurisdiction over the Motion, the proposed Sale transaction, and the APA pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).  Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

5.    The statutory predicates for the relief sought in the Motion are Sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 1015, 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004 and 6006 of the Local Rules of Bankruptcy Practice for the United States Bankruptcy Court for the District of Nevada (the "Local Rules").

6.    Pursuant to Local Rule 9014.2, the Trustee consents to entry of final order(s) or judgment(s) by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## II.  THE BID PROCEDURES AND SALE PROCESS

**A.    The Station Assets Being Sold.**

7.    As more fully set forth in the APA attached hereto as **Exhibit "F,"** subject to the highest and best offer(s) at the Auction, the Trustee is seeking to sell all right, title and interest of Debtors in the following radio stations (collectively, the "Stations"):

1.    KRCK-FM, Mecca, California (FCC Facility ID No. 52808) ("Station 1")

2.    KREV(FM), Alameda, California (FCC Facility ID No. 36029) ("Station 2")

3.    KFRH(FM), North Las Vegas, Nevada (FCC Facility ID No. 19062) ("Station 3")

4.    KBET(AM), Winchester, Nevada (FCC Facility ID No. 136292) ("Station 4")

5.    K276GX, Las Vegas, Nevada (FCC Facility ID No. 203222) ("Station 5")

**6.**     K251BX, Palm Desert, California (FCC Facility ID No. 150925) ("Station 6")

**7.**     K238AK, Palm Desert, California (FCC Facility ID No. 147714) ("Station 7")

The sale of the Stations includes, without limitation, all right, title, and interest in and to all assets, properties, interests and rights of Seller, real and personal, tangible and intangible, that are used or held for use in the operation of the Stations (collectively, the "Station Assets"), including, without limitation, the following:

(a)     all licenses, permits and other authorizations issued to Seller by the FCC with respect to the Stations, including those described on *Schedule 1.1(a)* of the APA, including any renewals or modifications thereof between the date hereof and Closing;

(b)     all of Seller's equipment, transmitters, antennas, cables, towers, and other tangible personal property of every kind and description that are used or held for use in the transmission systems of the Stations, including those items listed on *Schedule 1.1(b)* of the APA;

(c)     the agreements used in the operation of the Stations that (i) are listed on *Schedule 1.1(c)* of the APA and (ii) the applicable buyer(s) indicate on *Schedule 1.1(c)* of the APA that buyer(s) will assume;

(d)     all of Seller's rights in and to the Stations' call letters and Seller's rights in and to the trademarks, trade names, service marks, copyrights, domain names, computer software, programs and programming material, jingles, slogans, logos, Facebook, Twitter and other social media accounts, and other intangible property that is used or held for use in the operation of the Stations, including, without limitation, those listed on *Schedule 1.1(d)* of the APA;

(e)     Seller's rights in and to all the files, documents, records, and books of account (or copies thereof) relating to the operation of the Stations, including the Stations' public inspection files, blueprints, technical information and engineering data, and logs;[2] and

(f)     all claims (including warranty claims), deposits, prepaid expenses, and Seller's goodwill in, and the going concern value of, the Stations.

---

[2] The Trustee shall retain a copy of Debtors' books and records that are transferred to any buyer to allow the Trustee to administer the estates.

**B.      The Bid Procedures.**

8.      The Trustee has prepared the Bid Procedures attached hereto as **Exhibit "C."**  The Bid Procedures (summarized below) were developed consistent with the objective of promoting active bidding and a robust auction.  The Bid Procedures further reflect the Trustee's objective of conducting the Auction in a controlled, but fair and open fashion that promotes interest in the Station Assets by financially-capable, motivated bidders that are able and willing to close the transaction(s).  See Carmel Decl. ¶ 3.

9.      The Trustee believes that the sale of the Station Assets through the Auction and in the manner prescribed by the Bid Procedures will maximize value for Debtors' estates and creditors.  See id. ¶ 4.

10.      The Trustee seeks to conduct an open sales process pursuant to which one or more winning bidders will enter into one or more APAs in substantially the form attached hereto as **Exhibit "F"** for the purchase of some or all of the Station Assets free and clear of liens, claims, and encumbrances (unless expressly assumed in the APA), with such liens, claims, and encumbrances attaching to the sale proceeds.  See id. ¶ 5; Ex. "F" hereto.

11.      For the avoidance of doubt, bidders may bid on one or more of the Stations and associated Station Assets.  See id. ¶ 6.

