# EXHIBIT 2

# EXHIBIT 2

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of November 14, 2023, between the Bankruptcy Estate of Golden State Broadcasting, LLC ("Seller"), by and through Michael W. Carmel, solely in his capacity as Chapter 11 Trustee ("Trustee"), and Friends of KEXP, a Washington non-profit corporation ("Buyer").

Recitals

WHEREAS, on October 19, 2021, Golden State Broadcasting, LLC, Silver State Broadcasting, LLC, and Major Market Radio, LLC (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code: SILVER STATE BROADCASTING, LLC (Case No. 21-14978-abl), GOLDEN STATE BROADCASTING, LLC (Case No. 21-14979-abl), and MAJOR MARKET RADIO LLC (Case No. 21-14980-abl) (collectively, the "Chapter 11 Cases") before the United States Bankruptcy Court, District of Nevada ("Bankruptcy Court").

WHEREAS, on November 19, 2021, the Bankruptcy Court entered its Order Authorizing Joint Administration of Cases (ECF No. 37), with SILVER STATE BROADCASTING, LLC designated as the lead case.

WHEREAS, on March 6, 2023, the Bankruptcy Court entered its Order on United States Trustee's Motion to Appoint Chapter 11 Trustee Under 11 U.S.C. § 1104(a), or, in the Alternative, to Convert Cases to Chapter 7 Pursuant to 11 U.S.C. § 1112(b); and Memorandum of Point and Authorities in Support and Reservation of Rights (ECF No. 405), and Creditor Mincin Law, PLLC's Motion for Appointment of Chapter 11 Trustee (ECF No. 393), thereby directing the appointment of a Chapter 11 trustee for the bankruptcy estates of the Debtors ("Debtors' Estates").

WHEREAS, on March 10, 2023, Tracy Hope Davis, the United States Trustee for Region 17, appointed the Trustee as the Chapter 11 trustee for Debtors' Estates.

WHEREAS, on March 10, 2023, the Bankruptcy Court entered its Order Approving Appointment of Chapter 11 Trustee (ECF No. 422), thereby approving the Trustee's appointment ("Trustee Order").

WHEREAS, on March 13, 2023, the Trustee filed his Notice of Acceptance of Appointment of Chapter 11 Trustee, accepting his appointment as the Chapter 11 trustee for the Debtors' Estates.

WHEREAS, the Trustee's preliminary investigations indicated that the following radio stations and FM translator stations are valuable assets of the Debtors' Estates:

KRCK-FM, Mecca, California (FCC Facility ID No. 52808) ("Station 1")
KREV(FM), Alameda, California (FCC Facility ID No. 36029) ("Station 2")
KFRH(FM), North Las Vegas, Nevada (FCC Facility ID No. 19062) ("Station 3")
KBET(AM), Winchester, Nevada (FCC Facility ID No. 136292) ("Station 4")

K276GX, Las Vegas, Nevada (FCC Facility ID No. 203222) ("Station 5")
K251BX, Palm Desert, California (FCC Facility ID No. 150925) ("Station 6")
K238AK, Palm Desert, California (FCC Facility ID No. 147714) ("Station 7")

**WHEREAS**, Debtors filed applications with the Federal Communications Commission ("FCC") on May 25, 2023 seeking FCC consent to the involuntary assignment of Station 1, Station 2, Station 3, Station 4, Station 5, Station 6, and Station 7 from Debtors to Seller and the FCC granted such consent on June 20, 2023.

**WHEREAS,** Buyer desires to purchase the following radio stations from Seller: Station 2 (the "Station").

**WHEREAS**, Seller wishes to sell, convey, assign and transfer to Buyer, and Buyer wishes to purchase and acquire from Seller, the Station Assets (defined below), free and clear of all Liens (defined below), claims, interests and encumbrances, all in the manner and subject to the terms and conditions set forth in this Agreement.

**WHEREAS**, the transactions contemplated by this Agreement were the result of a Bankruptcy Court supervised auction, and are subject to (1) the approval of the Bankruptcy Court, and will be consummated only pursuant to the Sale Order (defined below) approving such sale free and clear of any interest in such property, except for the Permitted Encumbrances, all as more specifically provided in this Agreement, and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Court approved bidding procedures; and (2) the FCC Consent (defined below).

**WHEREAS**, Seller and Buyer have negotiated in good faith and at arm's length for the purchase and sale of the Station Assets.

**NOW, THEREFORE,** in consideration of the mutual covenants, mutual promises, conditions and representations herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Seller and Buyer, the parties hereto agree as follows:

Agreement

NOW, THEREFORE, taking the foregoing into account, and in consideration of the mutual covenants and agreements set forth herein, the parties, intending to be legally bound, hereby agree as follows:

ARTICLE 1:   SALE AND PURCHASE

1.1     Station Assets.  On the terms and subject to the conditions hereof, on the Closing Date (defined below), after conducting a public auction pursuant to Section 363 of the Bankruptcy Code, except the Excluded Assets (defined below), Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase and acquire from Seller, all right, title and interest of Seller in and to all assets, properties, interests and rights of

ACTIVE 691534198v1

Seller, real and personal, tangible and intangible, that are used or held for use in the operation of the Station (collectively, the "Station Assets"), including, without limitation, the following:

(a)    all licenses, permits and other authorizations issued to Seller by the FCC solely with respect to the Station (the "FCC Licenses"), including those described on *Schedule 1.1(a)* for each of the purchased Stations, including any renewals or modifications thereof between the date hereof and Closing (defined below);

(b)    all of Seller's equipment, transmitters, antennas, cables, towers, and other tangible personal property of every kind and description that are used or held for use in the transmission systems of the Station (the "Tangible Personal Property"), including, without limitation, those items listed on *Schedule 1.1(b)* for each of the purchased Stations;

(c)    the agreements used in the operation of the Station that (i) are listed on *Schedule 1.1(c)* attached hereto and (ii) Buyer indicates on *Schedule 1.1(c)* it will assume (the "Station Contracts");

(d)    all of Seller's rights in and to the Station's call letters and Seller's rights in and to the trademarks, trade names, service marks, copyrights, domain names, computer software, programs and programming material, jingles, slogans, logos, Facebook, Twitter and other social media accounts, and other intangible property that is used or held for use in the operation of the Station, including, without limitation, those listed on *Schedule 1.1(d)* for each of the purchased Stations (the "Intangible Property");

(e)    Seller's rights in and to all the files, documents, records, and books of account (or copies thereof) relating to the operation of the Station, including the Station's public inspection files, blueprints, technical information and engineering data, and logs; and

(f)    all claims (including warranty claims), deposits, prepaid expenses, and Seller's goodwill in, and the going concern value of, the Station.

