GARMAN TURNER GORDON LLP
GREGORY GARMAN, ESQ.
Nevada Bar No. 6654
Email: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
Email: tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
Email: mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: 725.777.3000
*Attorneys for Michael Carmel,*
*Chapter 11 Trustee*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | CASE NO. BK-21-14978-ABL |
| SILVER STATE BROADCASTING, LLC, | Chapter 11 |
| ☐ AFFECTS THIS DEBTOR | *Jointly Administered with:* |
| ☒ AFFECTS GOLDEN STATE BROADCASTING, LLC | Golden State Broadcasting, LLC Case No. 21-14979-ABL |
| ☐ AFFECTS MAJOR MARKET RADIO, LLC | Major Market Radio, LLC Case No. 21-14980-ABL |
| ☐ AFFECTS ALL DEBTORS | |

**<u>DISCLOSURE STATEMENT TO ACCOMPANY GOLDEN STATE BROADCASTING LLC'S PLAN OF REORGANIZATION</u>**

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

## TABLE OF CONTENTS

DISCLOSURE STATEMENT TO ACCOMPANY GOLDEN STATE BROADCASTING LLC'S PLAN OF REORGANIZATION………………………………...……………………….1

I. INTRODUCTION .............................................................................................................. 1

II. INFORMATION REGARDING THE PLAN AND DISCLOSURE STATEMENT ............. 2

III. REPRESENTATIONS .................................................................................................... 3

IV. DISCUSSION OF THE PAYMENTS TO BE MADE UNDER THE PLAN ...................... 3
    A.  Treatment of Administrative Claims. ...................................................................4
    B.  Treatment of Priority Tax Claims. .......................................................................6
    C.  Class 1 – Secured Claims.....................................................................................6
    D.  Class 2 – Priority Unsecured Claims. ..................................................................7
    E.  Class 3 – General Unsecured Claims. ..................................................................8
    F.  Class 4 – Equity Securities. .................................................................................9

V. SUMMARY OF VOTING PROCESS ............................................................................ 10
    A.  Who May Vote to Accept or Reject the Plan.....................................................10
    B.  Summary of Voting Requirements. ....................................................................10

VI. INFORMATION ABOUT DEBTOR'S BUSINESS AND THE CHAPTER 11 CASE ....... 11
    A.  Overview of the Debtor's Assets and Historical Operations. .............................11
    B.  The Receivership. .............................................................................................12
    C.  The Commencement of the Case and Proceedings in the Chapter 11 Case
        Prior to the Trustee's Appointment....................................................................13
    D.  The Trustee's Appointment and Subsequent Proceedings in the Chapter 11
        Case...................................................................................................................14

VII. DESCRIPTION OF THE NON-PAYMENT TERMS OF THE PLAN ............................ 15
    A.  Means of Implementation of the Plan. ...............................................................15
    B.  Executory Contracts and Leases. ......................................................................18
        1.  Executory Contracts. ................................................................................. 18
        2.  Approval of Assumption or Rejection. ....................................................... 18
        3.  Cure of Defaults....................................................................................... 19
        4.  Objection to Cure Amounts. ...................................................................... 19
        5.  Confirmation Order. .................................................................................. 19
        6.  Rejection Damages Claim Bar Date. ......................................................... 20
    C.  Conditions to Confirmation and Effectiveness of the Plan.................................20
    D.  Title to Property. ...............................................................................................20
    E.  Discharge, Injunction, and Exculpation.............................................................21

VIII. RISK FACTORS........................................................................................................ 23

IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ............................................. 24

X. CONFIRMATION OF THE PLAN................................................................................. 27
    A.  Confirmation of the Plan...................................................................................27
    B.  Objections to Confirmation of the Plan. ............................................................27
        1.  Best interest of Creditors and liquidation analysis. .................................... 27
        2.  Feasibility................................................................................................. 29
        3.  Accepting impaired class. .......................................................................... 30
        4.  Acceptance of Plan. .................................................................................. 30

5.  Confirmation over a dissenting Class ("Cram Down"). ...................................... 30
6.  Allowed Claims. .................................................................................................. 31
7.  Impaired Claims and Equity Securities ............................................................. 31
8.  Voting procedures. ............................................................................................. 32

XI. ALTERNATIVES TO THE PLAN ...................................................................................... 33
A.  Alternative Plans of Reorganization. ...................................................................33
B.  Liquidation Under Chapter 7. ...............................................................................33

XII. RECOMMENDATION AND CONCLUSION ...................................................................... 34

APPENDIX ................................................................................................................................ 35

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

ii

# I.
## INTRODUCTION

On October 19, 2021 (the "Petition Date"), Golden State Broadcasting, LLC ("Debtor") filed its voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Nevada, Las Vegas (the "Bankruptcy Court"), thereby commencing case number BK-21-14979-ABL, being jointly administered under case number BK-21-14978-ABL (the "Chapter 11 Case").[1]   On March 10, 2023, the Bankruptcy Court appointed Michael Carmel (the "Trustee") as the Chapter 11 Trustee in the Chapter 11 Case.

The Trustee has prepared this Disclosure Statement (the "Disclosure Statement") in connection with the solicitation of votes on *Golden State Broadcasting, LLC's Plan of Reorganization* (the "Plan") to treat the Claims of Creditors of Debtor and the Persons holding Equity Securities in Debtor.[2]   The various exhibits to this Disclosure Statement included in the Appendix are incorporated into and are a part of this Disclosure Statement.  The Plan is included as **Exhibit "1"** in the Appendix.  The information provided in this Disclosure Statement is based on the best information available to the Trustee.  After having reviewed the Disclosure Statement and the Plan, any interested party desiring further information may contact:

Garman Turner Gordon LLP
Attn: Talitha Gray Kozlowski, Esq.
7251 Amigo Street, Suite 210
Las Vegas, NV  89119
(725) 777-3000 Telephone
Email:  tgray@gtg.legal

Interested parties may also obtain further information from the Bankruptcy Court at its PACER website:  http://www.nvb.uscourts.gov.

. . .

. . .

. . .

[1] Unless otherwise indicated herein, all references to "Chapters" or "Sections" refer to Title 11 of the U.S. Code (the "Bankruptcy Code").

[2] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

## II.
## INFORMATION REGARDING THE PLAN AND DISCLOSURE STATEMENT

The objective of a Chapter 11 case is the confirmation (i.e., approval by the bankruptcy court) of a plan of reorganization for a debtor. A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against, and equity interests in, a debtor. After a plan has been filed, the holders of such claims and equity securities that are Impaired (as defined in Section 1124) are permitted to vote to accept or reject the plan. Before a debtor or other plan proponent can solicit acceptances of a plan, Section 1125 requires the debtor or other plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about the Debtor and the Plan to enable Creditors and Equity Security Holders to make an informed decision in exercising their rights to vote to accept or reject the Plan. This Disclosure Statement will be used to solicit acceptances of the Plan only after the Bankruptcy Court has found that this Disclosure Statement provides adequate information in accordance with Section 1125 and has entered an order approving this Disclosure Statement. Approval by the Bankruptcy Court is not an opinion or ruling on the merits of this Disclosure Statement, and it does not mean that the Plan itself has been or will be approved by the Bankruptcy Court.

After the appropriate Persons have voted on whether to accept or reject the Plan, there will be a hearing on the Plan to determine whether it should be confirmed. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including but not limited to Section 1129. The Bankruptcy Court will also receive and consider a Ballot Summary that will present a tally of the votes of Classes accepting or rejecting the Plan that are cast by those entitled to vote. Once confirmed, the Plan will be treated essentially as a contract binding on all Creditors, Holders of Equity Securities, and other parties-in-interest in the Chapter 11 Case.

THIS DISCLOSURE STATEMENT IS NOT THE PLAN.  FOR THE CONVENIENCE OF CREDITORS AND HOLDERS OF EQUITY SECURITIES, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT.   IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS.

### III.
### REPRESENTATIONS

Unless otherwise specifically noted, the financial information in this Disclosure Statement has not been subject to audit.  Instead, this Disclosure Statement was prepared from information the Trustee has obtained regarding the Debtor's business.