12.      Subject to Court approval, the Trustee has caused Debtors' estates to enter into an agreement with VCY to serve as the stalking horse for the purchase of Station 1, Station 2, Station 3, Station 6, and Station 7 for a purchase price of $4.5 million.  Station 4 and Station 5 are not included in VCY's stalking horse bid.  The APA for the purchase of Stations 1, 2, 3, 6, and 7 executed by VCY is attached hereto as **Exhibit "G."**  See id. ¶¶ 8 and 9; Ex. "G."

13.      The Trustee submits that the Motion and Bid Procedures provide the information required by Local Rule 6004 and are typical for asset sales of this size and nature, require a deposit, and require a bidder to be Qualified Bidder.[3]  See id. ¶ 7.

---

[3] Capitalized terms not defined in this section shall have the meanings ascribed to them in the Bid Procedures attached hereto as **Exhibit "C."**

14.     The following paragraphs in this section summarize the key provisions of the Bid Procedures, but are qualified in their entity by reference to the actual Bid Procedures.

a.     APA.  The Bid Procedures and a copy of the APA will be provided to each Potential Bidder.

b.     "As-Is, Where Is."  The sale of the Station Assets shall be on an on an "as is," "where is" and "with all faults" basis without representation or warranty of any kind, either express or implied, including, but not limited to, any warranties as to merchantability, fitness, or usability, except to the extent expressly set forth in the APA between the applicable Seller and the Prevailing Bidder.  Except as otherwise provided in the Prevailing Bidder's APA, all of the Debtors' right, title and interest in and to the Station Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests therein (collectively, the "Claims") pursuant to Section 363(f) of the Bankruptcy Code, such Claims to attach to the net proceeds of the sale of the Station Assets, with the same validity and priority as existed immediately prior to such sale.

c.     Due Diligence.  The Trustee, through his professionals, will create a drobox containing due diligence materials.  Any persons interested in purchasing some or all of the Station Assets (a "Potential Bidder") shall execute a confidentiality agreement to access the due diligence.  The due diligence materials will include the information reasonably necessary to enable a Potential Bidder to evaluate the Station Assets to the extent such information is readily available or reasonably preparable by the Trustee in light of the circumstances of the Chapter 11 Cases, all with the understanding that this is an "as is, where is" transaction.

d.     Bid Deadline.  The deadline for any Qualified Bidder to submit Bids will be three business days before the Auction.

e.     Qualified Bidder Requirements.  To be eligible to participate in the bidding process and to be designated a "Qualified Bidder," each Potential Bidder must submit a Bid that fulfills the following requirements on or prior to the Bid Deadline:

• Provides that the Qualified Bidder's Bid shall remain open and irrevocable until thirty (30) days following the date of entry of a Sale Order;

• Provides that the Qualified Bidder is obligated to perform as a Back-Up Bidder (as defined below) in the event such Qualified Bidder is not the Prevailing Bidder;

• Is made by a person or entity that demonstrates evidence of fully committed and available funds to consummate the proposed transaction, in each case acceptable to the Trustee in his sole discretion;

• Provides written evidence that the Qualified Bidder has obtained authorization and approval from its board of directors (or comparable governing body) and its equity holders, if necessary, with respect to the submission of its Bid and the execution of the APA, or a representation that no such authorization or approval is required;

- Provides by wire transfer or immediately available funds to the Trustee's trust account or to an appropriate escrow agent approved by the Trustee in writing in advance, at the Trustee's election, before the Bid Deadline of an earnest money deposit equal to 10% of the purchase price of such Bid (the "Deposit");