1.2    Liens.  The Station Assets shall be transferred to Buyer free and clear of liens, claims and encumbrances ("Liens") except for the (a) Assumed Obligations (defined below); (b) statutory liens for taxes not yet due and payable; and (c) those Liens set forth on *Schedule 1.2* (the Liens described in (a), (b), and (c) above are referred to herein as the "Permitted Encumbrances").

1.3    Excluded Assets.  Notwithstanding anything to the contrary contained herein, the Station Assets shall not include (a) Seller's cash and cash equivalents; (b) Seller's insurance policies; (c) Seller's employee pension, retirement, or other savings plans, and employee benefit plans; (d) the Station's accounts receivable and any other rights to payment of cash consideration for goods or services  sold or provided prior to the Effective Time (defined below), or otherwise arising during or attributable to any period prior to the Effective Time; (e) any assets unrelated to the operations of the Station (for example, additional stations); (f) any of Seller's governing documents or other company

3

records (other than those described in Section 1.1(e)); and (g) any assets set forth on *Schedule 1.3* (collectively, the "Excluded Assets").

1.4    Assumed Obligations.    On the Closing Date, Buyer shall assume the obligations of Seller arising after Closing under the Station Contracts (collectively, the "Assumed Obligations").  Except for the Assumed Obligations, Buyer does not assume and will not be deemed by execution and delivery of this Agreement or any agreement, instrument or document delivered pursuant to or in connection with this Agreement or otherwise by reason of the consummation of the transactions contemplated hereby, to have assumed any liabilities, obligations or commitments of Seller of any kind, whether or not disclosed to Buyer, including, without limitation, any liability or obligation of Seller under any contracts not included in the Station Contracts (the "Retained Liabilities").

1.5    Purchase Price.    The purchase price to be paid for the Station Assets shall be the sum of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000), which amount shall be increased or decreased by the proration amount referred to in Section 1.7 below (the "Purchase Price").  The Purchase Price shall be paid by Buyer to Seller at Closing in cash in immediately available funds pursuant to the written instructions of Seller to be delivered by Seller to Buyer at least three (3) business days prior to Closing.

1.6    Deposit.

(a)    Buyer has deposited with Seller the sum of Three Hundred Thousand Dollars ($300,000) (the "Deposit").  Seller shall hold the Deposit in escrow and, at Closing, the Deposit and any interest accrued thereon shall be credited toward the Purchase Price.

(b)    If this Agreement is terminated by Seller pursuant to Section 10.1(c), then the Deposit shall be retained by Seller as liquidated damages and the sole and exclusive remedy of Seller.  Seller hereby waives all other legal and equitable remedies it may otherwise have as a result of any breach or default by Buyer under this Agreement.  If this Agreement is terminated for any other reason, the Deposit and any interest accrued thereon shall be promptly disbursed to Buyer, within three (3) business days of Buyer's notice to Seller of Buyer's termination of this Agreement.  Seller shall not, by any act or omission, delay or prevent any such disbursement.

1.7    Prorations and Adjustments.

(a)    All prepaid and deferred income and expenses relating to the Station Assets and arising from the operation of the Station shall be prorated between Buyer and Seller in accordance with generally accepted accounting principles as of 11:59 p.m. on the day immediately preceding the Closing Date (the "Effective Time").

(b)    Such prorations shall include, without limitation, any property taxes (except transfer taxes as provided by Section 11.1), music and other license fees, and other amounts under Station Contracts and similar prepaid and deferred items.  Seller shall receive a credit for all of the Station's deposits.  Prorations and adjustments shall be made no later than ninety (90) calendar days after Closing.  There shall be no proration or adjustment for employee leave or other employee matters.

4

(c)     Notwithstanding anything to the contrary contained herein, there shall be no adjustment for and Seller shall remain solely liable for any contracts or agreements not included in the Assumed Obligations.

1.8     Allocation.  The Purchase Price shall be allocated to the Station as set forth on Schedule 1.8. Buyer and Seller each further agrees to file its federal income tax returns and its other tax returns reflecting such allocation as and when required under Section 1060 of the Internal Revenue Code of 1986, as amended.

1.9     Closing.  The consummation of the sale and purchase of the Station Assets pursuant to this Agreement (the "Closing") shall take place within ten (10) days after the date the FCC Consent (defined below) is Final (defined below).  Buyer may, in its sole discretion, elect to proceed to Closing prior to the FCC Consent becoming Final, but in any case Closing is subject to the satisfaction or waiver of the last of the conditions required to be satisfied or waived pursuant to Articles 6 or 7 below (other than those requiring a delivery of a certificate or other document, or the taking of other action, at the Closing). The date on which the Closing is to occur is referred to herein as the "Closing Date."

1.10     FCC Consent.

(a)     Within five (5) business days after the date the Sale Order becomes a Final Order, Buyer and Seller shall file an application (the "FCC Application") requesting FCC consent to the assignment of the FCC Licenses from Seller to Buyer (the "FCC Consent").  Seller and Buyer shall diligently prosecute the FCC Application.  Each party shall promptly provide the other with a copy of any pleading, order or other document served on it relating to the FCC Application, and shall furnish all information required by the FCC.  Buyer and Seller shall notify each other of all documents filed with or received from any governmental agency with respect to this Agreement or the transactions contemplated hereby.  Buyer and Seller shall furnish each other with such information and assistance as the other may reasonably request in connection with their preparation of any governmental filing hereunder.

(b)     Seller shall, at its expense, timely take any action reasonably requested by the FCC with respect to any pending FCC enforcement or other matters related to the Station, including, without limitation, entering into a tolling agreement, establishing an escrow or making other arrangements satisfactory to the FCC.

(c)     Concurrently with the filing of the FCC Application, Seller may, in its sole and absolute discretion, file an application with the FCC requesting a modification of the Station's FCC License status from commercial to non-commercial, contingent on consummation of the transactions contemplated by the FCC Application, subject to Bankruptcy Court authorization.