Other than as stated in this Disclosure Statement, neither the Chapter 11 Trustee nor the Debtor has authorized any representations or assurances concerning the Debtor and its operations or the value of its assets.  Therefore, you should scrutinize any information received from any third-party, and you assume any risk resulting from reliance upon such unauthorized information.  In deciding whether to accept or reject the Plan, you should therefore not rely on any information relating to the Debtor or the Plan other than that contained in this Disclosure Statement or in the Plan itself.

### IV.
### DISCUSSION OF THE PAYMENTS TO BE MADE UNDER THE PLAN

The following is a general overview of the treatment of Claims and Equity Securities under the Plan and is qualified in its entirety by reference to the provisions of the Plan itself.  The Plan's treatment of each Class of Claims is summarized in the following table:

| Description | Treatment | Estimated Amount of Claims[3] |
|---|---|---|
| Administrative Claims | Paid in full.<br>Unclassified; non-voting. | $1,250,000-$1,450,000[4] |

---

[3] The estimated amounts set forth in this chart are based on information currently available to the Trustee.  Additional applications seeking allowance of administrative claims may be filed, which if allowed would increase the number of administrative claims.  Similarly, the successful prosecution of claim objections may result in fewer claims being allowed and paid in Classes 1 through 3.

[4] The Administrative Claims as of the filing of this Disclosure Statement is estimated to be $1,150,000.  Additional Professional Fees will be incurred prior to the Effective Date.  The amount of these fees will depend entirely on the number of contested matters that occur prior to confirmation and the activity in the two pending appeals filed by the

| Priority Tax Claims | Paid in full.<br>Unclassified; non-voting. | $0 |
|---|---|---|
| Secured Claims | Paid in full.<br>Class 1; Unimpaired;<br>No solicitation required. | $423,000 |
| Priority Unsecured Claims | Paid in full.<br>Class 2; Unimpaired;<br>No solicitation required. | $0 |
| General Unsecured Claims | A Distribution will be tendered.<br>Class 3; Impaired;<br>Solicitation required. | $1,200,000 |
| Equity Securities | A Distribution will likely be tendered.<br>Class 4; Impaired;<br>Solicitation required. | $752,000 - $552,000[5] |

A.    **Treatment of Administrative Claims.**

Administrative Claims are as defined in Section 1.1.1 of the Plan: any Claims for any cost or expense of administration of the Chapter 11 Case allowed under Sections 503(b) or 507(b) of the Bankruptcy Code and entitled to priority under Section 507(a)(1) of the Bankruptcy Code, including, but not limited to: (i) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate; (ii) all Taxes arising between the Petition Date and the Effective Date, including those Taxes for which returns are not yet due; and (iii) all Professional Fees[6] approved by the Bankruptcy Court pursuant to interim and final allowances. To the extent that a Claim is allowed pursuant to Sections 365(d)(3) and (d)(5) of the Bankruptcy Code, such Claim shall also be deemed an "Administrative Claim."

---

(continued)

debtors out of possession, under the direction of Mr. Stolz. It is also possible that other Professional Fees and/or Administrative Claims may be asserted before the Administrative Claims Bar Date, which, if approved, could materially increase the total amount of Allowed Administrative Claims.

[5] The Distribution to Class 4 will be dependent upon the amount of Administrative Claims ultimately allowed.

[6] "Professional Fees" means the Administrative Claims for compensation and reimbursement submitted pursuant to Sections 328, 330, 331, or 503(b) of the Bankruptcy Code of Persons: (i) employed pursuant to an order of the Bankruptcy Court under Section 327, 328, or 1102 of the Bankruptcy Code; or (ii) for whom compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Sections 363(b) or 503(b) of the Bankruptcy Code or by other Final Order. *See also* Plan Section 1.1.60.

Pursuant to Section 1123(a)(1), Allowed Administrative Claims are not designated as a Class. The Holders of such unclassified Claims shall be paid in full under the Plan consistent with the requirements of Section 1129(a)(9)(A) and are not entitled to vote on the Plan. The amount of Administrative Claims as of the filing of this Disclosure Statement is estimated to be $1,150,000. This is comprised of the following estimated fees and costs: (i) the YH Loan administrative claim of $166,834; (ii) the Trustee's counsel's fees for Garman Turner Gordon LLP, estimated at $660,000; (iii) the Trustee's FCC counsel for Jeffrey Timmons, estimated at $40,000; (iv) the Trustee's statutory fee under Section 326, estimated at $135,750; (v) the $100,000 administrative claim awarded to W. Lawrence Patrick, the Receiver, by order of the Bankruptcy Court [ECF No. 1070]; and (vi) the interim fee awarded to Harris Law Practice [ECF No. 195] of $34,726.66. If authorized by the Bankruptcy Court, it is also possible that certain of the foregoing Administrative Claims may be paid in advance of Plan confirmation.

Additionally, C&E Haas Development Company, LLC has filed a motion seeking allowance of an administrative claim in the amount of $37,194.42, plus fees incurred prosecuting the motion. The Trustee intends to oppose this motion. It is possible that other Professional Fees may be asserted by and awarded to Debtor's former professionals or that other Administrative Claims may be asserted and awarded, which could materially increase the number of Allowed Administrative Claims.

Under the Plan, each Allowed Administrative Claim shall be paid upon the latest of: (i) the Effective Date or as soon thereafter as is practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable, (iii) the fourteenth (14th) Business Day after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the Holder of such Claim and the Trustee or Reorganized Debtor, as applicable, and the Holder of the Administrative Claim shall agree upon. For the avoidance of doubt, trade accounts payable, accrued expenses, and other liabilities of the Debtor arising in the ordinary course of business after the Petition Date will continue to be paid in the ordinary course of business from Cash on hand and cash flow based on the terms of the agreement with each respective vendor.

All requests for payment of Administrative Claims against the Debtor and all final applications for allowance and disbursement of Professional Fees must be filed by the Administrative Claims Bar Date, or the Holders thereof shall be forever barred from asserting such Administrative Claims against the Debtor and the Reorganized Debtor.  The Administrative Claim Bar Date is defined as "[u]nless an alternate date is set by Final Order of the Bankruptcy Court, the end of the first Business Day occurring on or after the fifteenth Business Date after the [Plan's] Effective Date."  All Professional Fees applications must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order, and all other orders governing payment of Professional Fees.  Unless otherwise ordered by the Bankruptcy Court, from and after the Effective Date no estate professional shall be required to file fee applications with the Bankruptcy Court, and the Reorganized Debtor may pay all professionals in the ordinary course for fees and expenses incurred after the Effective Date.

**B.    <u>Treatment of Priority Tax Claims.</u>**

As set forth more specifically in Section 1.1.58 of the Plan, Priority Tax Claims include any Claim against the Debtor entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code, which includes certain tax obligations.  Each Holder of an Allowed Priority Tax Claim, if any, will be paid in full in Cash by the Debtor or the Reorganized Debtor, as applicable, on the later of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (iii) the fourteenth (14th) Business Day after such Priority Tax Claim is allowed, or as soon thereafter as practicable; or (iv) such other date as is agreed to by the Holder of such Claim and the Reorganized Debtor.  Until the Allowed Priority Tax Claim is paid in full, the unpaid balance shall accrue statutory interest from the Effective Date fixed at the applicable federal or state statutory rate in effect with respect to such Priority Tax Claim on the Petition Date.

As of the filing of this Disclosure Statement, the Trustee is not aware of any Priority Tax Claims.

. . .

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

**C.    Class 1 – Secured Claims.**

Class 1 consists of the Secured Claims, which include the Claim of YH Advisor Group, Inc. for its post-petition loan (the YH Loan) to the estate, which loan repayment totals $166,834.00, and the Claim of Bellaire Tower Homeowners Association, which Proof of Claim is in the amount of $422,464.82 as of the filing of this Disclosure Statement.   As discussed above, the YH Loan is expected to be paid as an Administrative Claim.