- Is submitted in a writing in the form of the APA with any proposed changes to the APA set forth in an electronic form both clean and marked to reflect such changes signed by the Qualified Bidder, that: (i) identifies the Qualified Bidder and any members of its investor group, if applicable; (ii) identifies with specificity what Station Assets the Qualified Bidder seeks to purchase; (iii) is not subject to conditions, representations, or terms that the Trustee determines to be unacceptable; (iv) does not contain any financing or due diligence contingencies to closing the proposed transaction unless the Trustee otherwise agrees in writing that such contingencies are acceptable;  (vi) does not contain any condition to closing the transaction relating to the receipt of any third party or governmental approvals (excluding required Bankruptcy Court and FCC approval); (vii) expressly acknowledges and represents that the Qualified Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Station Assets and the proposed transaction prior to making its Bid; (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and the Station Assets in making its Bid or that of any of its legal, financial, or other advisors; and (C) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Debtors or the Station Assets or the proposed transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the APA ultimately accepted and executed by the Trustee; (viii) identifies each and every executory contract and unexpired lease that the Qualified Bidder desires the applicable Debtor to assume and assign to the Qualified Bidder at the closing and provides evidence of such Qualified Bidder's ability to provide adequate assurance of future performance of such contracts or leases (as required by section 365(f)(2)(B) of the Bankruptcy Code) along with the Bid; (ix) includes a written acknowledgment by such Qualified Bidder that it agrees to the terms of these Bidding Procedures; (x) includes a written acknowledgment by such Qualified Bidder that it does not have any lien rights against Debtors or the Station Assets and expressly waives any right to assert or file any lis pendens or other lien or claim against the Station Assets; (xi)          identifies any broker utilized by the Qualified Bidder in making its Bid; and (xii) contains all other information reasonably requested by the Trustee.

f.  Auction.  The Trustee will conduct the Auction on a date that is approximately sixty days after entry of the Bid Procedures Order with respect to the Qualified Bids in order to determine the highest and best Bid(s) (the "Prevailing Bid") to submit for approval by the Bankruptcy Court at the Sale Hearing.  The Auction shall be organized and conducted by the Trustee at the Bankruptcy Court located at Foley Federal Building and U.S. Courthouse, 300 Las Vegas Blvd South, Las Vegas, NV 89101, in Courtroom 1, or such other location as may be announced prior to the

Auction to all Qualified Bidders..   The following procedures shall govern the Auction:

(a)     The only persons or entities who will be permitted to Bid at the Auction are the authorized representatives of each Qualified Bidder (the "Auction Participants").  While only the Auction Participants may make Qualified Bids at the Auction, the Auction may be attended and viewed also by the Trustee, the Trustee's counsel, and/or other authorized representatives and such other parties as agreed to by Trustee, in his sole discretion.

(b)     Each Qualified Bidder participating in the Auction shall confirm at the Auction that it has not engaged in any collusion regarding these Bid Procedures with any other Qualified Bidder, concerning the Auction, or any proposed transaction relating to all or a portion of the Station Assets.

(c)     The Trustee is authorized to conduct the Auction in accordance with such procedures and requirements as may be established at the discretion of the Trustee and his counsel, which rules may include, but shall not be limited to, the determination of the amount of time between Bids, whether to adjourn the Auction at any time and from time to time, the conducting of multiple rounds of open or sealed bidding with notice only to the parties entitled to attend the Auction, and to declare that the Auction has ended when no further Bids are timely made or otherwise.

(d)     The first Qualified Bid at the Auction shall be deemed to have been made by the Initial Highest Bidder(s) in the amount of the Initial Highest Bid(s). The next Qualified Bid(s) at the Auction shall be an amount equal to or greater than the Initial Highest Bid(s) plus no less than $150,000. Thereafter, the Auction will continue in the manner determined by the Trustee above; provided, however:

(a) additional Bids must be Qualified Bids (except that subsequent Qualified Bids made at the Auction, although received from a Qualified Bidder that made a Qualified Bid prior to the Bid Deadline, need not be received by the Bid Deadline); and

(b) all subsequent Qualified Bids made during the Auction for: (i) all of the Station Assets or for the acquisition of all Station Assets for Stations 1, 2, 3, 6 *and* 7 must be made in higher increments of at least $250,000, unless otherwise determined by the Trustee, in his sole discretion, and announced by the Trustee at the Auction; or (ii) less than the Station Assets for Stations 1, 2, 3, 6 *and* 7, in higher increments of at least $25,000, unless otherwise determined by the Trustee, in his sole discretion, and announced by the Trustee at the Auction.

(e)     The Trustee shall determine, in his sole discretion, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

(f)     At the conclusion of the Auction: (a) the Trustee shall, in his sole discretion, select: (i) the Prevailing Bid(s), and (ii) the second highest or best offer(s) for the Station Assets (the "Back-Up Bid"); (b) the Trustee shall notify the Prevailing Bidder(s) that such person's offer has been determined by the Trustee to be the Prevailing Bid(s) and will be contingent only on Bankruptcy Court approval, and shall notify the person that made the Back-Up Bid(s) (the "Back-Up Bidder(s)") that such person's offer has been determined by the Trustee to be a Back-Up Bid and will be contingent only on the failure of the Prevailing Bid(s) to by approved by the Bankruptcy Court; and (c) the Trustee shall file a notice with the Bankruptcy Court announcing the Prevailing Bidder(s). Prior to the commencement of the Sale Hearing, the Prevailing Bidder(s) shall complete and sign all agreements and documents as necessary to bind the Prevailing Bidder(s) to all of the terms and conditions contemplated by the Prevailing Bid(s).