ACTIVE 691534198v1

ARTICLE 2:    SELLER REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer as follows:

2.1    Authorization.  The Trustee Order is a valid order from the Bankruptcy Court appointing the Trustee to serve as trustee and take possession of the assets of the Debtors, and Trustee has taken possession of such assets.  Subject to entry of the Sale Order (defined below), Seller has the power and authority to execute, deliver and perform this Agreement, and to deliver the documents to be made pursuant hereto (the "Seller Authorization") and such actions do not require any further authorization or consent of Seller.  This Agreement and the documents to be made pursuant hereto are legal, valid and binding agreements of Seller enforceable in accordance with their respective terms, except in each case as such enforceability may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

2.2    No Conflicts.  The execution, delivery and performance by Seller of this Agreement and the documents to be made pursuant hereto does not conflict with the Trustee Order, or any other contract or agreement to which Seller is a party or by which it is bound, or any law, judgment, order, or decree to which Seller is subject, and does not require the consent, approval or authorization, or filing with, any third party or any court or governmental authority, except the FCC Consent and entry of the Sale Order (defined below).

2.3    FCC Licenses. Seller is the holder of the FCC Licenses required under the Communications Act of 1934, as amended (the "Communications Act"), including those listed and described on *Schedule 1.1(a)*.  Except as disclosed on *Schedule 2.3*, Seller has not been served with any pending action nor, to Seller's actual knowledge, has any action been threatened by or before the FCC to revoke, suspend, cancel, rescind or modify any of the FCC Licenses (other than proceedings relating to FCC rules of general applicability), and Seller has not been served with any order to show cause, notice of violation, notice of apparent liability, or notice of forfeiture or complaint pending nor, to Seller's actual knowledge, has any such action been threatened against Seller or the Station by or before the FCC.

2.4    Personal Property.  While *Schedule 1.1(b)* contains a list of Tangible Personal Property included in the Station Assets based on the best information provided to Seller to date, Seller makes no representations or warranties regarding the accuracy of this list.

2.5    Real Property.  Seller owns no real property in connection with the operation of the Station.  To the best of Seller's knowledge,  *Schedule 1.1(c)* includes a description of any lease or similar agreement under which Seller is lessee or licensee of, or holds, uses or operates, any real property in the business or operation of the Station (the "Real Property Leases").  To the best of Seller's knowledge, there is no pending suit for

ACTIVE 691534198v1

condemnation or other taking by any public authority regarding the property leased under the Real Property Leases. Seller will deliver to Buyer copies of all title insurance policies, title insurance commitments and surveys in its possession (if any) that are applicable to the Real Property Leases. *Schedule 1.1(c)* includes the amount that is required to be paid to cure any defaults pursuant to Section 365(b)(1)(A) of the Bankruptcy Code with respect to any such Real Property Leases.

2.6     Contracts.  To the best of Seller's knowledge, *Schedule 1.1(c)* contains a list of all contracts used in the operation of the Station, which schedule identifies any and all contracts used in the operation of the Station.  Seller will deliver to Buyer copies of each Station Contract (including each Real Property Lease), together with all amendments thereto, that Seller has in its possession.  *Schedule 1.1(c)* includes the amount that is required to be paid to cure any defaults pursuant to Section 365(b)(1)(A) of the Bankruptcy Code with respect to any such unexpired contracts.

2.7     Environmental.  Seller has not received in respect of the Station or Station Assets any written notice or claim to the effect that it is or may be liable under any environmental, health or safety law.  Seller will deliver to Buyer copies of all environmental reports and assessments in his possession (if any) that are applicable to the Station.

2.8     Intangible Property.  To the best of Seller's knowledge, *Schedule 1.1(d)* contains a description of all Intangible Property being transferred to Buyer hereunder. Trustee has received no written notice of any claim that any Intangible Property or the use thereof conflicts with, or infringes upon, any rights of any third party. Seller has not been served with any pending legal proceedings claiming infringement or unauthorized use regarding the Intangible Property.

2.9     Station Assets.  At Closing, Seller will transfer to Buyer good and marketable title to the Station Assets, free and clear of Liens, except for Permitted Encumbrances.

2.10     Compliance with Law.  No action, suit or proceeding against Seller has been served upon Seller or, to Seller's actual knowledge, threatened against Seller in respect of the Station or the Station Assets.

2.11     No Finder.  Payment of any brokerage fees authorized by the Bankruptcy Court shall be Seller's sole cost and expense.

2.12     Disclosure.  This Agreement and the documents made pursuant hereto do not and will not contain any intentionally untrue statement of material fact by Seller or intentionally omit a material fact required to be made by Seller in order to make the statements herein and therein not misleading in light of the circumstances in which they are made.

2.13     As-Is, Where-Is. Except as otherwise expressly set forth herein, Trustee and Seller make no representations or warranties with respect to the condition or completeness of the Station Assets and Buyer understands, acknowledges, and agrees that it is acquiring

7

the Station Assets on an "as is," "where is" and "with all faults" basis without representation or warranty of any kind, either express or implied, including, but not limited to, any warranties as to merchantability, fitness, or usability. Trustee and Seller make no representations whatsoever with respect to the accuracy or completeness of any books, records, or other information provided by Trustee or Seller in connection with the Station Assets other than the express representations and warranties made herein. Except for the express representations and warranties contained herein (as modified by the Schedules hereto), Seller makes no other express or implied representation or warranty with respect to the Station Assets, the Assumed Obligations or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any affiliate of Seller or any of their respective officers, directors, employees, agents or representatives.

2.14    Buyer's Investigation. Buyer's right to indemnification or other post-Closing remedy based on the representations, warranties, covenants and agreements of Seller contained herein shall be limited by any investigation conducted by Buyer, or any knowledge acquired by Buyer at any time, with respect to the inaccuracy of, or non-compliance with, any such representation, warranty, covenant or agreement, and shall operate as an amendment, supplementation and modification of any representation, warranty or agreement given or made by Seller in this Agreement and shall be deemed to amend or supplement the Schedules. The prior sentence shall not release Seller from the obligations to transfer the Station Assets to Buyer lien free, nor shall it limit Buyer's remedies pre-Closing on the discovery of any such inaccuracy or non-compliance.