The Allowed Claims in Class 1 of the Plan shall be treated as follows:

Each Allowed Secured Claim shall, in full and final satisfaction of such Claim, be paid in full in Cash by the Debtor or Reorganized Debtor, as applicable, upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the fourteenth (14th) day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the Trustee, and after the Effective Date, by the Reorganized Debtor.

Each Holder of a Secured Claim shall be considered to be its own separate subclass within Class 1, and each subclass shall be deemed to be a separate class for purposes of the Plan. The Trustee may add each additional Holder of a Secured Claim as an additional separate subclass.

Creditors in Class 1 are Unimpaired under the Plan, deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and are not entitled to vote on the Plan.

**D.    Class 2 – Priority Unsecured Claims.**

Class 2 is comprised of the Allowed Priority Unsecured Claims, which are defined in, *inter alia*, Section 1.1.59 of the Plan, and include Allowed Claims accorded priority in right to payment under Section 507(a) of the Bankruptcy Code.   The Allowed Claims in Class 2, if any, shall be treated as follows:

Each Allowed Priority Unsecured Claim, shall, in full and final satisfaction of such Claim, be paid in full in Cash by the Debtor or Reorganized Debtor, as applicable, upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the fourteenth (14th) day after such

Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the Trustee, and after the Effective Date, by the Reorganized Debtor.

Creditors in Class 2 are Unimpaired under the Plan, deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and are not entitled to vote on the Plan. However, as the filing of this Disclosure Statement, the Trustee is not aware of any Priority Unsecured Claims or Allowed Priority Unsecured Claims.

As of the filing of this Disclosure Statement, the Trustee is not aware of any Priority Unsecured Claims.

**E.**    **Class 3 – General Unsecured Claims.**

Class 3 is comprised of the Allowed General Unsecured Claims. As of the filing of this Disclosure Statement, the following creditors have asserted Class 3 General Unsecured Claims against Debtor: (i) C&E Haas Development Company ($219,999.52, set by Final Order at ECF No. 740); (ii) W. Lawrence Patrick ($666,020.60, set by Final Order at ECF No. 1070); (iii) Mincin Law PLLC ($37,644.73, proof of claim no. 1); and (iv) VCY America, Inc. ($255,467.99, proof of claim no. 4).

The Allowed General Unsecured Claims in Class 3 are expected to be paid in full, with payments made on the schedule set forth below. The payment schedule is necessary as the Trustee will not be aware of the full amount of asserted administrative claims until fifteen (15) days after the Effective Date, which is the Administrative Claim Bar Date. Depending on the amount of administrative claims asserted and the extent of the Disputed Claim Reserve, the Trustee may be in a position to cause the full repayment of Allowed Class 3 Claims as quickly as 30 to 45 days after the Effective Date.

Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of a General Unsecured Claim shall, in full and final satisfaction of such Allowed General Unsecured Claim, be paid as follows:

(i)    The Debtor shall pay Holders of Allowed General Unsecured Claims as of the Effective Date fifty percent (50%) of the unpaid balance of their Allowed Claims on the Effective Date or as soon thereafter as practicable.

(ii)    On the fifteenth (15th) Business Day after the Disputed Claim Reserve[7] is funded, the Reorganized Debtor shall pay each Holder of an Allowed General Unsecured Claim on such date the lesser of: (i) their Pro Rata share of the Remaining Cash on such date; and (ii) the outstanding, unpaid balance of their Allowed General Unsecured Claim.

(iii)    Within fifteen (15) days after all Disputed Claims having been resolved, the Reorganized Debtor shall pay each Holder of an Allowed General Unsecured Claim the lesser of: (i) their Pro Rata share of the Remaining Cash and the Disputed Claim Reserve; and (ii) the outstanding, unpaid balance of their Allowed General Unsecured Claim.

(iv)    Prior to any Distribution being made on account of Class 4 Equity Securities, all Allowed Class 3 General Unsecured Claims shall have been paid in full with interest as provided in the Plan.

Class 3 is Impaired under the Plan.  The Holders of the Class 3 Allowed General Unsecured Claims are entitled to vote on the Plan.

**F.    <u>Class 4 – Equity Securities.</u>**

Class 4 is comprised of the Allowed Equity Securities in the Debtor as of the Record Date.  The Trustee understands that the Class 4 Equity Securities are held by Royce International Broadcasting Corp.  The Allowed Equity Securities in Class 4 shall be treated as follows:

On the Effective Date, all Allowed Equity Securities shall be deemed cancelled and extinguished without further act or action under any applicable agreement, law, regulation, order, or rule.  On the Final Distribution Date, the Reorganized Debtor shall tender Pro Rata the Final Distribution to each Holder of Allowed Equity Securities as of the Record Date unless otherwise legally obligated to pay some other Person (*i.e.*, in compliance with a charging order, garnishment, writ of execution, etc.).

Class 4 is Impaired under the Plan.  The Holders of the Class 4 Allowed Equity Securities are entitled to vote on the Plan.

. . .

---

[7] After the Effective Date, the Reorganized Debtor shall establish the Disputed Claim Reserve, which is a separate account with cash or other assets equal to the aggregate amount of the Disputed Claims.

# V.
## SUMMARY OF VOTING PROCESS

### A.    Who May Vote to Accept or Reject the Plan.

Generally, holders of allowed claims or equity interests that are "Impaired" under a plan are permitted to vote on the plan. A claim is defined by the Bankruptcy Code and the Plan to include a right to payment from a debtor. An equity security represents an ownership stake in a debtor, such as a share. In order to vote, a creditor must first have an allowed claim.

The solicitation of votes on the Plan will be sought only from those Holders of Allowed Claims whose Claims are Impaired and which will receive property or rights under the Plan. As explained more fully below, to be entitled to vote, a Claim must be both "Allowed" and "Impaired."

### B.    Summary of Voting Requirements.

In order for the Plan to be confirmed, the Plan must be accepted by at least one non-insider, Impaired Class of Claims; this excludes the votes of insiders. A class of claims is deemed to have accepted a plan when allowed votes representing at least two-thirds (2/3) in amount and a majority in number of the claims of the class actually voting cast votes in favor of a plan. A class of equity securities has accepted a plan when votes representing at least two-thirds (2/3) in amount of the outstanding equity securities of the class actually voting cast votes in favor of a plan.

The Trustee is soliciting votes from Holders of Allowed Claims in the following Classes:

| Class | Description |
|-------|-------------|
| Class 3 | General Unsecured Claims |
| Class 4 | Equity Securities |

A VOTE FOR ACCEPTANCE OF THE PLAN BY THOSE HOLDERS OF CLAIMS AND EQUITY SECURITIES WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT. THE TRUSTEE BELIEVES THAT THE TREATMENT OF CREDITORS UNDER THE PLAN IS THE BEST ALTERNATIVE FOR CREDITORS

**AND EQUITY SECURITIES, AND THUS THE TRUSTEE RECOMMENDS THAT THE HOLDERS OF ALLOWED CLAIMS AND EQUITY SECURITIES WHO ARE ENTITLED TO VOTE ON THE PLAN DO VOTE IN FAVOR OF THE PLAN.**

**VI.**
**INFORMATION ABOUT DEBTOR'S BUSINESS AND THE CHAPTER 11 CASE**

**A.    Overview of the Debtor's Assets and Historical Operations.**

Historically, the Debtor has operated radio station KREV (FCC Facility ID # 36029), at times known as KREV(FM) 92.7 Alameda, California.  Although the Trustee's investigation reveals that historically the Debtor also leased radio studio premises in or near the San Francisco Bay Area, at the time the Trustee was appointed, the Debtor no longer leased radio studio space. Additionally, the Trustee's investigation revealed that certain radio station memorabilia, records, furniture, and other miscellaneous personal property was stored in warehouse property located nearby in the Sacramento, California area, the rent for which at times was paid by the Debtor, who also insured the premises contents.