(g)     The Deposit of the Prevailing Bidder(s) or the Back-Up Bidder(s), as the case may be, shall be held by the Trustee and applied by the Trustee against the purchase price to be paid by the Prevailing Bidder(s) or the Back-Up Bidder(s), as applicable, at the closing of the relevant transaction approved by the Bankruptcy Court. The Prevailing Bidder(s)' or Back-Up Bidder(s) Deposits, as applicable, shall be held by the Trustee and forfeited to the Trustee if such parties breach the obligation to close under the APA(s).

(h)     The Trustee shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Trustee's acceptance thereof have been authorized by order of the Bankruptcy Court following the conclusion of the Sale Hearing.

g.     <u>Sale Hearing.</u> The Sale Hearing shall be conducted by the Trustee at the Bankruptcy Court on approximately fourteen days after the Auction.

h.     <u>Modifications.</u> The Trustee in his sole discretion, may adopt, implement, and/or waive such other, additional or existing procedures or requirements that serves to further an orderly Auction and bid process.

## C.   **Stalking Horse Protection.**

15.     VCY has agreed to serve as the stalking horse for the sale of Station 1, Station 2, Station 3, Station 6, and Station 7 for a purchase price of $4.5 million. In connection therewith, VCY has tendered a $450,0000 deposit to the Trustee. To entice VCY to serve as the stalking horse—which sets the floor, ensures the estates receive at least $4.5 million, and furthers interest in the sale and likelihood of competitive bidding at the Auction—the Trustee seeks authorization to provide the following limited bid protections to VCY (the "<u>Stalking Horse Protections</u>"): (i) a break-up fee of $150,000; (ii) an initial overbid of $150,000; and (iii) incremental bidding of

$250,000 for any buyer seeking to acquire all five stations (Station 1, Station 2, Station 3, Station 6, and Station 7). See Carmel Decl. ¶ 9; Ex. G §§ 1.6 and 5.9

16.     Break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted pursuant to Section 363. In re Integrated Resources, 147 B.R. 650, 659-60 (S.D.N.Y. 1992) ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtors' assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value."). Bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989); see also Integrated Resources, 147 B.R. at 660-61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); In re Hupp Int'l Indus, Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence."). As a result, courts routinely approve bid protections similar to the bid protections proposed here in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. See In re O'Brien Envtl. Energy, Inc., 181 F.3d 527 (3rd Cir. 1999).

17.     The Trustee's ability to offer these limited Stalking Horse Protections is beneficial to Debtors' estates and creditors because it ensures the estates will receive at least $4.5 million for the sale of Station 1, Station 2, Station 3, Station 6, and Station 7. The stalking horse bid further sets a floor for further bidding and enables the Trustee to shop VCY's bid for higher and better offers in connection with the Auction. Moreover, VCY, as the proposed stalking horse bidder, has expended and will continue to expend time and resources negotiating, drafting, and undertaking due diligence activities necessitated by the Sale transaction, all of which increase the likelihood of competitive bidding as other buyers will be able to bid without incurring these expenses. Further, if VCY is ultimately the successful bidder and the Court approved purchaser, then there will be no break-up fee paid. As such, the Trustee submits that these limited Stalking Horse Protections are

in the best interest of the estates and creditors and should be approved.  See Carmel Decl. ¶ 10.

**D.    Notice and Scheduling of the Auction.**

18.    The Trustee requests the in-court Auction be scheduled approximately sixty (60) days after entry of the Bid Procedures Order, with the Sale Hearing scheduled fourteen (14) days after the Auction.  The Trustee submits that in light of the history of these Chapter 11 Cases and the nature of the Station Assets, sixty (60) days from entry of the Bid Procedures Order provides an appropriate marketing period and is likely to generate multiple bidders.  Further, the firm Auction date provides credibility to the process and encourages Potential Bidders to promptly engage in the contemplated sale process.  See Carmel Decl. ¶ 11.

19.    The Trustee has prepared the Auction Notice attached hereto as **Exhibit "E,"** which provides sufficient information regarding the Bid Procedures, Auction, and Sale Hearing.