ARTICLE 3:   BUYER REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller as follows:

3.1    Organization. Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and if such qualification is necessary, is (or will be at Closing) qualified to do business in each jurisdiction in which the Station Assets are located. Buyer has the requisite power and authority to execute, deliver and perform this Agreement and the documents to be made pursuant hereto.

3.2    Authority. The execution, delivery and performance of this Agreement and the documents to be made pursuant hereto have been duly authorized and approved by all necessary action of Buyer (the "Buyer Authorization") and do not require any further authorization or consent of Buyer. This Agreement and the documents to be made pursuant hereto are legal, valid and binding agreements of Buyer enforceable in accordance with their respective terms, except in each case as such enforceability may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

3.3    No Conflicts. The execution, delivery and performance by Buyer of this Agreement and the documents to be made pursuant hereto does not conflict with any

8

ACTIVE 691534198v1

organizational documents of Buyer or any law, judgment, order, or decree to which Buyer is subject, and does not require the consent, approval or authorization, or filing with, any third party or any court or governmental authority, except the FCC Consent.

3.4    Qualification.  Buyer is legally, financially and otherwise qualified to hold the FCC Licenses under the Communications Act and the rules, regulations and policies of the FCC, including with respect to multiple ownership, as they exist on the date of this Agreement.

3.5    No Finder.  No broker, finder or other person is entitled to a commission, brokerage fee or other similar payment in connection with this Agreement or the transactions contemplated hereby as a result of any agreement or action of Buyer or any party acting on Buyer's behalf.  Payment of any broker engaged by Buyer shall be Buyer's sole cost and expense.

3.6    Disclosure.  This Agreement and the documents made pursuant hereto do not and will not contain any untrue statement of material fact by Buyer or omit to state a material fact required to be made by Buyer in order to make the statements herein and therein not misleading in light of the circumstances in which they are made.

ARTICLE 4:  SELLER COVENANTS

4.1    Covenants.  From the date hereof until Closing, Seller shall, subject to the Trustee Order and the obligations and restrictions imposed by Title 11 of the United States Code (the "Bankruptcy Code"):

(a)    operate the Station in the ordinary course of business consistent with past practice and keep its books and accounts, records and files in the ordinary course, and preserve the business and goodwill of the Station and the Station Assets;

(b)    use commercially reasonable efforts to bring the Station into compliance in all material respects with the Communications Act, FCC rules, regulations and policies, and all other applicable laws, rules and regulations, and maintain the FCC Licenses in full force and effect, and diligently prosecute any applications for renewal of the FCC Licenses pending as of the date of this Agreement;

(c)    keep all Tangible Personal Property in its current (or better) operating condition (ordinary wear and tear excepted) and repair and maintain adequate and usual supplies, spare parts and other materials as have been customarily maintained in the past, and otherwise preserve intact the Station Assets and maintain in effect its current insurance policies with respect to the Station and the Station Assets;

(d)    at the request of Buyer, from time to time give Buyer access during normal business hours to all of the Station's employees, facilities, properties, accounts, books, deeds, title papers, insurance policies, licenses, agreements, contracts, commitments, records and files, equipment, machinery, fixtures, furniture, vehicles and all other Station Assets, and provide Buyer all other information in Trustee's possession concerning the Station as Buyer may reasonably request;

ACTIVE 691534198v1

(e)    pay accounts payable in the ordinary course of business consistent with past practice;

4.2    Post-Final Order Covenants.  From the date of the Final Order until Closing, Seller shall not, without the prior written consent of Buyer:

(a)    sell, lease, or otherwise dispose of any Station Assets except for non-material dispositions in the ordinary course of business or items which are replaced by assets of comparable or superior kind, condition and value;

(b)    create, assume or permit to exist any Liens on the Station Assets, and not dissolve, liquidate, merge or consolidate with any other entity, except for Permitted Encumbrances;

(c)    modify any of the FCC Licenses; or

(d)    amend or terminate any of the Station Contracts, or enter into any contract, lease or agreement with respect to the Station except for ordinary course cash time sales agreements and any other agreements entered into in the ordinary course of business that will be paid and performed in full before Closing.

For the avoidance of doubt, nothing in this Section 4.2 prohibits the Trustee from taking all actions: (i) authorized by the *Order Approving Motion for Order Pursuant to 11 U.S.C. §§ 363 and 105 and Bankruptcy Rules 6004 and 2002 Authorizing Chapter 11 Trustee to Enter Into Programming Agreements and Use Revenue Generated to Recoup Operational Costs of the Respective Stations* pending the Closing; or (ii) necessary to preserve and maintain the FCC Licenses pending the Closing.

ARTICLE 5:   JOINT COVENANTS

Buyer and Seller hereby covenant and agree as follows, subject to the Trustee Order:

5.1    Confidentiality.  Subject to the requirements of applicable law, all non-public information regarding the parties and their business and properties that is disclosed in connection with the negotiation, preparation or performance of this Agreement shall be confidential and shall not be disclosed to any other person or entity, except on a confidential basis to the parties' attorneys, accountants, investment bankers, investors and lenders, and their respective attorneys for the purpose of consummating the transaction contemplated by this Agreement.

5.2    Announcements.  Prior to Closing, no party shall, without the prior written consent of the other, issue any press release or make any other public announcement concerning the transactions contemplated by this Agreement, except to the extent that such party is so obligated by law, including any requirements under the Bankruptcy Code or as requested by the Bankruptcy Court, and except as necessary to enforce rights under or in connection with this Agreement.  Notwithstanding the foregoing, the parties acknowledge

that this Agreement and the terms hereof will be filed with the Bankruptcy Court and the FCC Application and thereby become public.

5.3    Control.  Consistent with FCC rules, control, supervision and direction of the operation of the Station prior to Closing shall remain the responsibility of Seller as the holder of the FCC Licenses.