The Debtor's primary assets are the broadcast license for radio station KREV (FCC Facility ID # 36029) and all right, title, and interest in and to all assets, properties, interests and rights, real and personal, tangible and intangible, that are used or held for use in the operation of the Station, including (i) permits, licenses, and other authorizations and any renewals or modifications thereof issued by the Federal Communications Commission ("FCC"); (ii) all equipment, transmitters, antennae, cables, and other tangible personal property of any kind used or held for use in the transmission system of the Station; (iii) all files, documents, records, books of account relating to the Station operation including any public inspection files, blueprints, engineering data, logs, and technical information; (iv) all claims including warranty claims, deposits, prepaid expenses, and goodwill in the going concern value of the Station; and (v) all rights in and to Station call letters, trademarks, trade names, service marks, copyrights, domain names, computer software, programs and programming material, jingles, slogans, logos, Facebook, Twitter, and other social media accounts, and other intangible property that is used or held for use in the operation of the Station.

On June 22, 2023, the Trustee filed a motion to approve Bid Procedures related to a Sale of the Station Assets, schedule an Auction, and set a hearing for the Sale of the Station Assets, and other relief. The Bankruptcy Court granted this motion, ultimately conducted an Auction on October 26, 2023, and thereafter conducted a Sale hearing on November 14, 2023, at which the Bankruptcy Court approved of the Sale of the Debtor's Station Assets to Prevailing Bidder Friends of KEXP ("Buyer") for the amount of 3.75 million. Since entry of the Bankruptcy Court's order approving this Sale, the Trustee has been working diligently with the Buyer toward a successful closing of the Sale, which closing occurred on February 1, 2024. The successful closing of the Sale resulted in the Estate generating the funds to effectuate the Plan and satisfy Allowed Claims and Equity Securities in accordance with the Plan.

**B.    The Receivership.**

In July of 2020, more than one year before the Chapter 11 Case commenced, the United States District Court for the Central District of California ("California District Court") appointed W. Lawrence Patrick as receiver (the "Receiver") over certain radio station assets including the Debtor's KREV-FM Station, to aid post-judgment execution and collection efforts in a copyright infringement case filed with the California District Court back in 2016 ("Copyright Case"). Relevant to the Debtor and this Chapter 11 Case, the Receiver was authorized to take charge of, and manage (among others) Debtor's Station, business, and affairs; to receive rents and collect accounts receivable, take all steps necessary to operate and manage the Station; take possession of the Station; and do all other acts necessary and proper to operate and manage the Station. The Receiver was challenged multiple times by the Debtor's then-principal, but never successfully. Ultimately the Receiver entered into a time brokerage arrangement with VCY America, Inc. ("VCY") to broadcast and operate the Debtor's Station while a sale of the Station to VCY closed. However, the Receiver was not able to consummate the contemplated sale of the Station to VCY and, ultimately, after incurring significant costs and attorney fees in heavy litigation with the Debtor's then-principal (who was also a defendant himself in the Copyright Case and vigorously contested the Receiver, causing the receivership to incur further attorney fees and costs), both VCY and the Receiver became creditors of this Chapter 11 Case. Although the

Receiver and the Debtor's former principal Mr. Stolz (who was ultimately removed by this Court for cause, necessitating the appointment of the Trustee) seriously contest the specifics of what transpired during the pre-bankruptcy period under which the Receiver operated the Debtor's Station, it cannot be reasonably disputed that the Receiver's operation and management of the Debtor's Station was an important step in ensuring that a broadcasting radio station could ultimately be operated, managed, and sold by the Trustee.

The Receiver holds a $100,000 Administrative Claim and a $660,020.60 General Unsecured Claim against the Debtor. The Receiver has also obtained orders awarding the Receiver and his counsel a total of $2,126,258.95 in fees and expense reimbursement from Royce International Broadcasting Corp. and Mr. Stolz. Further, on January 31, 2024, the California District Court entered an Order awarding the Receiver and his counsel an additional $593,422.71 in fees and expense reimbursement from Royce International Broadcasting Corp. Accordingly, the Receiver is also a creditor of Royce International Broadcasting, Corp., who solely owns the Debtor.

**C.** **The Commencement of the Case and Proceedings in the Chapter 11 Case Prior to the Trustee's Appointment.**

During the more than sixteen months preceding the Trustee's appointment in the Chapter 11 Case, the Debtor (then under the control of Mr. Stolz): (i) litigated extensively the turnover of the Debtor's assets and records from the Receiver; (ii) employed counsel Harris Law Practice as its general bankruptcy counsel; (iii) obtained extension of the period within which Debtor could exclusively file a plan of reorganization and filed multiple plans but did not succeed in confirming any; (iv) employed station broker Robert Mahlman for a designated period of time to market and sell the Debtor's Station (though Mr. Mahlman ultimately failed to sell the Station, and his brokerage agreement expired months before the Trustee's appointment); (v) employed FCC counsel; (vi) filed objections to the Debtor's largest two general unsecured creditors but did not obtain orders from the Bankruptcy Court adjudicating those objections; (vii) successfully defended the Receiver's motion seeking to convert the Chapter 11 Case; and (viii) litigated the Debtor's extensive payments dispute with the operator of the tower site at 1 Bayview Park Road

in San Francisco ("Bayview Site") from which the Debtor's Station was broadcasting, including prosecuting (unsuccessfully) a motion to assume the license agreement for use of the Bayview Site and initiating an objection to the Bayview Site owner's proof of claim.

**D.    The Trustee's Appointment and Subsequent Proceedings in the Chapter 11 Case.**

The Trustee was appointed on March 10, 2023.  Since the time of his appointment, the Trustee has taken a number of steps to move the Chapter 11 Case forward and generate a meaningful recovery for creditors.  Aside from the Sale discussed above, these steps included, without limitation: (i) investigating the Debtor's operations and financial affairs; (ii) investigating the Debtor's prior management and commencing an adversary proceeding seeking the turnover and recovery of, *inter alia*, transfers of money that prior management facilitated, authorized, and/or directed toward itself or for its benefit; (iii) employed FCC counsel to advise and assist the Trustee with license matters crucial to maintaining the Debtor's Station KREV (FCC Facility ID # 36029) and ensuring the successful Sale of the Station; (iv) entered into and obtain Court approval for a programming agreement with AutopilotFM, LLC to broadcast on the Debtor's Station; (iv) oversaw and maintained responsibility for radio broadcasting to ensure KREV stayed on air, preserved the value of this asset for the benefit of Debtor's creditors; (v) obtained Bankruptcy Court approval of a significant settlement with the operator of the Debtor's former tower site located at 1 Bayview Park Road in San Francisco (the Bayview Site) that resolved an eight-year payments dispute the Debtor had had with this operator ("C&E") by, *inter alia*, fixing the amount of C&E's proof of claim and fixing the calculations applicable to C&E's administrative claim; (vi) resolved a pending appeal in the Court of Appeal of the State of California that had been initiated by the Debtor's prior management against secured creditor Bellaire Tower Homeowners Association; (vii) successfully defeated efforts by the Debtor's prior management to wrest control of the Debtor's case away from the Trustee and otherwise disrupt the Sale process; (viii) defended an appeal initiated by Mr. Stolz regarding the scope of the automatic stay in the Chapter 11 Case; (ix) prosecuted and protected the Debtor's interests in Mr. Stolz's personal bankruptcy filed in another judicial district (and now being transferred to the District of Nevada); (x) obtained Bankruptcy Court approval for the Debtor to move to new,

more economical tower site premises located at Mount Sutro in the City and County of San Francisco, after the Bayview Site agreement terminated; (xi) defended the Debtor in multiple appeals including two appeals filed by the Debtor's prior management concerning the Sale process and Sale Order; (xii) successfully opposed a motion seeking to remove the Trustee; and (xiii) reached a consensual agreement with the Debtor's other largest creditor, the Receiver, regarding the allowance and amount of the Receiver's general unsecured and administrative claims in the Chapter 11 Case.