20.    Within three (3) business days following the entry of the Bid Procedures Order, the Trustee shall serve by ECF or first-class mail, the Bid Procedures and Auction Notice on: (i) the Office of the United States Trustee; (ii) all parties known by the Trustee to be asserting a lien on any of the Debtors' Station Assets; (iii) the Internal Revenue Service; and (iv) all of Debtors' known creditors, equity security holders, and other parties-in-interest entitled to notice under Bankruptcy Rule 2002(a).

**E.    Assumption and Cure of Executory Contracts and Unexpired Leases.**

21.    It is anticipated that the Prevailing Bidder may desire to assume and be assigned certain of the Assumed Contracts and Leases.

22.    As such, the Trustee seeks to establish the following procedures for determining cure amounts through the closing date of the Sale (the "Cure Amounts"), as well as the deadline for objections to the assumption and/or assignment of the contracts and leases to be assumed and/or assigned in connection with the Sale.

23.    No less than ten (10) business days prior to the Sale Hearing, the Trustee shall file and serve by email, facsimile, or Federal Express overnight delivery, at the Trustee's election based on the information available to the Trustee, the Assumption Notice attached hereto as **Exhibit "D"** to the counterparties to the Assumed Contracts and Leases.

24. The Trustee requests that the Court establish five (5) business days before the Sale Hearing as the deadline by which counterparties to the Assumed Contracts and Leases (each a "Counterparty") must file and serve any objection to the assumption and assignment of the Assumed Contracts and Leases, including the Cure Amounts (the "365 Objection Deadline").

25. Where a Counterparty to an Assumed Contract or Lease files an objection to the assumption and assignment of such Assumed Contract or Lease (the "Disputed Assumption") and/or asserts a cure amount higher than the proposed Cure Amounts listed on the Assignment Notice (the "Disputed Cure Amounts"), the Trustee, Prevailing Bidder, and Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.

26. If the dispute cannot be consensually resolved, the determination of the assumption and assignment of the Disputed Assumption and/or the amount to be paid under Section 365 with respect to the Disputed Cure Amounts will be determined by the Court and the Trustee requests that the Court set the hearing for two (2) business days prior to the Sale Hearing.

27. Any Counterparty to a Assumed Contract or Lease that fails to timely object to the proposed Cure Amounts or the proposed assumption and assignment by the Section 365 Objection Deadline is deemed to have consented to such Cure Amounts and the assumption and assignment of such Assumed Contract or Lease, and such party shall be forever barred from objecting to the Cure Amounts or such assumption and assignment and from asserting any additional cure or other amounts against the applicable Debtor(s), estate(s), or the Prevailing Bidder(s).

28. Except as may otherwise be agreed to by the parties to an Assumed Contract or Lease, the defaults under the Assumed Contracts or Lease that must be cured in accordance with Section 365(b) shall be cured by the Prevailing Bidder paying all Cure Amounts relating to an Assumed Contract or Lease upon the Closing.

29. No executory contract or unexpired lease will be assumed until the Closing and in accordance with the terms of the APA(s) executed by the Prevailing Bidder(s).

30. The Trustee submits that these procedures provide a reasonable, appropriate, and orderly mechanism to address the Assumed Contracts and Leases and any disputes thereto.

**F.** **Broker Compensation.**

31.     Instead of hiring a single commercial broker for the sale of the Station Assets, the Trustee proposes paying a fee at Closing (subject to Bankruptcy Court approval) as set forth herein to any commercial broker that satisfies the following criteria:

1.     The broker is an established media broker;

2.     The broker was formally engaged as the broker for a Prevailing Bidder other than VCY;

3.     The Prevailing Bidder has confirmed in writing that the Prevailing Bidder would not have bid at the Auction without the broker's assistance;

4.     The broker has established to the Trustee's satisfaction that the broker is independent and does not have a direct or indirect ownership interest in the Prevailing Bidder or any of its affiliates; and

5.     The aggregate Prevailing Bids total or exceed $6 million.

32.     If each of the five criteria identified above are established to the Trustee's satisfaction, in his sole and absolute discretion, and approved by the Bankruptcy Court at the Sale Hearing, then the broker shall be paid a broker fee equal to two percent (2%) of the applicable Prevailing Bidder's purchase price paid at Closing, which payment shall be paid from the sale proceeds (the "Broker Fee").  The Trustee shall disclose any Broker Fees approved by the Trustee and obtain final Court approval of such fees at the Sale Hearing.