5.4    Risk of Loss.  The risk of loss of or damage to the Station Assets shall remain with Seller at all times until 12:01 a.m. local time on the day of Closing.  Prior to Closing, Seller shall repair and replace any lost or damaged Station Asset where the loss or damage occurred after execution of this Agreement and prior to Closing ("Damaged Asset"); provided, however, that in the event the cost to repair a Damaged Assets exceeds the amount recoverable under the insurance policy covering the same, Seller may elect not to repair the Damaged Asset. If Seller elects not to repair the Damaged Asset, Seller must notify Buyer of such election within ten (10) days after the date either party becomes aware of the damage to the Station Assets.  Buyer may, in its sole discretion, either (a) proceed to Closing and deduct the cost of the repair of the Damaged Asset from the Purchase Price not to exceed $100,000, or (b) terminate this Agreement by written notice to Seller. Buyer shall inform Seller of its election with respect to (a) or (b) above within ten (10) days after the date Seller notifies Buyer that Seller will not repair the Damaged Asset.

5.5    Broadcast Interruption.  If prior to Closing  the Station is  off the air or operating at a power level that results in a material reduction in coverage (a "Broadcast Interruption"), then Seller shall seek to return the Station to the air and restore prior coverage as promptly as possible.  Notwithstanding anything to the contrary in this Section 5.5 or any other provision of this Agreement, as set forth on the record of the Auction, Buyer has assumed any and all risks associated with the Station being silent or otherwise off the air while working with the FCC to transfer the licenses to Buyer or at the time of Closing.

5.6    Employees.  Buyer will not hire any employees of the Station at Closing.

5.7    Final.  For purposes of this Agreement, the term "Final" shall mean that action shall have been taken by the FCC (including action duly taken by the FCC's staff, pursuant to delegated authority) which shall not have been reversed, stayed, enjoined, set aside, annulled or suspended; with respect to which no timely request for stay, petition for rehearing, appeal or certiorari or sua sponte action of the FCC with comparable effect shall be pending; and as to which the time for filing any such request, petition, appeal, certiorari or for the taking of any such sua sponte action by the FCC shall have expired or otherwise terminated.

5.8    Bankruptcy Court Requirements.

(a)    Buyer and Seller acknowledge that, under the Bankruptcy Code, the sale of the Station Assets was subject to te court-supervised auction, and is subject to approval of the Bankruptcy Court.  Buyer and Seller acknowledge that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or best value

11

possible for the Station Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Station Assets to prospective bidders, entertaining higher or better offers from qualified bidders, conducting an auction and, if appropriate, selling the Station Assets to another qualified bidder.

(b)     Seller shall file with the Bankruptcy Court, and prosecute the same to completion, such pleadings and motions that shall be necessary and appropriate to receive any and all orders and rulings from the Bankruptcy Court, and to provide such notifications to the Bankruptcy Court or interested parties, that are necessary or appropriate, in writing, to fully authorize and allow Buyer the benefit of the transactions set forth in this Agreement, including without limitation bid procedures and Buyer's acquisition of the Station Assets as contemplated by this Agreement, and Seller's subsequent sale, assignment and transfer of the Station Assets as contemplated under this Agreement, and shall further take any and all commercially reasonable and customary actions and make and submit such appropriate notices, filings and submissions, and make all appropriate court appearances in support thereof.  Such motion or motions shall be brought inter alia under Section 363 of the Bankruptcy Code, specifically including Sections (b), (f), (k) and (m) of the Bankruptcy Code, free and clear of any interest in such property, except the Permitted Encumbrances.  Seller shall file a Motion for Order Pursuant to Sections 105(A), 363, 365, 503 and 507 of the Bankruptcy Code and Rules 2002, 6004, 6006 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure to approve and authorize the sale of the Station Assets to Buyer free and clear of liens, claims, encumbrances and other interests, except the Permitted Encumbrances, and a request for a waiver of the stay imposed by Federal Rule of Bankruptcy Procedure 6004(h), in the Bankruptcy Case (the "363 Motion"), by June 23, 2023, which 363 Motion shall include inter alia a request for a waiver of the stay imposed by Federal Rule of Bankruptcy Procedure 6004(h). The order being sought by the 363 Motion shall be referred to herein as the "Sale Order", the form of which shall be subject to reasonable approval by Buyer.

(c)     The Sale Order, once entered by the Bankruptcy Court, shall be a "Final Order" provided: (i) no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (ii) the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) no court or other governmental entity having jurisdiction over Seller or Buyer shall have issued or entered any order, decree, or injunction (whether temporary, preliminary or permanent) then in effect to stay or otherwise enjoin the sale transaction contemplated by this Agreement; and (iv) no stay is in effect.  As a condition to Closing the sale and of all of Buyer's obligations hereunder, a Final Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to Buyer and Seller.

ACTIVE 691534198v1

5.9     Modification of the Station.  Buyer acknowledges that the right to use the Station's current tower site terminates on December 31, 2023.  Seller and Buyer covenant and agree, subject to Seller's ultimate supervision and control as the FCC licensee but at Buyer's expense, and notwithstanding any other provision of this Agreement, to cooperate in the relocation of the Station to a new tower and site as promptly as possible, including by:

(a)     Seller cooperating and assisting in the filing with the FCC of a request for a technical special temporary authority ("STA") for the Station to operate at the new tower and site identified and secured by Buyer, with the technical parameters specified by and an engineering exhibit provided by Buyer, using such Tangible Personal Property or other equipment provided by Buyer for construction of the STA facilities, and with the tower and site, engineering, FCC filing fees, and cost of construction of the STA facilities at the expense of Buyer;

(b)     Seller cooperating and assisting in the filing with the FCC of an application for a construction permit for a minor change in the Station's licensed facilities for the Station to operate at the new tower and site identified and secured by Buyer, with the technical parameters specified by and any engineering exhibit provided by Buyer, using such Tangible Personal Property or other equipment provided by Buyer for construction of the minor change permit facilities, and with the tower and site, engineering, FCC filing fees, and cost of construction of the minor change permit facilities at the expense of Buyer;

(c)     Seller shall have a right to use the STA and/or minor change permit facilities to operate the Station at no cost to Seller prior to Closing, and for up to twelve (12) months after any termination of this Agreement (other than due to a breach or default by Seller);

(d)     Buyer shall endeavour, with the cooperation of Seller, to: (i) be able to provide the technical parameters and any engineering exhibits necessary to file for both the STA and the minor change permit application as soon as possible, and (ii) be able to commence at least the STA operations by on or before December 31, 2023, if possible, or as soon thereafter as possible (with Buyer and Seller acknowledging that in that event, the Station would have to go silent temporarily after December 31, 2023); and

(e)     Seller and Buyer anticipate entering into a time brokerage or similar agreement ("TBA") under which Buyer would provide programming for the Station (among other mutually agreeable terms), to commence upon the date when operation of the Station from the new tower and site begins under the granted technical STA (or the granted minor change permit, as the case may be).