## VII.
## DESCRIPTION OF THE NON-PAYMENT TERMS OF THE PLAN

**A.**    **Means of Implementation of the Plan.**

As a condition to the occurrence of the Effective Date, the Sale to Friends of KEXP shall have closed, with sale proceeds of $3.75 million being paid to the Debtor.   The Plan contemplates reorganizing Debtor to allow for the Trustee to resolve any claim objections and to make the Distributions under the Plan.   Upon all Distributions being made, the Reorganized Debtor will be wound down and dissolved.

Specifically, and as set forth in the Plan, on the Effective Date, except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, the following events shall occur:

- Vesting of Assets in Reorganized Debtor.  As set forth more fully in Section 9.1 of the Plan, on the Effective Date, the Assets shall be vested in the Reorganized Debtor free and clear of all Liens, Claims, and Equity Securities, except as otherwise expressly provided in the Plan.

- Preservation of Assets and Cash.  On the Effective Date, all Assets, including Cash, shall be vested in and held and preserved by the Reorganized Debtor, to be distributed in accordance with the Plan.

- Management of the Reorganized Debtor.   Michael W. Carmel shall be the Reorganized Debtor's sole manager and shall operate the Reorganized Debtor in accordance with the Nevada Revised Statutes and the provisions of the Plan.   Mr.

Carmel's compensation shall be based on the Distributions made by the Reorganized Debtor and paid consistent with Section 326 of the Bankruptcy Code, which percentages shall take into account the prior Distributions made as the Trustee for the Debtor.

- Notice of Effectiveness.  When the steps contemplated by Section 8 of the Plan have been completed, the Trustee shall file with the Bankruptcy Court and serve upon all Creditors and potential Holders of Administrative Claims reasonably known to the Trustee (whether or not disputed), a Notice of Effective Date of Plan, which shall include a notice of the Administrative Claim Bar Date.

- The Trustee shall cause the Debtor to make the Distributions required to be made on the Effective Date.  The Reorganized Debtor shall be responsible for making all Distributions occurring after the Effective Date.  The Reorganized Debtor may, in its sole discretion, make such Distributions before the allowance of each Claim has been resolved if the Reorganized Debtor has a good faith belief that it has sufficient remaining Assets available to tender the required Distributions under the Plan should the Disputed Claims be Allowed by entry of a Final Order of the Bankruptcy Court.

- Reserve.  The Reorganized Debtor shall establish and maintain the Disputed Claim Reserve, which funds shall be used to pay any Disputed Claims that are subsequently allowed.

- Final Decree.  On or before the fifteenth (15th) Business Day after all of the Distributions required by Sections 2 and 4 of the Plan have been tendered, the Reorganized Debtor shall file a motion to close the Chapter 11 Case.  Prior to the hearing on the motion seeking to close the Chapter 11 Case, the Final Report shall be filed.

- No Corporate Action Required.  As of the Effective Date: (i) the adoption, execution, delivery, and implementation or assignment of all contracts, leases, instruments, releases, and other agreements related to or contemplated by the

Plan; and (ii) the other matters provided for under or in furtherance of the Plan involving corporate action to be taken by or required of Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by the members or officers of Debtor or the Trustee.

- Articles of Organization, By-laws, Operating Agreement.    The articles of organization and any other corporate governance documents of the Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, a provision prohibiting the issuance of non-voting equity securities to the extent required by Section 1123(a)(6) of the Bankruptcy Code.

- No Governance Action Required. As of the Effective Date: (i) the adoption, execution, delivery, and implementation or assignment of all contracts, leases, instruments, releases, and other agreements related to or contemplated by the Plan; and (ii) the other matters provided for under or in furtherance of the Plan involving corporate action to be taken by or required of the Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by the members or managers of the Debtor.

- Filing with Nevada Secretary of State.  To the extent required by Nevada Revised Statutes, on or as soon as reasonably practical after the Effective Date, a certified copy of the Plan and the Confirmation Order shall be filed with the Nevada Secretary of State.  From the Confirmation Date until the Effective Date, the Trustee is authorized and directed to take any action or carry out any proceeding necessary to effectuate the Plan pursuant to applicable Nevada provisions.

- Debtor.  Debtor shall be dissolved pursuant to NRS 78.622 without action on the part of the directors, officers, Equity Security Holder, or the Trustee, effective on

the first (1st) day after the Effective Date.

- Reorganized Debtor. After the Final Distribution and consummation of the Plan, the Reorganized Debtor shall be dissolved in accordance with the Nevada Revised Statutes.

**B.      Executory Contracts and Leases.**

   **1.      Executory Contracts.**

Except for Executory Contracts and Unexpired Leases assumed pursuant to prior order of the Bankruptcy Court or set forth on the schedule of Assumed Executory Contracts and Unexpired Leases attached as Schedule 6.1 to the Plan (which may be supplemented and amended up to the date the Bankruptcy Court enters the Confirmation Order), all Executory Contracts and Unexpired Leases that exist on the Confirmation Date shall be deemed rejected by Debtor on the Effective Date

   **2.      Approval of Assumption or Rejection.**

Entry of the Confirmation Order shall constitute as of the Effective Date: (i) approval, pursuant to Bankruptcy Code Section 365, of the rejection by the Reorganized Debtor of each Executory Contract and Unexpired Lease to which the Debtor is a party that is not listed on Schedule 6.1, not otherwise provided for in the Plan, and neither assigned, assumed and assigned, nor rejected by separate order of the Bankruptcy Court prior to the Effective Date; and (ii) rejection by the Debtor of each Executory Contract and Unexpired Lease to which the Debtor is a party that is not listed on Plan Schedule 6.1. Upon the Effective Date, each counterparty to an assumed Executory Contract or Unexpired Lease listed shall be deemed to have consented to an assumption contemplated by Section 365(c)(1)(B) of the Bankruptcy Code, to the extent such consent is necessary for such assumption. To the extent applicable, all Executory Contracts or Unexpired Leases of the Reorganized Debtor assumed pursuant to Article 6 of the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," regardless of how such term may be defined in the relevant Executory Contract or Unexpired Lease and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by confirmation of the Plan.

3. **Cure of Defaults.**

The Reorganized Debtor shall Cure any defaults respecting each Executory Contract or Unexpired Lease assumed pursuant to Section 6.1 of the Plan upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court or agreed upon by the Debtor, and after the Effective Date, the Reorganized Debtor; or (iii) the fourteenth (14th) Business Day after the entry of a Final Order resolving any dispute regarding: (a) a Cure amount; (b) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease assumed pursuant to the Plan in accordance with Section 365(b)(1) of the Bankruptcy Code; or (c) any matter pertaining to assumption, assignment, or the Cure of a particular Executory Contract or an Unexpired Lease.

4. **Objection to Cure Amounts.**

Any party to an Executory Contract or Unexpired Lease who objects to the Cure amount determined by the Debtor to be due and owing must file and serve an objection on the Trustee's counsel no later than thirty (30) days after the Effective Date. Failure to file and serve a timely objection shall be deemed consent to the Cure amounts paid by the Reorganized Debtor in accordance with Section 6.3 of the Plan. If there is a dispute regarding: (i) the amount of any Cure payment; (ii) the ability of Reorganized Debtor to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease to be assumed or assigned; or (iii) any other matter pertaining to assumption, the Cure payments required by Section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

5. **Confirmation Order.**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions described in Article 6 of the Plan pursuant to Sections 1123 and 365 of the Bankruptcy Code as of the Effective Date. Notwithstanding the forgoing, if, as of the date the Bankruptcy Court enters the Confirmation Order, there is pending before the Bankruptcy Court a dispute concerning the Cure amount or adequate assurance for any particular Executory Contract

or Unexpired Lease, the assumption of such Executory Contract or Unexpired Lease shall be effective as of the date the Bankruptcy Court enters an order resolving any such dispute and authorizing assumption by the Debtor.

**6.      Rejection Damages Claim Bar Date.**

All proofs of claim with respect to Claims arising from the rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be filed no later than the end of the first Business Day occurring on or after the thirtieth (30th) calendar day after the Effective Date.  Any Claim not filed within such time shall be forever barred.