33.     By way of example, if there are two Prevailing Bids meeting the five criteria above totaling $6 million, one Prevailing Bid for $5 million and one Prevailing Bid for $1 million, the total Broker Fee would be $120,000, split between the two brokers as follows: $100,000 Broker Fee for the $5 million bid and $20,000 Broker Fee for the $1 million bid.  The net benefit to the estates resulting from the bids facilitated by the brokers would be $5.88 million, or $1.38 million more than the current stalking horse bid.

34.     Taking into consideration the break-up fee, the total broker fee and break-up fee would be $270,000, but the net benefit to the estates would be $5.73 million, which is $1.23 million more than the current stalking horse bid.

35.     The Trustee submits that this brokerage strategy is in the best interest of the estates

and creditors as it encourages multiple brokers in the media space to reach out to their contacts to encourage participation in the Auction, without the restriction of an exclusive broker agreement or the market brokerage fee of five percent (5%) or more of the sale price.  See Carmel Decl. ¶ 12.

### III.  STATUTORY AND LEGAL AUTHORITY

#### A.    The Standard for Asset Sales - Section 363(b).

Section 363(b) of the Bankruptcy Code provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  The standard for approval of a sale of property of the estate under Section 363 is whether there exists some articulated business justification for the proposed transaction, and whether the sale is in the best interests of the debtor, creditors, and equity holders. See Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19 (9th Cir. BAP 1988) (quoting Institutional Creditors of Continental Airlines, Inc. (In re Continental Airlines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986).  Stated otherwise, the decision to sell assets outside of the ordinary course of business is based upon the sound business judgment of the debtor.  See Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Trans World Airlines, Inc., 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

In making such a determination, courts may look to the following factors:

(a)    Whether a sound business justification exists for the sale;

(b)    Whether the assets are increasing or decreasing in value;

(c)    Whether the sale will produce a fair and reasonable price for the property;

(c)    Whether the assets have been given adequate marketing; and

(d)    Whether adequate and reasonable notice of the sale was given.

See In re Work Recovery, 202 B.R. 301, 303-04 (Bankr. D. Ariz. 1996); and In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991); In re Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); In re United Healthcare Sys., Inc., No. 97-1159, 1997 WL 176574, at *4 and n.2 (D. N.J. Mar. 26, 1997).

#### B.    Procedural Requirements - Rules 6004(f) and 2002(c)(1).

Bankruptcy Rule 6004(f) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bankr. P. 2002(c)(1).  A trustee is entitled to broad discretion in determining the manner of a sale, including whether to sell property by public or private sale.  See In re Frezzo, 217 B.R. 985, 989 (Bankr. M.D. Pa. 1988) (citing In re Canyon Partnership, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985)).

Bankruptcy Rule 2002(c)(1) provides that:

> [N]otice of a proposed use, sale, or lease of property… shall include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections.

## C.    Sales "Free and Clear" - Section 363(f).

Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interests in such property of an entity other than the estate, only if --
>
> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money judgment of such interest.

Section 365(f) is written in the disjunctive.  Thus, satisfaction of any one of the five conditions is sufficient to sell property free and clear of interest.  See In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions is met, the debtor has the authority to conduct the sale free and clear of all liens" (citing Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988)); In re Dundee Equity Corp., 1992 WL 53743, at *4 (Bankr. S.D.N.Y. March 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met"); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132,

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

**D.**    **Assumption and Assignment of Contracts - Section 365.**

Section 365(a) of the Bankruptcy Code provides:

> Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

Section 365(f)(2) of the Bankruptcy Code provides:

> The trustee may assign an executory contract or unexpired lease of the debtor only if--
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

**E.**    **Section 105.**

Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

## IV. LEGAL ARGUMENT

**A.**    **The Bid Procedures Are Fair, Appropriate, and Should Be Approved.**

Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or public auction. The Trustee submits that the Station Assets can best be valued in the context of an actual auction subject to competitive bidding. At the Sale Hearing, the Trustee will present to the Court the Prevailing Bid(s) that were subjected to a comprehensive sale process culminating in the Auction. As a result, the successful bid will represent a fair and reasonable price for the Station Assets. See In re Onouli-Kona Land Co., 846 F.2d 1170 (9th Cir. 1988) (upholding the results of a Section 363 auction where there was no evidence of bad faith); In re Gucci, 126 F.3d 380 (2d Cir. 1997) ("[W]here the purchaser is found

to have acted in good faith, the auction price suffices to demonstrate that the purchaser paid value for the assets."); <u>In re Abbotts Dairies of Pennsylvania, Inc.</u>, 788 F.2d 143 (3d Cir. 1986) (holding that an auction is sufficient to establish the value of assets except where purchaser did not act in good faith); <u>In re Alpha Industries, Inc.</u>, 84 B.R. 703, 706 (Bankr. Mont. 1988) ("Generally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt.").