ARTICLE 6:  SELLER CLOSING CONDITIONS

The obligation of Seller to consummate the Closing is subject to satisfaction of the following conditions at or prior to Closing, which (except for Section 6.4 below) may be waived by Seller:

6.1     Bringdown.  The representations and warranties of Buyer made in this Agreement shall be true and correct in all material respects as of Closing, Buyer shall have

ACTIVE 691534198v1

performed the obligations to be performed by it under this Agreement at or prior to Closing in all material respects, and Seller shall have received a certificate dated as of the Closing Date from Buyer (executed by an authorized officer) to the effect that the conditions set forth in this <u>Section 6.1</u> have been satisfied (the "<u>Buyer Bringdown Certificate</u>").

      6.2    <u>Proceedings</u>.  Neither Seller nor Buyer shall be subject to any court or governmental order or injunction restraining or prohibiting the consummation of the transactions contemplated hereby.

      6.3    <u>FCC Consent</u>.  The FCC Consent shall have been granted.

      6.4    <u>Court Approval</u>.  The Final Order shall have been entered.

      6.5    <u>Deliveries</u>.  Buyer shall have made the deliveries to be made by it at Closing under this Agreement.

ARTICLE 7:  <u>BUYER CLOSING CONDITIONS</u>

      The obligation of Buyer to consummate the Closing is subject to satisfaction of the following conditions at or prior to the Closing, which (except for <u>Section 7.4</u> below) may be waived by Buyer:

      7.1    <u>Bringdown</u>.  The representations and warranties of Seller made in this Agreement shall be true and correct in all material respects as of Closing, Seller shall have performed the obligations to be performed by it under this Agreement at or prior to Closing in all material respects, and Buyer shall have received a certificate dated as of the Closing Date from Seller (executed by the Trustee solely in his capacity as court-appointed trustee for each of the Seller entities) to the effect that the conditions set forth in this <u>Section 7.1</u> have been satisfied (the "<u>Seller Bringdown Certificate</u>").

      7.2    <u>Proceedings</u>.  Neither Seller nor Buyer shall be subject to any court or governmental order or injunction restraining or prohibiting the consummation of the transactions contemplated hereby.

      7.3    <u>FCC Consent</u>.  The FCC Consent shall have been granted and shall have (at Buyer's option) become Final.

      7.4    <u>Court Approval</u>.  The Final Order shall have been entered by the Bankruptcy Court in a form reasonably acceptable to Buyer.

      7.5    <u>Deliveries</u>.  Seller shall have made the deliveries to be made by it at Closing under this Agreement.

      7.6    <u>Liens</u>.  Any Liens that are not Permitted Encumbrances shall have been deemed to not attach to the Station Assets pursuant to the Sale Order.

      7.7    <u>Assumption of Risk If Stations Are Silent</u>.  Notwithstanding anything to the contrary in this Section 7 or any other provision of this Agreement, as set forth on the

ACTIVE 691534198v1

record of the Auction, Buyer has assumed any and all risks associated with one or more of the Stations being silent or otherwise off the air while working with the FCC to transfer the licenses to Buyer or at the time of Closing.

ARTICLE 8:   CLOSING DELIVERIES

8.1     Seller Deliveries.  At Closing, Seller shall deliver or cause to be delivered to Buyer:

(a)     the Seller Bringdown Certificate;

(b)     the Final Order;

(c)     an Assignment of FCC Licenses assigning the FCC Licenses from Seller to Buyer;

(d)     an Assignment and Assumption of Contracts assigning the Station Contracts (if any) to Buyer;

(e)      an Assignment of Marks assigning the Station's registered marks (if any) to Buyer;

(f)     domain name transfers assigning the Station's domain names from Seller to Buyer following customary procedures of the domain name administrator;

(g)     endorsed vehicle titles conveying the vehicles (if any) included in the Tangible Personal Property to Buyer;

(h)     a bill of sale conveying the Station Assets to Buyer;

(i)     any other documents and instruments of conveyance, assignment and transfer that may be reasonably necessary to convey, transfer and assign the Station Assets to Buyer, free and clear of Liens, except for Permitted Encumbrances.

8.2     Buyer Deliveries.  At the Closing, Buyer shall deliver to Seller:

(a)     the Purchase Price in accordance with the terms of this Agreement;

(b)     a certified copy of the Buyer Authorization;

(c)     the Buyer Bringdown Certificate;

(d)     an Assignment and Assumption of Contracts assuming the obligations arising after Closing under the Station Contracts (if any);

(e)     domain name transfers assigning the Station's domain names from Seller to Buyer following customary procedures of the domain name administrator; and

ACTIVE 691534198v1

(f)    any other documents and instruments of assumption that may be reasonably necessary to assume the Assumed Obligations.

ARTICLE 9:   SURVIVAL AND INDEMNIFICATION

9.1    Survival.  The representations and warranties in this Agreement shall survive Closing for a period of six (6) months from the Closing Date at which time they shall expire and be of no further force or effect, except that, if within such applicable period the indemnified party gives the indemnifying party written notice of a claim for breach thereof describing in reasonable detail the nature and basis of such claim, then such claim shall survive until the resolution of such claim.  The covenants and agreements in this Agreement shall survive Closing until performed.

9.2    Indemnification.

(a)    From and after Closing, Seller shall defend, indemnify and hold harmless Buyer from and against any and all losses, costs, damages, liabilities and expenses, including reasonable attorneys' fees and expenses ("Damages") incurred by Buyer arising out of or resulting from:

(i)    any breach by Seller of its representations and warranties under this Agreement;

(ii)    the Retained Liabilities; or

(iii)    without limiting the foregoing, the business or operation of the Station prior to Closing (including any third party claim arising from such operations).

Notwithstanding the foregoing or anything else herein to the contrary, after Closing, (1) Seller shall have no liability to Buyer under Section 9.2(a)(i) until Buyer's aggregate Damages exceed Twenty-Five Thousand Dollars ($25,000), after which such threshold amount shall be included in, not excluded from, any calculation of Damages, and (2) the maximum aggregate liability of Seller under Section 9.2(a)(i) shall be an amount equal to the Purchase Price.