**C.      Conditions to Confirmation and Effectiveness of the Plan.**

- Confirmation of the Plan is conditional upon the Confirmation Order being entered in form and substance reasonably acceptable to the Trustee.    The following are the conditions precedent to the occurrence of the Effective Date of the Plan:

- The Confirmation Order shall be a Final Order, except that the Trustee reserves the right to cause the Effective Date to occur notwithstanding the pendency of an appeal of the Confirmation Order;

- The sale of certain of Debtor's radio station assets authorized by the Order: (I) Authorizing the Sale of Debtors' Station Assets Outside of the Ordinary Course of Business Free and Clear of All Liens, Claims, Encumbrances, and Interests; (II) Authorizing the Assumption, Sale, and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief [ECF No. 925] shall have closed;

- All documents necessary to implement the transactions contemplated by the Plan shall be in form and substance reasonably acceptable to the Trustee; and

- Sufficient Cash and other Assets are set aside, reserved, and withheld to make the Distributions required by the Bankruptcy Code and the Plan.

**D.      Title to Property.**

Subject to the provisions of the Plan and as permitted by Section 1123(a)(5)(B) of the

Bankruptcy Code, the Assets, and all right, title, and interest being assumed by the Reorganized Debtor in the assumed Executory Contracts, shall be transferred to the Reorganized Debtor on the Effective Date. As of the Effective Date, all such property shall be free and clear of all Liens, Claims, and Equity Securities except as otherwise provided herein. On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property and compromise or settle any Claim, without the supervision of or approval of the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

Accordingly, in accordance with Section 1123(b)(3) of the Bankruptcy Code, and except as otherwise expressly provided herein, all Avoidance Actions and Litigation Claims shall be assigned and transferred to the Reorganized Debtor. The Reorganized Debtor, as the successor in interest to the Debtor and the Estate with respect to the Avoidance Actions and Litigation Claims, may and shall have the exclusive right to sue on, settle, or compromise any and all Avoidance Actions and Litigation Claims. Closely review Schedule 1.1.50 to the Plan for a list of the preserved Causes of Action.

**E.    Discharge, Injunction, and Exculpation.**

It is important that all parties-in-interest closely review the Plan's discharge injunction and exculpation provisions. Accordingly, they are set forth below verbatim.

- **Discharge. On the Effective Date, except as otherwise provided in the Plan, the Debtor shall be discharged from any and all unclassified Claims, Claims in Classes 1, 2, and 3, and all Equity Securities to the fullest extent provided in Sections 524 and 1141 of the Bankruptcy Code. The Discharge shall be to the fullest extent provided under Section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, and, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any kind or**

nature whatsoever against the Debtor or any of its assets or properties, and regardless whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims.    Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date as to unclassified Claims, Claims in Classes 1, 2, and 3, and all Equity Securities, the Debtor shall be deemed discharged and released under and to the fullest extent provided under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code.    Nothing in the Plan or Confirmation Order shall operate to expand the Debtor's discharge as provided for in Section 9.3 of the Plan beyond those allowed by the Bankruptcy Code. Nothing in the Plan or Confirmation Order shall discharge any Claims of the United States arising after the Effective Date.

- **Compromise and Settlement.**  The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (i) in the best interests of the Debtor, its Estate, and all Holders of Claims and Equity Securities, (ii) fair, equitable and reasonable, (iii) made in good faith, and (iv) approved by the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.

- **Injunction.**  From and after the Effective Date, and except as provided in the Plan and the Confirmation Order, all entities that have held, currently hold, or may hold a Claim or an Equity Security or other right of an Equity Security Holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of any such Claims or terminated Equity Securities or rights: (i) commencing or continuing in any manner any action or other proceeding against the

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

Reorganized Debtor or its property; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Reorganized Debtor or its property; (iii) creating, perfecting, or enforcing any Lien or encumbrance against the Reorganized Debtor or its property; (iv) asserting a right of subrogation of any kind against any debt, liability, or obligation due to Reorganized Debtor or its property; and (v) commencing or continuing any action, in any manner or any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.

- **Exculpation.** From and after the Effective Date, neither Debtor, the Trustee, the Reorganized Debtor, the professionals nor any of their respective present or former members, directors, officers, managers, employees, advisors, attorneys, or agents, shall have or incur any liability to any holder of a Claim or Equity Security or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (from the Petition Date forward) the Chapter 11 Case, the pursuit of confirmation of the Plan, or the consummation of the Plan, except for gross negligence and willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Chapter 11 Case. Under no condition shall this exculpation apply with respect to any of the preserved Causes of Action included on Schedule 1.1.50 to the Plan.

## VIII.
## RISK FACTORS

Because the Plan provides for the orderly liquidation of Debtor, common risk factors found in typical reorganizations are not deemed to be material or otherwise applicable with respect to the Plan. Debtor is not being reorganized as a going concern. As such, there are no

financing or regulatory contingencies. However, in addition to matters addressed elsewhere in this Disclosure Statement, the Plan involves certain risks which should be taken into consideration.

Even if the requisite acceptances are received, the Plan may not be confirmed by the Bankruptcy Court. Confirmation of the Plan requires, among other things, a finding by the Bankruptcy Court that it is not likely that there will be a need for further financial reorganization and the value of distributions to dissenting members of Impaired Classes of Creditors not be less than the value of distributions such Creditors would receive if Debtor were liquidated under Chapter 7 of the Bankruptcy Code. Although the Trustee believes that the Plan will not be followed by a need for further financial reorganization and that dissenting members of Impaired Classes of Creditors and Equity Securities will receive distributions at least as great as would be received in a liquidation under Chapter 7 of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will conclude that these tests have been met.

Furthermore, notwithstanding the Trustee's best efforts to provide reasonable estimates of the expected return to Creditors, the actual returns may vary from the estimates provided in this Disclosure Statement.

**IX.**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES**

**The following summary does not constitute either a tax opinion or tax advice to any person. No representations regarding the effect of implementation of the Plan on individual Creditors are made herein or otherwise. Rather, the tax disclosure is provided for informational purposes only. All Creditors are urged to consult their respective tax advisor regarding the tax consequences of the Plan.**

Debtor, Debtor's member, Creditors, and any Person affiliated with the foregoing are strongly urged to consult their respective tax advisor regarding the federal, state, local, and foreign tax consequences which may result from the confirmation and consummation of the Plan. This Disclosure Statement shall not in any way be construed as making any representations regarding the particular tax consequences of the confirmation and consummation of the Plan to

any Person.  This Disclosure Statement is general in nature and is merely a summary discussion of potential tax consequences and is based upon the Internal Revenue Code of 1986, as amended (the "IRC") and pertinent regulations, rulings, court decisions, and Treasury decisions, all of which are potentially subject to material and/or retroactive changes.

Under the IRC, there may be federal income tax consequences to Debtor, its member(s), its Creditors, and/or any Person affiliated therewith as a result of confirmation and consummation of the Plan.

As previously stated, Debtor is a Nevada limited liability company, whose sole member is Royce International Broadcasting Corp.  Provided that Debtor has not elected to be taxed as a corporation, any gains or losses as a result of the liquidation of the Debtor's assets, and the subsequent dissolution will be passed through to its member, to be reported on its federal income tax return.

Upon the confirmation and consummation of the Plan, the Holders of Allowed Secured Claims, the Holders of Priority Unsecured Claims, the Holders of General Unsecured Claims, and to the extent applicable the Holders of Equity Securities will receive either a full payment of their respective Claims or a partial payment of their respective Claims, as set forth in the Plan Articles 2 and 4.  The federal income tax consequences to Creditors and their affiliates arising from the Plan will vary depending upon, among other things, the type of consideration received by the Creditor in exchange for its Claim, whether the Creditor reports income using the cash or accrual method of accounting, whether the Creditor has taken a "bad debt" deduction with respect to its Claim, whether the Creditor received consideration in more than one tax year, and whether the Creditor is a resident of the United States.  If a Creditor's Claim is characterized as a loss resulting from a debt, then the extent of the deduction will depend on whether the debt is deemed wholly worthless or partially worthless, and whether the debt is construed to be a business or nonbusiness debt as determined under IRC § 166.