The Sale Procedures are structured to produce an open, transparent, and vibrant auction process. The Trustee submits that the sale of the Station Assets, pursuant to the Bid Procedures and by the public Auction, will ensure that the bidding process with respect to the Station Assets is fair, reasonable, and will yield the maximum value for Debtors' estates and creditors considering the circumstances of these Chapter 11 Cases. It is widely recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are therefore appropriate in the context of bankruptcy sales. <u>See</u> <u>In re Integrated Res., Inc.</u>, 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) (such procedures "encourage bidding and to maximize the value of the Debtors' assets"); <u>In re Financial News Network, Inc.</u>, 126 B.R. 152, 156 (S.D.N.Y. 1991) (as amended) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for an [sic] fair and efficient resolution of bankrupt estates"); <u>see also</u> <u>In re Montgomery Ward Holding Corp.</u>, Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997) [ECF No. 377]; <u>In re Fruehauf Trailer Corp.</u>, Case No. 96-01563 (PJW) (Bankr. D. Del. Jan. 31, 1997) [ECF No. 439].

The Trustee has determined that the sale process is the optimal mechanism for maximizing the value of the Debtors' Station Assets for the benefit of the estates and creditors. The Bid Procedures provide a careful balance of ensuring sufficient time for marketing and effectuating a sale process while also being cognizant of the financial constraints and the potential loss resulting from any significant delay or uncertainty in the sale process. The sale process as set forth in the Bid Procedures is necessary under the circumstances and provides the best mechanism to maximize value for the Debtors, their creditors, and their estates. <u>See</u> Carmel Decl. ¶ 13.

Similar procedures have previously been approved by this Court and others. <u>See</u> <u>e.g.</u>, In

re Jagged Peak, Inc., Case No. 19-15959 (lead case) (Bankr. D. Nev. Oct. 29, 2019) [ECF No. 198]; In re Consolidated Resorts, Inc., et al., Case No. 09-22035 (Lead Case) (LBR) (Bankr. D. Nev. Mar. 16, 2012) [ECF No. 973]; In re Humboldt Creamery, LLC, Case No. 09-11078 (AJ) (Bankr. N.D. Cal. July 28, 2009) [ECF No. 177]; In re Asyst Techs, Inc., Case No. 09-43246 (RJN) (Bankr. N.D. Cal. June 8, 2009) [ECF No. 181]; In re Nortel Networks, Inc., Case No. 09-10138 (KG) (Bankr. D. Del. June 30, 2009) [ECF No. 1012]; In re Tweeter Home Entm't Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. June 26, 2007) [ECF No. 211]; In re Radnor Holdings Corp., Case No. 06-10894 (PJW) (Bankr. D. Del. Sept. 22, 2006) [ECF No. 277].

As the Bid Procedures serve to maximize the value of the estates for the benefit of the creditors, the Trustee requests approval of the Bid Procedures.

**B.      The Sale of the Majority of the Debtors' Assets Should Be Approved.**

A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors, or interest holders.  See, e.g., In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).  In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., Inc., 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [Trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate" (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

The Trustee believes that the current sale process for the sale of the Station Assets is the appropriate and optimal mechanism in order to maximize the value of Debtors' Station Assets for the benefit of all creditors and the estates.  See Carmel Decl. ¶ 13.  Accordingly, the Trustee submits that the sale of the Station Assets amply satisfies Section 363(b) of the Bankruptcy Code.

**C.      The Sale Should Be Made "Free and Clear."**

Pursuant to Section 363(f), the Sale may be free and clear of liens, claims, and

encumbrances.  The only party asserting a lien is Bellaire Towers Homeowners Association, which is a judgment lien in the amount of $364,003.32 against Golden State Broadcasting, LLC.  <u>See</u> Claim No. 2-1.  The Trustee believes that Bellaire Tower Homeowners Association will consent to the sale, but even if it did not, Section 363(f)(3) authorizes the sale free and clear of Bellaire Tower Homeowners Association's lien as the sales prices is greater than its lien, which lien will attach to the sale proceeds.  Accordingly, the Trustee requests that the Station Assets be sold fee and clear of all liens, claims, and encumbrances pursuant to Section 363(f).