(b)    From and after Closing, Buyer shall defend, indemnify and hold harmless Seller from and against any and all Damages incurred by Seller arising out of or resulting from:

(i)    any breach by Buyer of its representations and warranties under this Agreement;

(ii)    the Assumed Obligations; or

(iii)    without limiting the foregoing, the business or operation of the Station after Closing (including any third party claim arising from such operations).

16

9.3    Procedures.

(a)    The indemnified party shall give prompt written notice to the indemnifying party of any demand, suit, claim or assertion of liability by a third party that is subject to indemnification hereunder (a "Claim"), but a failure to give such notice or delaying such notice shall not affect the indemnified party's rights or the indemnifying party's obligations, except to the extent the indemnifying party's ability to remedy, contest, defend or settle with respect to such Claim is thereby prejudiced.

(b)    The indemnifying party shall have the right to undertake the defense or opposition to such Claim with counsel reasonably satisfactory to the parties.  In the event that the indemnifying party does not undertake such defense or opposition in a timely manner, the indemnified party may undertake the defense, opposition, compromise or settlement of such Claim with counsel selected by it at the indemnifying party's cost.

(c)    Notwithstanding anything herein to the contrary:

(i)    the indemnified party shall have the right, at its own cost and expense, to participate in the defense, opposition, compromise or settlement of any Claim, and shall have the right to consult with the indemnifying party and its counsel concerning any Claim, and the indemnifying party and the indemnified party shall cooperate in good faith with respect to any Claim; and

(ii)    the indemnifying party shall not, without the indemnified party's written consent, settle or compromise any Claim or consent to entry of any judgment which does not include a release of the indemnified party from all liability in respect of such Claim.

ARTICLE 10:  TERMINATION AND REMEDIES

10.1    Termination.  This Agreement may be terminated prior to Closing as follows:

(a)    by mutual written consent of Buyer and Seller;

(b)    by written notice of Buyer to Seller if Seller:

(i)    does not perform the obligations required to be performed by it under this Agreement on the Closing Date; or

(ii)    otherwise breaches in any material respect any of its representations or warranties or defaults in any material respect in the performance of any of its covenants or agreements contained in this Agreement and such breach or default is not cured within the Cure Period (defined below);

(c)    by written notice of Seller to Buyer if Buyer:

17

(i)    does not perform the obligations required to be performed by it under this Agreement on the Closing Date, all conditions to its obligation to do so having been satisfied or waived; or

(ii)    otherwise breaches in any material respect any of its representations or warranties or defaults in any material respect in the performance of any of its covenants or agreements contained in this Agreement and such breach or default is not cured within the Cure Period;

(d)    by written notice of Buyer to Seller, or of Seller to Buyer, if the FCC denies the FCC Application or upon order of the Bankruptcy Court;

(e)    by written notice of Buyer to Seller, or of Seller to Buyer, if the Closing does not occur by the date one (1) year after the date of this Agreement (the "Outside Date"); or

(f)    by written notice of Buyer to Seller, or of Seller to Buyer, if the Sale Order is not issued by the Bankruptcy Court by the date one hundred twenty (120) days after entry of the order approving the bid procedures motion.

The term "Cure Period" as used herein means a period commencing the date Buyer or Seller receives from the other written notice of breach or default hereunder and continuing until the earlier of (1) thirty (30) days thereafter or (2) the Closing Date. Termination of this Agreement shall not relieve any party of any liability for breach or default under this Agreement prior to the date of termination. Notwithstanding anything contained herein to the contrary, Sections 1.6 (Deposit), 5.1 (Confidentiality), 5.2 (Announcements) and 11.1 (Expenses) shall survive any termination of this Agreement.

10.2    Specific Performance. In the event of a breach or threatened breach by Seller of any representation, warranty, covenant, obligation or agreement under this Agreement, at Buyer's election, in addition to any other remedy available to it, Buyer shall be entitled to an injunction restraining any such breach or threatened breach and to enforcement of this Agreement by a decree of specific performance requiring Seller to fulfill its obligations under this Agreement, in each case without the necessity of showing economic loss or other actual damage and without any bond or other security being required.

ARTICLE 11: MISCELLANEOUS.

11.1    Expenses. Each party shall be solely responsible for all costs and expenses incurred by it in connection with the negotiation, preparation and performance of and compliance with the terms of this Agreement, except that Seller shall be solely responsible for all governmental taxes, fees, and charges applicable to the request for FCC Consent and all governmental taxes, fees, and charges applicable to the transfer of the Station Assets under this Agreement.

11.2    Further Assurances. After Closing, each party hereto shall execute all such instruments and take all such actions as any other party may reasonably request, without

18

payment of further consideration, to effectuate the transactions contemplated by this Agreement, including, without limitation, the execution and delivery of confirmatory and other transfer documents in addition to those to be delivered at Closing.

11.3    Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.  Neither Seller nor Buyer may assign any of its rights or delegate any of its obligations hereunder without the written consent of the other party, in its sole discretion, and any such attempted assignment or delegation without such consent shall be void.

11.4    Notices.  Any notice pursuant to this Agreement shall be in writing and shall be deemed delivered on the date of personal delivery or confirmed facsimile transmission or confirmed delivery by a nationally recognized overnight courier service, or on the third (3rd) day after prepaid mailing by certified U.S. mail, return receipt requested, and shall be addressed as follows (or to such other address as any party may request by written notice):

| | |
|---|---|
| if to Seller, then to: | Michael W. Carmel, Trustee<br>80 East Columbus Avenue<br>Phoenix, Arizona 85012-2334<br>Email: michael@mcarmellaw.com |
| with a copy (which shall not constitute notice) to: | Garman Turner Gordon, LLP<br>7251 Amigo Street, Suite 210<br>Las Vegas, Nevada 89119<br>Attn:  Talitha Gray Kozlowski, Esq<br>Email: tgray@gtg.legal |
| if to Buyer, then to: | Friends of KEXP<br>472 1st Ave N.<br>Seattle, Washington 98109<br>Attn: Ethan Raup, Chief Executive Officer<br>Email: ethan@kexp.org |
| with a copy (which shall not constitute notice) to: | Greenberg Traurig, LLP<br>10845 Griffith Peak Drive, Suite 600<br>Las Vegas, Nevada 89135<br>Attn:  Kara Hendricks<br>Email: hendricksk@gtlaw.com |

11.5    Severability.  If any court or governmental authority holds any provision in this Agreement invalid, illegal or unenforceable under any applicable law, then, so long as no party is deprived of the benefits of this Agreement in any material respect, this Agreement shall be construed with the invalid, illegal or unenforceable provision deleted and the validity, legality and enforceability of the remaining provisions contained herein shall not be affected or impaired thereby.