Creditors and Equity Securities Holders should consult their tax advisor regarding the tax treatment (including federal, state, local, and foreign tax consequences) of their respective allowed Claims.  This disclosure is not a substitute for tax planning and specific advice for

Persons affected by the Plan.

Upon the confirmation and consummation of the Plan, it is anticipated that all claims will be paid in full. However, if not all claims are paid, the remainder being discharged. When a lender discharge all or part of a borrower's debt, the discharged amount generally must be included in the borrower's gross income for federal income tax purposes (IRC § 61(a)(12)). However, an exception provides that debt discharge that occurs while a borrower is in a Title 11 bankruptcy proceeding is excluded from gross income (IRC § 108(a)(1)(A) and (d)(2)). Another exception provides that debt discharge that occurs while the borrower is insolvent is excluded from gross income to the extent of the borrower's insolvency immediately before the discharge (IRC § 108(a)(1)(B) and (d)(3)).

A bankrupt or insolvent taxpayer can exclude partnership debt discharge income from gross income. In the case of partnerships and partners, bankruptcy or insolvency is determined at the partner level. To the extent that a partner is insolvent after a discharge of indebtedness, the discharge is entirely excluded from gross income (IRC § 108(a)(1)(B) and (a)(3)). However, a taxpayer's tax attributes must be reduced (but not below zero) if debt discharge income is excluded from the taxpayer's gross income. Tax attributes include net operating losses, general business credits, minimum tax credits, capital loss carryovers, basis in property, passive activity losses and credits, and foreign credits.

Whether or not the debt discharge income can be excluded from gross income will be determined based on the solvency of the holders of Debtor's membership interest immediately before the discharge. The partners should consult their tax advisors regarding the treatment (including federal, state, local, and foreign tax consequences) of their respective income/expense activity reported to them on Form K-1 from the partnership. This disclosure is not a substitute for tax planning and specific advice for partners affected by the Plan.

. . .

. . .

. . .

. . .

X.
CONFIRMATION OF THE PLAN

A.      Confirmation of the Plan.

Pursuant to Section 1128(a), the Bankruptcy Court will hold hearings regarding confirmation of the Plan at the U.S. Bankruptcy Court, 300 Las Vegas Blvd. South, Las Vegas, Nevada, 89101, **on _____ __, 2024, at __:__ __.m. prevailing Pacific Time**.  To the extent necessary, the Bankruptcy Court will schedule additional hearing dates.

B.      Objections to Confirmation of the Plan.

Section 1128(b) provides that any party-in-interest may object to confirmation of a plan. Any objections to confirmation of the Plan must be in writing, must state with specificity the grounds for any such objections, and must be timely filed with the Bankruptcy Court and served upon counsel for the Trustee at the following address:

Garman Turner Gordon LLP
Attn:  Gregory E. Garman, Esq.
Attn: Talitha Gray Kozlowski, Esq.
Attn: Mary Langsner, Ph.D.
7251 Amigo Street, Suite 210
Las Vegas, NV  89119
(725) 777-3000 Telephone
Email:  ggarman@gtg.legal
Email:  tgray@gtg.legal
Email:  mlangsner@gtg.legal

For the Plan to be confirmed, the Plan must satisfy the requirements stated in Section 1129.  In this regard, the Plan must satisfy, among other things, the following requirements.

1.      Best interest of Creditors and liquidation analysis.

Pursuant to Section 1129(a)(7), for the Plan to be confirmed it must provide that Creditors and Holders of Equity Securities will receive at least as much under the Plan as they would receive in a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code (the "Best Interest Test").  The Best Interest Test with respect to each impaired Class requires that each Holder of an Allowed Claim or Equity Security of such Class either: (i) accepts the Plan; or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if Debtor was liquidated under Chapter 7 of

the Bankruptcy Code.  The Bankruptcy Court will determine whether the value received under the Plan by the Holders of Allowed Claims in each Class of Creditors or Equity Securities equals or exceeds the value that would be allocated to such Holders in a liquidation under Chapter 7 of the Bankruptcy Code.  The Trustee believes that the Plan meets the Best Interest Test and provides value which is not less than that which would be recovered by each such holder in a Chapter 7 bankruptcy proceeding.

Generally, to determine what Holders of Allowed Claims and Equity Securities in each impaired Class would receive if the Debtor were liquidated, the Bankruptcy Court must determine what funds would be generated from the liquidation of the Debtor's Assets in the context of a Chapter 7 liquidation case, which for unsecured Creditors would consist of the proceeds resulting from the disposition of the Assets of the Debtor, including the unencumbered Cash held by the Debtor at the time of the commencement of the liquidation case.  Such Cash amounts would be reduced by the costs and expenses of the liquidation and by such additional Administrative Claims and Priority Unsecured Claims as may result from the use of Chapter 7 for the purpose of liquidation.

In a Chapter 7 liquidation, Holders of Allowed Claims would receive distributions based on the liquidation of the non-exempt assets of the Debtor.  Such assets would include the same assets being collected and liquidated under the Plan.  However, the net proceeds from the collection of property of the Estate available for distribution to Creditors would be reduced by any commission payable to the Chapter 7 trustee and the trustee's attorney's and accounting fees, as well as the administrative costs of the Chapter 11 estate (such as the compensation for Chapter 11 professionals).  The Trustee has already taken the steps to reduce the majority of Debtor's Assets to Cash, and the Estate has already absorbed much of the cost of realizing upon Debtor's Assets.  In a Chapter 7 case, the Chapter 7 trustee would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee to creditors, even though the Trustee has already taken the steps necessary to accommodate much of the funds and the Estate has already incurred many of the expenses associated with generating those funds.  Accordingly, there is a reasonable likelihood that Creditors would "pay again" for the funds accumulated by

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

the Trustee because the Chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed from the Estate and would incur the costs of retaining new professionals that would need to "get up to speed" to have the necessary knowledge base to complete the liquidation of Estate Assets and distributions to Holders of Allowed Claims and Equity Securities.

It is further anticipated that a Chapter 7 liquidation would result in significant delay in the payment to Holders of Allowed Claims. Among other things, a Chapter 7 case could trigger a new bar date for filing Claims that would be more than ninety (90) days following conversion of the Chapter 11 Case to Chapter 7. Hence, a Chapter 7 liquidation would not only delay distribution but also raises the prospect of additional claims that were not asserted in the Chapter 11 Case. Moreover, Claims that may arise in the Chapter 7 case or result from the Chapter 11 Case would be paid in full from the Assets before the balance of the Assets would be made available to pay pre-Chapter 11 Allowed Priority Unsecured Claims.

The distributions from the Assets would be paid pro rata according to the amount of the aggregate Allowed Claims. The Trustee believes that the most likely outcome under Chapter 7 would be the application of the "absolute priority rule." Under that rule, no junior creditor may receive any distribution until all senior creditors are paid in full, with interest, and no Equity Securities Holder may receive any distribution until all Allowed Claims are paid in full.

As set forth in the Liquidation Analysis[8] and accompanying notes annexed hereto as **Exhibit "2"** the Trustee has determined that confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired Class[9] with no less of a recovery than they would receive if the Debtor were liquidated under Chapter 7.

**2.      Feasibility.**

The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by liquidation or the need for

---

[8] The Liquidation Analysis sets forth Debtor's best estimates as to value and recoveries in the event that the Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code and Debtor's Assets are liquidated.

[9] The Impaired Classes are Class 3 (General Unsecured Claims) and Class 4 (Equity Securities).

further financial reorganization of Debtor (the "<u>Feasibility Test</u>").  For the Plan to meet the Feasibility Test, the Bankruptcy Court must find by a preponderance of the evidence that the Debtor will possess the resources and working capital necessary to meet its obligations under the Plan.

As the Plan contemplates the liquidation and/or distribution of all of the Debtor's Assets, the Chapter 11 Trustee is able to demonstrate that confirmation of the Plan is not likely to be followed by a subsequent bankruptcy filing or liquidation.