**D.**  <u>**The Prevailing Bidder Is Entitled to a Good Faith Finding.**</u>

Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

The Trustee submits, and will present evidence at the Sale Hearing if necessary, that the selection of the Prevailing Bidder(s) shall be the product of arms-length, good faith negotiations in the anticipated competitive sale process.  Accordingly, the Trustee requests that the Court make a finding at the Sale Hearing and in the Sale Order that the Prevailing Bidder(s) have purchased the Station Assets in good faith and are entitled to the full protections of Section 363(m), thereby protecting the Prevailing Bidder(s)' interest in the Station Assets should the sale ever be reversed or modified on appeal.

**E.**  <u>**The Assumption and Assignment Is a Proper Exercise of the Trustee's Business Judgment.**</u>

Bankruptcy courts employ a "business judgment" standard when evaluating a trustee's decision to assume or reject an executory contract or unexpired lease.  <u>See</u> <u>In re G.I. Industries, Inc.</u>, 204 F.3d 1276, 1282 (9th Cir. 2000), citing <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513, 523, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (recognizing that the business judgment rule is used in reviewing motions to assume or reject executory contracts) (superseded in part by 11 U.S.C. § 1113); <u>Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.</u>, 872 F.2d 36, 40 (3d Cir. 1989); <u>Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)</u>, 78 F.3d 18, 25 (2d Cir. 1996); <u>Orion</u>

1  Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d

2  Cir. 1993); In re III Enter., Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted),

3  aff'd, 169 B.R. 551 (E.D. Pa. 1994); Official Comm. for Unsecured Creditors v. Aust (In re

4  Network Access Solutions, Corp.), 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for

5  approving the assumption of an executory contract is the business judgment rule"); In re Exide

6  Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an

7  executory contract is governed by the business judgment standard").

8          Here, in the Trustee's business judgment, the assumption and assignment of the contracts

9  is in the best interests of the estates and the creditors. Foremost, the decision to assume and assign

10 certain of the executory contracts and unexpired leases will be made by the Prevailing Bidder(s)

11 and will be an integral part of the Sale and thus necessary to maximize the value achieved through

12 the Sale. Additionally, after the Sale closes, the estates will have no further need to maintain any

13 of the executory contracts or unexpired leases as their operations will have fully terminated.

14 Further, the assumption and assignment will relieve the estates of any liability associated

15 therewith. See 11 U.S.C. § 363(k). Moreover, the Counterparties to the Assumed Contracts and

16 Leases will have an opportunity to object to the Cure Amounts and the assumption and assignment

17 to ensure that adequate assurance of future performance is provided to the Counterparties before

18 assumption and assignment is permitted. Accordingly, the Trustee believes that the assumption

19 and assignment of the Assumed Contracts and Leases is in the best interests of the estates and their

20 creditors and should be approved. See Carmel Decl. ¶ 14.

21 **F.    The Form of Notice of Hearing and Sale Should Be Approved.**

22         Pursuant to Bankruptcy Rules 2002(a) and (c), the Trustee is required to notify creditors of

23 the proposed sale of the Station Assets, including a disclosure of the time and place of the Auction,

24 the terms and conditions of the proposed Sale, and the deadline for filing objections. The Trustee

25 submits that the notice procedures described above fully comply with Bankruptcy Rule 2002 and

26 are reasonably calculated to provide timely and adequate notice of the proposed sale of the Assets,

27 the Bid Procedures, the Auction, the Cure Amount, and the Sale Hearing to Debtors' creditors and

28 all other parties-in-interest that are entitled to notice. Based upon the foregoing, the Trustee

respectfully requests that the Court approve the notice procedure proposed above, including the form and manner of service of the Auction Notice and the Assumption Notice.

### V.  CONCLUSION

WHEREFORE, the Trustee respectfully requests that the Court enter the Bid Procedures Order attached hereto as **Exhibit "A"** at this initial hearing and the Sale Order attached hereto as **Exhibit "B"** at the conclusion of the Sale Hearing.

DATED this 22nd day of June 2023.

By: */s/ Gregory E. Garman*
GREGORY E. GARMAN, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
MARY LANGSNER, Ph.D.
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119

*Attorneys for Michael Carmel, Chapter 11 Trustee*