ACTIVE 691534198v1

11.6    <u>Governing Law; Jurisdiction</u>.  The construction and performance of this Agreement shall be governed by the laws of the Nevada without giving effect to the choice of law provisions thereof.  The prevailing party in a lawsuit brought to enforce the performance or compliance of any provision of this Agreement may recover reasonable attorneys' fees and costs from the non-prevailing party.

THE PARTIES SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA FOR ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, ANY OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.

11.7    <u>Good Faith</u>.  The sale transaction contemplated by this Agreement has been achieved in good faith, at arms-length, and with no fraud or collusion by any of the parties; therefore the sale transaction is entitled to a finding of good faith under 11 U.S.C. § 363(m).

11.8    <u>Miscellaneous</u>.  No amendment or waiver of compliance with any provision hereof or consent pursuant to this Agreement shall be effective unless in a writing signed by the party against whom enforcement of such amendment, waiver, or consent is sought. This Agreement constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements and understandings with respect to the subject matter hereof.  Nothing in this Agreement expressed or implied is intended or shall be construed to give any rights to any person or entity other than the parties hereto and their respective successors and permitted assigns. This Agreement may be executed in separate counterparts, each of which shall be deemed to be an original and all of which together constitute one and the same agreement.  As used in this Agreement, the term "Seller" refers to the Seller, by and through the Trustee.

[SIGNATURE PAGE FOLLOWS]

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first set forth above.

BUYER:                              Friends of KEXP

By: _____
                Name: Ethan Raup
                Title:  Chief Executive Officer

SELLER:

                _____
                Michael W. Carmel, solely in his capacity as court-
                appointed Chapter 11 Trustee

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first set forth above.

BUYER:                          Friends of KEXP

                                By: _____
                                Name: Ethan Raup
                                Title:   Chief Executive Officer

SELLER:                         _____
                                Michael W. Carmel, solely in his capacity as court-
                                appointed Chapter 11 Trustee

ACTIVE 691534198v1

**Schedule 1.1(a)**
**FCC Licenses**

Call Sign:  KREV(FM), Alameda, California                    Facility ID 36029

Frequency:   92.7 MHz, Channel 224, Class A

Licensee:     Golden State Broadcasting, LLC

| DESCRIPTION | FILE NUMBER/TYPE | EXPIRATION DATE |
|---|---|---|
| Renewal Application | 0000155217 | pending |
| License Authorization | BLH-20140110AAC | 12/1/2021 |
| Auxiliaries | None | |

ASR:  1053379                         Owner:  Immaculate Heart Media, Inc.

ACTIVE 691534198v1

**Schedule 1.1(b)**
**Tangible Personal Property**[1]

*__KREV__*:

**KREV Main Transmitter Site Inventory**
SWR 2-Bay Directional Antenna
SWR 2-Bay Directional Antenna
1 5/8" Transmission Line LDF7-50A
7/8" Transmission Line AVA50
Mark Microwave Dish
TFT Model 724A Stereo Monitor
TFT FM Modulation Monitor
Burk Model ARC-16 Remote Control Unit SN A930802
Inovonics Model 712 RDS Generator
Moseley Model PCL 505 Aural STL Receiver
Rack Mount Surge Protected Power Strip
Bay Networks BayStack 10/100 AutoSense Switch
Burk Model IP8 Remote Panel
Burk Model IP8 Remote Panel
Nautel Model NV7.5
Broadcast Electronics Model FM4C Transmitter
Broadcast Electronics Model FXi 250 Exciter
Mosely LanLink 900 Dual Gateway
Andrew Automatic Dehydrator
Sony CMT-NE3 FM Receiver
Exhaust Fan

---

[1] Buyer acknowledges that Seller has not been able to verify the existence of the assets identified on this Schedule 1.1(b) and, accordingly, Seller makes no representations or warranties concerning the availability of such assets. Buyer may conduct its own investigation and inventory of the Station Assets and this Schedule will be updated to either include or omit any identified assets herein which are available or no longer available based on Buyer's investigation.

ACTIVE 691534198v1

**Schedule 1.1(c)**
**Executory Contracts, Leases, and Cure Amounts**

| Contract or Lease | Debtor | Cure Amount | Buyer Assumes | Buyer Rejects |
|---|---|---|---|---|
| Transmitter Site Use Agreement with C&E Haas Development Company, LLC (Antenna Tower for KREV) | Golden State Broadcasting, LLC | Est. $219,999.52 | | X |

**Schedule 1.1(d)**
**Intangible Property**

*Domain names:*

      www.927rev.com

*Registered marks:*

      None.

*Unregistered service marks*:

      KREV

25

**Schedule 1.2**
**<u>Liens</u>**

None.

**Schedule 1.3**
**Excluded Assets**

1.  Any tangible personal property not listed on *Schedule 1.1(b)*.  Notwithstanding the foregoing, any tangible personal property added to *Schedule 1.1(b)* due to Buyer's site visit(s) shall not be deemed Excluded Assets.

2.  Any other claims held by the Debtor's bankruptcy estates that are not expressly included in this Agreement. For the avoidance of doubt, the Station Assets do not include litigation claims, including Chapter 5 claims, commercial tort claims, or claims for malpractice.

ACTIVE 691534198v1

**Schedule 1.8**
**Allocation**

(a)      KREV(FM) (Station 2): $3,750,000

ACTIVE 691534198v1

**Schedule 2.3**
**FCC Notices**

Seller has been advised informally by the FCC staff that the FCC Enforcement Bureau ("EB") has placed a hold on the pending renewal application for the Station, which Seller understands is based on FCC investigations or inquiries, or potential enforcement action, against other commonly owned Debtors, Silver State Broadcasting, LLC and Major Market Radio, LLC, and broadcast stations licensed to those entities.

ACTIVE 691534198v1