**3.    <u>Accepting impaired class.</u>**

Since various Classes of Claims are impaired under the Plan, for the Plan to be confirmed, the Plan must be accepted by at least one impaired Class of Claims (not including the votes of insiders of Debtor).

**4.    <u>Acceptance of Plan.</u>**

For an impaired Class of Claims to accept the Plan, those representing at least two-thirds (2/3) in amount and a majority in number of the Allowed Claims voted in that Class must be cast for acceptance of the Plan.

**5.    <u>Confirmation over a dissenting Class ("Cram Down").</u>**

If there is less than unanimous acceptance of the Plan by Impaired Classes of Claims, the Bankruptcy Court nevertheless may confirm the Plan at the Trustee's request.  Section 1129(b) provides that if all other requirements of Section 1129(a) are satisfied and if the Bankruptcy Court finds that (i) the Plan does not discriminate unfairly; and (ii) the Plan is fair and equitable with respect to the rejecting Class(es) of Claims or Equity Securities impaired under the Plan, the Bankruptcy Court may confirm the Plan despite the rejection of the Plan by a dissenting impaired Class of Claims or Equity Securities.

The Trustee will request confirmation of the Plan pursuant to Section 1129(b) with respect to any Impaired Class of Claims that does not vote to accept the Plan.  The Trustee believes that the Plan satisfies all of the statutory requirements for Confirmation, that the Trustee has complied with or will have complied with all the statutory requirements for Confirmation of the Plan, and that the Plan is proposed in good faith.  At the Confirmation Hearing, the

Bankruptcy Court will determine whether the Plan satisfies the statutory requirements for Confirmation.

**6.    Allowed Claims.**

You have an Allowed Claim if: (i) you or your representative timely file a Proof of Claim and no objection has been filed to your Claim within the time period set for the filing of such objections; (ii) you or your representative timely filed a Proof of Claim and an objection was filed to your Claim upon which the Bankruptcy Court has ruled and Allowed your Claim; (iii) your Claim is listed by Debtor in its Schedules or any amendments thereto (which are on file with the Bankruptcy Court as a public record) as liquidated in amount and undisputed and no objection has been filed to your Claim; or (iv) your Claim is listed by Debtor in its Schedules as liquidated in amount and undisputed and an objection was filed to your Claim upon which the Bankruptcy Court has ruled to Allow your Claim.

Under the Plan, the deadline for filing objections to Claims is fifteen days after the Effective Date.  If your Claim is not an Allowed Claim, it is a Disputed Claim, and you will not be entitled to vote on the Plan unless the Bankruptcy Court temporarily or provisionally allows your Claim for voting purposes pursuant to Bankruptcy Rule 3018.  If you are uncertain as to the status of your Claim or Equity Securities or if you have a dispute with Debtor, you should check the Bankruptcy Court record carefully, including the Schedules of Debtor, and you should seek appropriate legal advice.  The Trustee and his professionals cannot advise you about such matters.

**7.    Impaired Claims and Equity Securities.**

Impaired Claims and Equity Securities include those whose legal, equitable, or contractual rights are altered by the Plan, even if the alteration is beneficial to the Holder of the Claim or Equity Securities, or if the full amount of the Allowed Claims will not be paid under the Plan.  Holders of Claims which are not impaired under the Plan are deemed to have accepted the Plan pursuant to Section 1126(f), and Debtor need not solicit the acceptances of the Plan of

such Unimpaired Claims.  As such, only Holders of Claims in Impaired Classes 3 and 4 under the Plan are entitled to vote.

**8.**    **Voting procedures.**

**a.**    **Submission of ballots**.

All Creditors entitled to vote will be sent a Ballot, together with instructions for voting, a copy of this approved Disclosure Statement, and a copy of the Plan.  You should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that was sent with this Disclosure Statement.  You should complete your Ballot and return it as follows:

> Garman Turner Gordon LLP
> Attn: Talitha Gray Kozlowski, Esq.
> 7251 Amigo Street, Suite 210
> Las Vegas, NV  89119
> (725) 777-3000 Telephone
> Email:  tgray@gtg.legal

TO BE COUNTED, YOUR BALLOT MUST BE **_RECEIVED_** AT THE ADDRESS LISTED ABOVE BY **_____ __, 2024, at 5:00 p.m. prevailing PACIFIC TIME**.

**b.**    **Incomplete ballots.**

Unless otherwise ordered by the Bankruptcy Court, Ballots which are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will be counted as a vote to accept the Plan.

**c.**    **Withdrawal of ballots.**

A Ballot may not be withdrawn or changed after it is cast unless authorized in writing by Debtor or the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change.

**d.**    **Questions and lost or damaged ballots.**

If you have any questions concerning these voting procedures, if your Ballot is damaged or lost, or if you believe you should have received a Ballot but did not receive one, you may contact Trustee's counsel as listed above regarding the submission of Ballots.

. . .

. . .

# XI.
# ALTERNATIVES TO THE PLAN

The Trustee believes that the Plan provides Creditors with the best and most complete form of recovery available.  As a result, the Trustee believes that the Plan serves the best interests of all Creditors and parties-in-interest in the Chapter 11 Case.  The Trustee believes not only that the Plan, as described herein, fairly adjusts the rights of various Classes of Claims and Equity Securities and enables them to realize the greatest sum possible under the circumstances, but also that rejection of the Plan in favor of some theoretical alternative method of reconciling the Claims and Equity Securities of the various Classes will not result in a better recovery for any Class.  It is not atypical for bankruptcy proceedings involving substantial entities to continue for months or years before a plan of reorganization is consummated and payments are made.

## A.    Alternative Plans of Reorganization.

The exclusivity period for Debtor to file its plan or reorganization expired upon the appointment of the Chapter 11 Trustee.  Since the expiration of the exclusivity period, no other person has filed a plan of reorganization.  As such, the only alternative to the Chapter 11 Trustee's Plan is liquidation under Chapter 7 of the Bankruptcy Code.

## B.    Liquidation Under Chapter 7.

If a plan cannot be confirmed, the Chapter 11 Case may be converted to a case under Chapter 7, in which a Chapter 7 trustee would be elected or appointed to liquidate the assets of debtor for distribution to and Holders of Allowed Claims and Equity Securities in accordance with the priorities established by the Bankruptcy Code.

As previously stated, the Trustee believes that a liquidation under Chapter 7 would result in a substantially reduced recovery of funds because of:  (i) additional Administrative Expenses involved in the appointment of a Chapter 7 trustee for Debtor and attorneys and other professionals to assist such Chapter 7 trustee; (ii) additional expenses and Claims, some of which may be entitled to priority, which would be generated during the Chapter 7 liquidation; and (iii) the additional delay associated with the appointment of the new Chapter 7 trustee and the trustee's retention of new legal and potentially accounting professionals, who would need time to

"get up to speed" and familiarize themselves with the facts and circumstances of this case, and the expenses associated therewith. Accordingly, Debtor believes that all Holders of Claims will receive a smaller, if any, distribution under a Chapter 7 liquidation.

## XII.
## RECOMMENDATION AND CONCLUSION

The Plan provides the best possible recovery for all Creditors and Equity Securities Holders as a whole, and therefore the Trustee recommends that all Creditors and Equity Securities Holders who are entitled to vote on the Plan vote to accept the Plan.

DATED this 7th day of February, 2024.

GOLDEN STATE BROADCASTING, LLC

*/s/ Michael Carmel*
By:  Michael W. Carmel
Its:  Chapter 11 Trustee

**Prepared and Submitted:**

GARMAN TURNER GORDON LP

By: */s/ Mary Langsner*
     GREOGRY E. GARMAN, ESQ.
     TALITHA GRAY KOZLOWSKI, ESQ.
     MARY LANGSNER, PH.D.
     2751 Amigo Street, Suite 210
     Las Vegas, Nevada 89119
     *Attorneys for Michael Carmel, Chapter 11 Trustee*

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

**APPENDIX**

EXHIBIT "1"          GOLDEN STATE BROADCASTING, LLC'S PLAN OF REORGANIZATION

EXHIBIT "2"          LIQUIDATION ANALYSIS

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000